Case No. C07-02851-JF

# United States District Court
# Northern District of California
# San Jose Division

---

## WELLS FARGO FINANCIAL CALIFORNIA, INC., SUCCESSOR BY MERGER TO WELLS FARGO FINANCIAL ACCEPTANCE CALIFORNIA, INC.,

*Appellant,*

**vs.**

## LETICIA I. ACAYA,

*Appellee.*

---

# Appellant's Brief

---

Appeal from an Order of the United States Bankruptcy Court for the Northern District of California, San Jose Division (No. 06-51741 MM), on Objection to Confirmation of Chapter 13 Plan

The Honorable Marilyn Morgan, United States Bankruptcy Judge

---

DAVID G. EPSTEIN (PRO HAC VICE)
**HAYNES AND BOONE, LLP**
901 Main Street, Suite 3100
Dallas, TX 75202-3789
Telephone: (214) 651-5000

DONALD H. CRAM, III (SBN 160004)
**SEVERSON & WERSON**
A Professional Corporation
One Embarcadero Center, 26th Floor
San Francisco, CA 94111-3600
Telephone: (415) 398-3344

Attorneys for Appellant
**Wells Fargo Financial California, Inc.**

# REQUEST FOR ORAL ARGUMENT

Wells Fargo respectfully requests the opportunity to present oral argument. The issues presented in this appeal arise as a result of 2005 amendments to the Bankruptcy Code. While there are bankruptcy court cases around the country that have considered the same issues, no circuit court of appeals has yet ruled on these issues. Wells Fargo believes that oral argument will assist the Court in resolving the issues presented in this bankruptcy-related appeal.

Dated: March 19, 2008

HAYNES AND BOONE, LLP

By /s/David G. Epstein
   David G. Epstein

SEVERSON & WERSON
A Professional Corporation

By /s/Donald H. Cram, III
   Donald H. Cram, III

Attorneys for Appellant Wells Fargo Financial California, Inc.

# CERTIFICATION REQUIRED BY BAP RULE 8010(a)-1(b)

The undersigned certifies that the following parties have an interest in the outcome of this appeal. These representations are made to enable Judges of the Panel to evaluate possible disqualification or recusal:

Wells Fargo Financial California, Inc.
Appellant

Leticia I. Acaya
Appellee

Dated: March 19, 2008

HAYNES AND BOONE, LLP

By /s/David G. Epstein
   David G. Epstein

SEVERSON & WERSON
A Professional Corporation

By /s/Donald H. Cram, III
   Donald H. Cram, III

Attorneys for Appellant Wells Fargo
Financial California, Inc.

# CERTIFICATION REQUIRED BY BAP RULE 8010(a)-1(c)

The undersigned certifies that the following are known related cases and appeals:

None.

Dated: March 19, 2008

HAYNES AND BOONE, LLP


By /s/David G. Epstein
    David G. Epstein

SEVERSON & WERSON
A Professional Corporation


By /s/Donald H. Cram, III
    Donald H. Cram, III

Attorneys for Appellant Wells Fargo
Financial California, Inc.

# CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

Certificate of Compliance With Type-Volume Limitations, Typeface Requirements, and Type Style Requirements

1.    This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,906 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word XP in 14 point font size and New Times Roman type style.

Dated:  March 19, 2008

HAYNES AND BOONE, LLP

By /s/David G. Epstein
   David G. Epstein

SEVERSON & WERSON
A Professional Corporation

By /s/Donald H. Cram, III
   Donald H. Cram, III

Attorneys for Appellant Wells Fargo Financial California, Inc.

# TABLE OF CONTENTS

*Page*

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................................... 1

STATEMENT OF THE CASE.................................................................. 2

STATEMENT OF THE FACTS................................................................ 2

    1.    Background ................................................................ 2

    2.    The Debtor's Proposed Chapter 13 Plan ............................... 3

    3.    Wells Fargo's Objection to Confirmation ........................... 3

    4.    The Bankruptcy Court Order ............................................ 3

SUMMARY OF ARGUMENT ................................................................ 4

ARGUMENT ..................................................................................... 4

    I.    THE BANKRUPTCY COURT ERRED IN HOLDING THAT THE CHARGE FOR NEGATIVE EQUITY IS NOT PART OF WELLS FARGO'S "PURCHASE MONEY SECURITY INTEREST" AS THE PHRASE IS USED IN §1325(a)(*) .................................................. 5

        A.    Introduction................................................................. 5

            1.    What Congress Did In Enacting the BACPA................. 5

            2.    Why Congress Made Protection Of Car Financings From "Strip-Down" A Part of BAPCPA.................................... 7

            3.    How People Buy Cars...................................................... 8

         B.    The Plain Language Of §1325(a)(*) As Well As Its Purpose And Legislative History, Support The Conclusion That §1325(a)(*) Protects Wells Fargo From Any "Stip-Down" By The Debtor ................................................................ 11

TABLE OF CONTENTS

*Page*

1.   The Plain Language ........................................................ 11

2.   The Purpose For Adding New §1325(a)(*) To The Code ................................................................................ 11

3.   The Legislative History To New §1325(a)(*) .............. 13

C.   The Treatment Of Negative Equity In Federal Truth In Lending Law Is Indicative Of How Congress Intended To Treat Negative Equity In BAPCPA ..................................................... 15

D.   Similarly, The Treatment Of Negative Equity In State Laws Affecting Motor Vehicle Financing Is Indicative Of How Congress Intended To Treat Negative Equity In BAPCPA .... 17

E.   The Uniform Commerical Code ["UCC"] Definition Of "Purchase Money Security Interest" Supports Including Negative Equity As Part Of The "Purchase Money Security Interest" Protected By §1325(a)(*) Of BAPCPA .................. 18

1.   Negative Equity Is "Part Of The Price Of The Collateral" .................................................................... 19

2.   Negative Equity Also Enabled The Debtor To Acquire The Collateral .............................................................. 23

3.   Including Car Finance Contracts With Negative Equity Is Consistent With Commercial Practices ..................... 24

F.   Interpreting The Term "Purchase Money Security Interest" In BAPCPA To Include Negative Equity Is The Only Interpretation That Makes Sense ............................................. 25

II.   ASSUMING THAT THE NEGATIVE EQUITY CHARGE IS NOT PART OF WELLS FARGO'S PURCHASE MONEY SECURITY INTEREST, THE BANKRUPTCY COURT ERRED IN APPLYING THE DUAL STATUS RULE ......................................................... 27

CONCLUSION ..................................................................................... 30

## TABLE OF AUTHORITIES

*Page(s)*

*Cases*

*Abrego Abrego v. The Dow Chem. Co.,*
   443 F.3d 676 (9th Cir. 2006) ...................................................................... 15

*Americredit Financial Services, Inc. v. Long (In re Long),*
   2008 WL 564798 (6th Cir. 2008) .............................................. 7, 12, 13, 25

*In re Burt,*
   378 B.R. 352 (Bankr. Utah 2007) .............................................................. 22

*Capital One Auto Finance v. Osborn,*
   515 F.3d 817 (8th Cir. 2008) ................................................................ 12, 30

*In re Cohrs,*
   373 B.R. 107 (Bankr. E.D. Cal. 2007) ...................................................... 22

*In re Duke,*
   345 B.R. 806 (Bankr. W.D. Ky. 2006) ...................................................... 12

*John v. United States,*
   247 F.3d 1032 (9th Cir. 2001) ................................................................... 26

*In re Matthews,*
   724 F.2d 798 (9th Cir. 1984) ..................................................................... 28

*In re Peaslee,*
   373 B.R. 252 (W.D. N.Y. 2007) .......................................................... 13, 22

*In re Pajot,*
   371 B.R. 139 (Bankr. E.D. Va. 2007) ..................................................... 9, 10

*In re Petrocci,*
   378 B.R. 489 (Bankr. N.D. N.Y. 2007) ................................................ 22, 24

*In re Schwalm,*
   380 B.R. 630 (Bankr. M.D. Fla. 2008) ................................ 15, 22, 25, 26, 27

*State of California v. Federal Regulatory Commission,*
   383 F.3d 1006 (9th Cir. 2003) ..................................................................... 5

# TABLE OF AUTHORITIES

*Page(s)*

*United States v. Hanousek,*
    176 F.3d 116 (9th Cir. 1999) ............................................................ 5

*In re Weiser,*
    381 B.R. 263 (Bankr. W.D. Mo. 2007) ........................................ 23, 24, 29

*In re Wright,*
    492 F.3d 829 (7th Cir. 1999) ......................................................... 12

*Statutes*

United States Code
    Title 11
        Section 506 ...................................................... 6, 12, 13, 14

        Section 522 ............................................................. 28, 29

        Section 707 ................................................................... 7

        Section 1325 ........................................................... *passim*

    Title 15
        Section 1600 ................................................................... 1

    Title 28
        Section 158 .................................................................... 1

Uniform Commercial Code

        Section 1-102 ................................................................ 24
        Section 9-103 ................................. 18, 19, 20, 21, 22, 23, 24

California Civil Code

        Section 2981 ................................................................ 21

*Regulations*

    12 C.F.R. 226 ................................................................... 16

TABLE OF AUTHORITIES

*Page(s)*

64 F.R. 16614-01 ........................................................................ 16

*Other Authorities*

David Gray Carlson, *Cars and Homes in Chapter 13 After the 2005 Amendments*,
    14 Am. Bankr. Inst. L. Rev. 301 (2006) ........................................ 9

FDIC Supervisory Insights, *The Changing Landscape of Indirect Automobile
    Lending*, June 23, 2005 ............................................................ 10

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. at 127, 128 (1977) ............................ 28

H.R. 2500, 105th Cong. §110 (1997) ........................................ 13, 14, 15

H.R. 3150, 105th Cong. § 128 (1998) .................................................. 14

David Kiley, *Car Buyers Burned By Negative Equity*,
    USA Today, July 6, 2003 ............................................................ 9

Keith M. Lundin, *Chapter 13 Bankruptcy*,
    3d ed 451.5-1 (200 + Supp. 2007-1) ............................................ 13

Elizabeth Warren, *Bankruptcy Reform Then and Now*,
    12 Am. Bankr. Inst. L. Rev. 299 (2004) ........................................ 7

Jonathan Welsh, *When A $38,000 Car Costs $44,000*,
    Wall St. J., May 22, 2007 ............................................................ 8

William Whitford, *A History of the Automobile Lender Provisions of BAPCPA*,
    2007 U.Ill. L. Rev. 143 .................................................................. 6

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This case arises from a Chapter 13 bankruptcy case pending in the United States Bankruptcy Court for the Northern District of California, *In re Leticia I. Acaya, Debtor*, Case No. 06-51741-MM.  On May 18, 2007, the Bankruptcy Court entered a final order (the "Bankruptcy Court Order") denying an objection to confirmation of the Debtor's Chapter 13 Plan filed on behalf of Wells Fargo Financial California, Inc., a successor by merger to Wells Fargo Financial Acceptance California, Inc. ("Wells Fargo").  On May 25, 2007, a timely notice of appeal of the Bankruptcy Court Order was filed on behalf of Wells Fargo.

The sole issue addressed by the Bankruptcy Court in this case was the proper statutory interpretation and application of a 2005 addition to Chapter 13 of the Bankruptcy Code, specifically 11 U.S.C. §1325(a).  United States District Courts have appellate jurisdiction over final judgments, orders and decrees entered by the bankruptcy courts pursuant to 28 U.S.C. §158(a)(1).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Did the Bankruptcy Court err in determining that Wells Fargo did not hold a "purchase money security interest" as that phrase is used in §1325 of the Bankruptcy Code?

- 1 -

2.      Did the Bankruptcy Court err in determining that the debt underlying Wells Fargo's claim was not protected from strip-down by the Bankruptcy Abuse Prevention Consumer Protection Act ["BAPCPA"] amendment to §1325(a)?

3.      Did the Bankruptcy Court err in adopting the "dual status rule" as a part of BAPCPA §1325?

STATEMENT OF THE CASE

This case presents a question of the effect of Chapter 13 on car financing transactions.    The answer to this question turns on the interpretation and application of the term "purchase money security interest" as used in BAPCPA and will affect many, if not most, car financing transactions in Chapter 13 cases.

STATEMENT OF THE FACTS

1.      <u>Background</u>.    On June 15, 2005, the Debtor purchased a 2005 Chevrolet (Vehicle") for her personal use from Cardinale Mazda ("Seller") in Salinas, California on secured credit, under a motor vehicle retail installment contract (the "Contract).  The Contract was subsequently assigned to Wells Fargo. (ER 2 pp. 8-9, Exhibit A; ER 4 pp. 18-19, Exhibit 2; ER 7 pp. 59-60, Exhibit A; ER 9 pp. 76-77).

The amount financed by the Contract was $19,939.39. This amount included (i) a $135 license fee, (ii) $8.75 for a certificate of title, (iii) document fees of $4, (iv) $600 for "gap insurance," (v) $2,495 for an optional service contract, and (vi)

- 2 -

$6,683 for the "negative equity" on the Debtor's trade-in (The basis for this "negative equity" number is the difference between the amount that the Debtor owed on the Ford and the trade-in allowance given by the Seller). (ER 9 p. 77).

2.     The Debtor's Proposed Chapter 13 Plan.  On September 7, 2006, less than a year after signing the Contract, the Debtor filed a Chapter 13 bankruptcy petition.  The Debtor filed a Chapter 13 Plan which acknowledged that the amount owing to Wells Fargo under the Contract was $17,099.89 but proposed to "strip-down" Wells Fargo's secured claim for the Vehicle to $9,757.00. (ER 1 p. 1).

3.     Wells Fargo's Objection To Confirmation.  Wells Fargo objected to confirmation of the Debtor's proposed Chapter 13 Plan on the ground that its purchase money secured claim was protected from such a "strip-down."  The Debtor contended that Wells Fargo's security interest was not a "purchase money security interest" because the amount financed included a negative equity component.  (ER 2 p. 9; ER 4, pp.19-30).

4.     The Bankruptcy Court Order.  After a hearing, the Bankruptcy Court sustained Wells Fargo's objection to confirmation. (ER 9 pp. 82-84) and held that Wells Fargo's secured claim was not protected from "strip-down," agreeing with the Debtor that Wells Fargo's security interest was not a "purchase money security interest" under §1325(a) of the Bankruptcy Code because the amount financed included a negative equity component.

## SUMMARY OF ARGUMENT

This is a case about the meaning of an unnumbered paragraph ["§1325(a))(*)"][1] added to the end of §1325(a) by BAPCPA) and how that new language affects the use of §1325 by Chapter 13 debtors to reduce the amount that he or she pays to keep a recently financed car. Wells Fargo asserts that both the text and the context of §1325(a)(*) support treating a car financing with a negative equity component as a "purchase money security interest", thereby protecting such a car financing from being "stripped down"

The Bankruptcy Court Order disregards the following critical points: (1) What Congress did in enacting BAPCPA; (2) Why Congress made protection of car financing transactions a part of that legislation; (3) How people buy cars; (4) The plain meaning of "purchase money security interest;" (5) Commercial practice; (6) What Congress and states had previously legislated; and (7) A statutory interpretation that makes sense.

## ARGUMENT

### Standard Of Review.

The Bankruptcy Court Order should be reviewed *de novo*. A bankruptcy court's findings of fact are reviewed under the "clearly erroneous" standard and its

conclusions of law are reviewed *de novo*. The facts in this case are not in dispute.
Each of the issues on appeal as set forth above are questions of law and therefore
subject to *de novo* review by this Court.

### Discussion Of Issues.

I.    THE BANKRUPTCY COURT ERRED IN HOLDING THAT THE
      CHARGE FOR NEGATIVE EQUITY IS NOT PART OF WELLS
      FARGO'S "PURCHASE MONEY SECURITY INTEREST" AS THE
      PHRASE IS USED IN §1325(a)(*)

A.    Introduction.

      1.    What Congress Did In Enacting BAPCPA[2]

What Congress did when it enacted BAPCPA was eliminate the choice of
Chapter 7 by individual debtors with the financial means to make meaningful
payments to creditors. Until BAPCPA, most debtors had the choice of chapters.

Because unsecured creditors such as credit card companies receive nothing
from most Chapter 7 distribution,[3] the pre-BAPCPA Bankruptcy Code contained a

---

(Fn. cont'd)

[1]    The Bankruptcy Court Order uses the phrase "hanging paragraph." The full text of 11 U.S.C.
§1325(a) can be found in the Addendum.

[2]    "As we have often stated, '[w]hen we look to the plain meaning of a statute to interpret its
meaning, we do more than view words or sections in isolation. We derive meaning from context
and this requires reading the relevant statutory provision as a whole." *State of California v.
Federal Regulatory Commission*, 383 F.3d 1006, 1016 (9th Cir, 2003), quoting *United States v.
Hanousek*, 176 F.3d 116, 120 (9th Cir. 1999).

[3]    In Chapter 7, an individual gives up only the interests in the non-exempt property he or she has
at the time of the bankruptcy filing. Since most individuals filing for bankruptcy have no
(Fn. cont'd)

number of statutory incentives to encourage individual debtors to choose Chapter 13. The most significant such Chapter 13 "carrot" was car financing strip down.

Prior to BAPCPA, a Chapter 13 debtor, but not a Chapter 7 debtor, could use §1325[4] to "strip-down" his or her car financing, i.e., reduce the debt secured by his car financing from the amount actually owed to the amount that the bankruptcy court decided that the car was worth and pay that reduced amount over the term of the Chapter 13 plan and then own his car free and clear of all liens.[5]

Notwithstanding these pre-BAPCPA Chapter 13 incentives, most individual debtors still chose Chapter 7. Accordingly, Congress, at the urging of credit card companies and other unsecured creditors enacted BAPCPA. In essence, BAPCPA

---

(Fn. cont'd)

valuable, unencumbered, non-exempt property interests, creditors with unsecured claims receive little if anything from Chapter 7 distributions.

[4] Read together, §1325(a)(5) and §506 gave a Chapter 13 debtor the power to "strip-down" certain secured claims. While §1325(a)(5) requires that a Chapter 13 plan pay secured claims in full, §506 limits the amount of such secured claims to the value of the underlying collateral, as determined by the Bankruptcy Court.

[5] See generally William Whitford, *A History of the Automobile Lender Provisions of BAPCPA*, 2007 U.Ill. L. Rev. 143, 143-146, several pages explaining why "Under the old law, the auto lender invariably preferred a Chapter 7 proceeding to a Chapter 13 proceeding."

replaces the pre-BAPCPA Chapter 13 carrots such as car financing strip-down with the new "stick" of the §707(b) "means" test.[6]

2. <u>Why Congress Made Protection Of Car Financings From "Strip-Down" A Part Of BAPCPA</u>

"Understanding how debtors 'crammed down' [stripped-down] their debt prior to the 2005 amendments is critical because the hanging paragraph was intended to address that simple issue – the issue of how to treat claims when the debtor retains the collateral." *AmeriCredit Financial Services, Inc. v. Long (In re Long)*, 2008 WL 564798 (6th Cir. 2008). Congress's issue was how to re-balance the rights of unsecured creditors who fare better in Chapter 13 cases and automobile financers who fare far better in Chapter 7 cases, i.e., to give "secured creditors fair treatment in Chapter 13."[7] Congress used that phrase in the Public Law caption: Section 1325(a)(*) is a part of Public Law 109-8, Section 306, 119 Stat 80, entitled "Giving Secured Creditors Fair Treatment in Chapter 13."

---

[6] While the term "means test" does not appear in §707(b), it is generally used to describe §707(b) which can be described as compelling individual debtors with the means to make meaningful payments to creditors to use Chapter 13, not Chapter 7, if they filed for bankruptcy.

[7] Chapter 13 debtors are required by §1325(b) to pay all of their disposable income to their creditors. Section 1325(a)(*) simply determines how much of that committed disposable income goes to the secured creditor that enabled the debtor to buy her car and how much goes to credit card issuers and other unsecured creditors., *See* Elizabeth Warren, *Bankruptcy Reform Then and Now*, 12 Am. Bankr. Inst. L. Rev. 299, 318-19 (2004) ("$1.00 that goes to the car industry in a Chapter 13 because the bill would prevent a strip-down on car loans is $1.00 that does not go the

(Fn. cont'd)

BAPCPA's "fair treatment" for automobile financers is protection from Chapter 13 "strip-down." What Congress did in enacting §1325(a)(*) was protect lenders that provide automobile financing from "strip-down" by these post-BAPCPA individual debtors with financial means now in Chapter 13.[8]

3.      How People Buy Cars

The car financing transaction in this case is a typical car financing transaction. Like the Debtor, most people buy a car to replace a car that they already have and use the car they already have as a trade-in. The Debtor's Ford was subject to an existing lien, going back to when the Debtor bought the Ford on credit. The amount that the Debtor owed on the Ford was greater than its value as a trade-in.

Such negative equity car financing is common today and was common at the time that Congress enacted BAPCPA. While people still regularly buy new cars every three years, they increasingly finance these cars over five or even seven years. *See* Jonathan Welsh, *When A $38,000 Car Costs $44,000*, Wall St. J., May 22, 2007, at D1 ("[The] average maturity of a car loan today is about 70

---

(Fn. cont'd)
credit card companies. . . But you are just moving it around . . . out of one [creditor's] pocket into another").

months."). Often these cars depreciate more quickly than the principal balance of the debt is paid down. *Id.* When that happens, the debtor is said to have a "negative equity" in his car or to be "upside down," meaning the debtor owes more on the debt than the car is worth.

In 2003, two years before Congress enacted BAPCPA, a lead article in USA Today reported:

> Edmonds.com, an auto shopping service, reports that 40% of new car buyers are "upside down" with an average negative equity of $2,200. . . .
> It's a growing phenomenon because big discounts on new cars have the effect of depressing the value of used cars and the five and six year loans means that it takes longer for car owners to achieve positive equity in a new vehicle.
> Every extra dollar (of discounts) we put in a Dodge Durango comes off the trade-in value of a used Durango," says Chrysler Financial spokesman James Ryan.
> Mark Eddins of Friendly Chevrolet in Dallas estimates that 90% of his customers are upside-down, often owing $10,000 to $15,000 more than the trade-in is worth. "It's an awful thing for our business," says Eddins. It's a bigger problem for customers of automakers who do the most discounting and attract the longest term loans.

David Kiley, *Car Buyers Burned By Negative Equity*, USA Today, July 6, 2003, available at *http://www.usatoday.com/money/autos/2003-07-06-car-loan_x.htm.*[9]

---

(Fn. cont'd)

[8]
See David Gray Carlson, *Cars and Homes in Chapter 13 After the 2005 Amendments*, 14 Am. Bankr. Inst. L. Rev. 301, 302 (2006) (explaining that part of Congress's intent in enacting BAPCPA was "rescuing car lenders from certain effects of cram down").

[9]
A recent bankruptcy court decision estimates that almost half of the vehicle financing transactions in Chapter 13 cases involve negative equity, *In re Pajot*, 371 B.R. 139, 153 (Bankr.
(Fn. cont'd)

- 9 -

And, virtually all people who want to buy a new car, using their old car with negative equity as a trade-in, do exactly what the Debtor did.  They enter into a single purchase transaction, evidenced by a single retail installment sales contract, secured only by the new vehicle.  The amount financed includes the price of the new car, less the amount of the trade-in, plus the amount needed to pay off the lien on the trade-in.

Car financings with a negative equity component are what happen in the "real world."  And, there are no real, "real world" alternatives available.

There are both business and legal reasons that car dealers will not take a trade-in that is subject to an outstanding lien.  A dealer would not be able to resell the trade-in vehicle because the lien of the existing creditor would appear on the vehicle's certificate of title.  Obtaining the consent of the lienholder is not a practical option: a car dealer will not be willing to assume payment obligations, and no lienholder will consent to its collateral being transferred to a dealership where it will be auctioned off or offered for resale to an unknown purchaser.

In theory, a consumer who is "upside down" with respect to a trade-in vehicle could borrow money from some other source to eliminate the negative

---

(Fn. cont'd)
E.D. Va. 2007).   *See also*, FDIC Supervisory Insights, *The Changing Landscape of Indirect Automobile Lending*, June 23, 2005 ("J.D. Power and Associates estimates that approximately 38% of new car buyers have negative equity at trade-in")

equity.  If that loan from "Friendly Finance" is unsecured, it will be a lot more

expensive for the consumer.  And, Friendly Finance will make a secured loan to

eliminate the negative equity on the trade-in vehicle only if that "Friendly Finance

loan" is secured by the new car and, the resulting security interest is protected

from "strip-down" in a later Chapter 13 case.

B.     The Plain Language Of §1325(a)(*) As Well As Its Purpose And
       Legislative History, Support The Conclusion That §1325(a)(*)
       Protects Wells Fargo From Any "Strip-Down" By The Debtor

       1.      The Plain Language

The meaning of §1325(a)(*) is plain.  It prohibits "strip-down" of any

"purchase money security interest" coming within its parameters.  Wells Fargo's

security interest clearly comes within those parameters.  Wells Fargo's security

interest is clearly a "purchase money security interest."   It secures only

indebtedness incurred by the Debtor in order to purchase the Vehicle.

All of the indebtedness was incurred by the Debtor to purchase the Vehicle.

The $135 license fee, the document fees of $45, $600 for gap insurance, $2,495

for optional service contract and $6,683 for negative equity were all debts that the

Debtor would not have incurred if she had not bought the Vehicle on credit.

       2.      The Purpose For Adding New §1325(a)(*) To The Code

"Secured creditors fair treatment in Chapter 13" -- Congress used that

phrase in the Public Law caption.  The hanging paragraph is a part of Public Law

109-8, section 306, 119 Stat. 80, entitled *"Giving Secured Creditors Fair Treatment in Chapter 13."* The Public Law caption for the hanging paragraph is "Restoring the Foundation for Secured Credit." In applying §1325(a)(*), the United States Court of Appeals for the Seventh Circuit in *In re Wright*, 492 F.3d 829, 832 (7th Cir. 2007) and the United States Court of Appeals for the Sixth Circuit in *Americredit Financial Services, Inc. v. Long (In re Long)*, 2008 WL 564798 (6th Cir. 2008), looked to this Public Law caption.[10]

   *Wright* and *Long* are two of the three Circuit Court decisions that deal with a §1325(a)(*) issue; the issue in these cases was different from the issue in this case.[11] Nonetheless, a federal district court recently looked to the *Wright* case and legislative captions to resolve the very issue in this case:

> Although *Wright* was concerned with whether debtors could surrender their car (which was worth less than the outstanding balance on the car loan) to the creditor and pay nothing on account of the difference between the loan balance and the car's market value, and did not address the precise issue in the cases at bar, the decision

---

[10]    As Judge Easterbrook observed in Wright, "It is interesting to note that the section of BAPCPA that added the hanging paragraph was entitled 'Section 306 – Giving Secured Creditors Fair Treatment in Chapter 13...Restoring the Foundation for Secured Credit," (quoting from *In re Duke*, 345 B.R. 806, 809 (Bankr. W.D. Ky. 2006)), and looked to this Public Law caption to reach the logical conclusion, "This implies replacing a contract-defeating provision such as § 506 . . . with the agreement freely negotiated." *In re Wright*, 492 F.3d at 832.

[11]    The issue in *Wright, Long* and *Capital One Auto Finance v. Osborn*, 515 F.3d 817 (8th Cir. 2008) was whether §1325(a)(*) eliminated a secured creditor's right to a deficiency claim when the Chapter 13 debtor surrendered the automobile. These cases held it did not – that §1325(a)(*) simply removes the Chapter 13 debtor's "strip-down" power.

in *Wright* is still noteworthy for its emphasis on the terms of the parties' contract. *See id.* (stating that "Section 306(b) of the 2005 Act, Pub.L. 109-8, 119 Stat. 23, 80 (Apr. 20, 2005), which enacted the hanging paragraph, is captioned 'Restoring the Foundation for Secured Credit,'" which "implies replacing a contract-defeating provision such as §506 ... with the agreement freely negotiated between debtor and creditor"). I conclude, therefore, that appellants' entire claims, including that portion of the claims attributable to the payoff of negative equity on the debtors' trade-in vehicles, should be treated as secured claims.

*In re Peaslee*, 373 B.R 252, 262 (W.D.N.Y. 2007).[12]

> 3.     The Legislative History To New §1325(a)(*)

The United States Court of Appeals for the Sixth Circuit recently stated in

*AmeriCredit v. Long*, 2008 WL 564798 (6th Cir. 2008),

> Based upon the legislative history, there is little doubt that the "hanging – sentence architects intended only good things for car lenders and other lienholders" Keith M. Lundin, *Chapter 13 Bankruptcy*, 3d ed 451.5-1 (200 + Supp. 2007-1).

The first, preliminary version of what became §1325(a)(*) was not limited

to lenders that provide automobile financing.  Section 110 of a 1998 House Bill

provided:

> (1) [Section 506] subsection (a) shall not apply to an allowed claim to the extent attributable in whole or in part to the purchase price of personal property acquired by the debtor within 180 days of the filing of the petition…;

---

[12] This District Court decision in *Peaslee* reverses a Bankruptcy Court decision cited and relied on by the Bankruptcy Court Order in this case.

(2) if such allowed claim attributable to the purchase price is secured only by the personal property so acquired, the value of the personal property and the amount of the allowed secured claim shall be the sum of the unpaid principal balance of the purchase price and accrued and unpaid interest and charges at the contract rate;…

H.R. 2500, 105th Cong. §110 (1997); H.R. 3150, 105th Cong. § 128 (1998).

Note three important differences between Section 110 of the 1998 House Bill and the language of §1325(a)(*).  First, Section 110 amended §506 of the Bankruptcy Code, not §1325.  Second, Section 110 was not limited to automobile financing.  Third, Section 110 did not use the term "purchase money security interest" and would not have protected much of the indebtedness that is covered by a purchase-money security interest in an automobile.  For example, it would not have protected amounts attributable to taxes, title and registration fees and negative equity.

Comparing Section 110 of the 1998 House Bill with §1325(a)(*) of 2005 BAPCPA shows that Congress expanded the nature of the obligation protected while limiting the protection to motor vehicle transactions.  Unlike Section 110 of the House Bill, §1325(a)(*) of BAPCPA: (i) extended its reach beyond principal and interest to cover all charges encompassed within a purchase-money security interest, (ii) extended the reach-back period to a 910-day period, rather than the 180-day period,  and (iii) removed all limitations inherent in the "to the extent" and "in whole or in part" language.

Moreover, the legislative history demonstrates that, in the final version of §1325(a)(*), Congress abandoned any attempt to limit the protection afforded to a secured creditor by reference to the components of the indebtedness that make up its secured claim.   Instead, Congress limits the protection by the type of transaction.   While Section 110 of the House Bill focused on the nature of the indebtedness that makes up the claim, *i.e.,* it must be principal and interest, §1325(a)(*) as enacted in BAPCPA refers instead to the nature of the transaction that gave rise to the claim, *i.e.*, motor vehicle financing.[13]

C.    The Treatment Of Negative Equity In Federal Truth In Lending Law
       Is Indicative Of How Congress Intended To Treat Negative Equity In
       BAPCPA

When Congress enacted BAPCPA in 2005, it is presumed to have known about other pertinent federal law governing purchase money financing of motor vehicles. *See Abrego Abrego v. The Dow Chem. Co.*, 443 F.3d 676, 684 (9th Cir. 2006) ("[W]e presume that Congress is aware of the legal context in which it is

---

[13]   "It is apparent from the plain language of BAPCPA, and the caption to its House Report discussion, that the 'hanging paragraph' was adopted to give favored treatment to a limited class of potentially under-secured creditors – those holding a purchase money security interest in a motor vehicle acquired for personal use within the 910 days preceding the bankruptcy petition date.   The debtors' argument carries with it the implicit conclusion that Congress intended the 'hanging paragraph' to be inoperative as to a substantial number of lawful auto finance transactions that were industry practice when BAPCPA was enacted." *In re Schwalm*, 380 B.R. 630, 634 (Bankr. M.D. Fla. 2008).

legislating."). And other federal law prior to BAPCPA recognized negative equity as an integral and important part of car financing.

At the time of BAPCPA, the most important federal law governing purchase money financing of cars was the Truth in Lending Act ("TILA") (15 U.S.C. §1600 *et seq*.). TILA and its accompanying federal regulation, Regulation Z (12 C.F.R. 226), deal, *inter alia*, with the disclosures that are required in purchase money debt for items of personal property such as cars (closed end credit).

In 1999, negative equity car financing was so common that the Federal Reserve Board amended Regulation Z to show how purchase money car financers should disclose negative equity. Those amendments direct creditors to incorporate negative equity as a part of the "total sale price" of a new car in a single financing transaction. 64 F.R. 16614-01, 16617. If, for example, the car "used as a trade-in has a value of $8,000 but has an existing lien of $10,000, leaving a $2,000 deficit that the consumer must finance . . . the total sale price would include the $2,000 lien payoff amount." 12 C.F.R. § Part 226, Supp. I, ¶18(j)-3 at 464. Thus, at the time of BAPCPA, the federal law was that negative equity charges should be linked with the cash price in "total sale price" and treated as a part of single credit transaction to purchase a motor vehicle.

Again, TILA is a disclosure statute. It does not deal with the question of when a Chapter 13 debtor can "strip-down" a car loan. TILA is relevant in

interpreting a provision of BAPCPA only to the extent that it is indirectly indicative of what Congress intended when it enacted BAPCPA. TILA's treatment of negative equity as a part of the "total sales price" of a motor vehicle supports the conclusion that Congress similarly intended that negative equity and gap insurance are part of a protected "purchase money security interest."

> D. Similarly, The Treatment Of Negative Equity In State Laws Affecting Motor Vehicle Financings Is Indicative Of How Congress Intended To Treat Negative Equity In BAPCPA

State laws such as Motor Vehicle Dealers and Manufacturers' Licensing Laws and Retail Installment Sales Acts are relevant for the same reason. Like TILA, these state statutes do not directly or indirectly deal with the question of when a Chapter 13 debtor can "strip-down" a car loan. However, like TILA, these state statutes apply to purchase money security car financings and so provide some inferential insight into whether Congress intended for car financing with a negative equity component to be a protected "purchase money security interests." And, like TILA, these state statutes support treating automobile financing with a negative equity component as a "purchase money security interest."

Unlike TILA, these statutes do more than require disclosure. These statutes heavily regulate automobile financing, controlling the charges that can be included in automobile financing. The language of these statutes varies significantly from state to state. What is relevant to an interpretation of the phrase "purchase money

- 17 -

security interest" in §1325(a)(*) of the Bankruptcy Code is that in 36 states, these

statutes expressly authorize dealers to engage in negative equity transactions and

treat transactions with a negative equity component the same as other dealer car

financing transactions. A list of these state statutes is in Addendum.

E.   The Uniform Commercial Code ["UCC"] Definition Of "Purchase Money Security Interest" Supports Including Negative Equity As Part Of The "Purchase Money Security Interest" Protected By §1325(a)(*) Of BAPCPA

States enacted the UCC long before Congress enacted the BAPCPA

protection of purchase money car financings from Chapter 13 "strip-downs."

Congress is thus presumed to have known about the UCC, just as Congress is

presumed to have known about TILA and retail installment sales acts. And, thus

the UCC, just as the other legislation, provides some indirect insight into what

Congress intended by the words "purchase money security interest" in

§1325(a)(*).

Section 9-103(b)(1) of the UCC provides that "a security interest in goods is

a purchase-money security interest . . . to the extent that the goods are purchase-

money collateral with respect to that security interest." Section 9-103(a)(1) then

defines "purchase-money collateral" as "goods . . . that secur[e] a purchase-money

obligation incurred with respect to that collateral." Wells Fargo's only collateral

is the Vehicle. There is no argument that the Vehicle cannot be "purchase money

collateral" as that phrase is used in the UCC.  All of the arguments focus on whether some of the obligations secured by the Vehicle can be "purchase money obligations" as that phrase is used in the UCC.

"Purchase money obligation" is thus the critical phrase.  Section 9-103(a)(2) defines "purchase-money obligation" as "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used."

Notice the UCC's definition of "purchase-money obligation" contains two alternatives: (i) the price of the collateral; or (ii) value given to enable the debtor to buy the collateral.  Negative equity is a "purchase money obligation" if it comes within either alternative.

         1.    <u>Negative Equity Is "Part Of The Price Of The Collateral"</u>

The first alternative is "price of the collateral."  Is negative equity part of the "price of the collateral"?  The UCC does not define the term "price of the collateral."

However, from the Bankruptcy Court proceeding in this case, we know that "price of the collateral" is more than just the cash price of the Vehicle – that "price of the collateral" obviously can include interest, fees, taxes, an optional service contract, and gap insurance that are all part of the obligation secured by the Contract.  Why not negative equity as well?

While there is no definition of "price of the collateral" in the UCC, Official

Comment 3 to Section 9-103 provides a description of the term:

> "As used in subsection (a)(2), the definition of 'purchase money
> obligation', the 'price of the collateral' or the 'value given to enable'
> includes obligations for expenses incurred in connection with
> acquiring rights in the collateral, sales taxes, duties, finance charges,
> interest, freight charges, costs of storage in transit, demurrage,
> administrative charges, expenses of collection and enforcement,
> attorney's fees and other similar obligations. . . ."

UCC Section 9-103, cmt. 3.

This is a very broad description of "price." Official Comment 3 to Section

9-103 is not limited to the common understanding of "price." For example, most

people would not think of "expenses of collection and enforcement" as part of the

"price of the collateral." And, under Official Comment 3,[14] "purchase money

obligation" is not limited to expenses legally required in order for the debtor to

acquire the goods: items such as "expenses of collection and enforcement" will be

incurred after the transaction has closed and the debtor has acquired the goods.

The first example in Official Comment 3 – "expenses incurred in connection

with acquiring rights in the collateral" – is especially broad. Instead of limiting

language such as "necessary in order to acquire rights in the collateral", the

---

[14] The Bankruptcy Court Order in this case treats a $2,495.00 optional service contract and $600.00 for gap insurance as part of the "price of the collateral."

Official Comment uses the much more inclusive phrase "in connection with acquiring rights in the collateral."[15]    UCC Section 9-103, Comment 3.

And, the structure of the sentence in Official Comment 3, set out above, is especially important.    "Expenses incurred in connection" is a separate and "independent" example.    There are no words like "including" or "such as" connecting the first item, --"expenses incurred in connection with acquiring rights in the collateral," -- with the items that follow.

"Sales taxes," "duties," and "finance charges" are not examples of "expenses incurred in connection with acquiring rights in the collateral."  Rather, "expenses incurred in connection with acquiring rights in the collateral," like "sales taxes', "duties", and "finance charges", is a separate and independent example of what is a part of  the "price of the collateral, -- a free-standing component of "purchase money obligation."

Negative equity payments come within the plain meaning of this language in the Comment to UCC Section 9-103: "expenses incurred in connection with

---

[15]  This interpretation of the UCC is consistent with the California Civil Code §2981(e), which provides, in relevant part, that the "cash price" paid for a vehicle includes "accessories or services related to the sale, including, but not limited to, . . . payment of a prior credit or lease balance remaining on the property being traded in."  Cal. Civ. Code §2981(e).

acquiring rights in the collateral."[16]    In reversing the bankruptcy court, the district

court in *Peaslee* reasoned: "it is not apparent why a refinancing of rolled-in

negative equity on a trade in as part of motor vehicle sale could not constitute an

'expense incurred in connection with acquiring rights in the new vehicle.  If the

buyer and the seller agree to include the payoff on the outstanding balance on the

trade-in as an integral part of their transaction . . . it is in fact difficult to see how

that could not be viewed as such an expense." *Peaslee II*, 373 B.R. 252, 259

(W.D.N.Y. 2007), quoted with approval in *In re Schwalm*, 380 B.R. 630, 634

(Bankr. M.D. Fla. 2008) (holding that car financing with negative equity and gap

insurance and extended warranty protection is a protected "purchase money

security interest" under §1325(a)(*)).

---

[16]    Use of the words "in connection with" in Comment 3 supports this position.  The critical language is "obligations for expenses **in connection with** acquiring rights in the collateral" qualify as purchase money obligations.  Some phrase such as "in order to" would have been used instead if the intent was to limit "purchase money obligations" to those expenses legally required to acquire the collateral.  *Cf., In re Burt*, 378 B.R. 352, 362 (Bankr. Utah 2007) ("Like the courts in *Peaslee II* and [*In re Cohrs*, 373 B.R. 107 (Bankr. E.D. Cal. 2007)], the Court believes this list is not exhaustive and the expenses identified in Comment 3 are merely examples or additional components of the 'price of the collateral' or the 'value given' to the debtor.  Therefore, just as the courts in *Peaslee II, Cohrs,* and [*In re Petrocci*, 378 B.R. 489 (Bankr. N.D.N.Y. 2007)] this Court cannot see how the refinancing of negative equity and the other transactions costs incurred in connection with the purchase of the debtor's new Truck could not qualify as an 'expense' within the meaning of Comment 3.")

2.    <u>Negative Equity Also Enabled The Debtor To Acquire The Collateral</u>

The other critical phrase in the UCC's definition of "purchase money obligation" is "enable the debtor to acquire rights in or the use of the collateral." Even if negative equity is not part of the "price of the collateral," it is part of the "purchase money obligation" if it enables a debtor to acquire a new car.

"Enable" is not limited to necessary. The specific examples in Comment 3 are not limited to necessary expenses. Further, any such "necessary" limitation is inconsistent with the Comment to UCC Section 9-103 which states: "The concept of 'purchase money security interest' requires a close nexus between the acquisition of collateral and the secured obligation." "Close nexus" is very different from "necessary." UCC Section 9-103, cmt. 3.

In this case, there was a close nexus between the dealer's willingness to finance the negative equity on the Debtor's existing car and the Debtor's acquisition of the Vehicle. We do not know and do not need to know whether there was any other way that the Debtor could have acquired the Vehicle. What we do need to know is that there was the requisite "close nexus" in this case – that financing negative equity was connected to and facilitated Debtor's purchase of the Vehicle. As recently stated in *In re Weiser*, 381 B.R. 263 (Bankr. W.D. Mo. 2007):

> In this case, in addition to the negative equity, Community America also financed an extended service contract and gap insurance when the Debtor purchased the Pontiac. . . . I find that Community America has a purchase money security interest securing those portions of the debt under Section 9-103 because they were expenses incurred in connection with the Debtor's acquiring rights in the Pontiac.  Since the Debtor would have had no reason to purchase these items had she not been purchasing the Pontiac.  I find that there is a close nexus between those items and the Pontiac.

*In re Weiser*, 381 B.R., at 270-271.

### 3.    Including Car Finance Contracts With Negative Equity Is Consistent With Commercial Practice

Car financing that includes negative equity is a common commercial practice, and an appreciation of commercial practices is important in interpreting and applying the UCC definition of "purchase money security interest."  As the court in *Petrocci* explained:

> Aside from the Court's difference of opinion with the reasoning in *Peaslee*, it believes that a holding that "price" as set out in UCC Section [9-103] includes negative equity (as does MVRISA's definition of "cash sale price") serves the underlying purposes and policies of the UCC because such a reading "permit[s] the continued *expansion of commercial practices* through custom, usage, and *agreement of the parties*."  UCC Section 1-102(2)(b).

*In re Petrocci,* 370 B.R. 489, 504 (Bankr. N.D.N.Y. 2007) (emphasis in original).

A car finance contract that includes a negative equity component is a common "commercial practice."

F.    Interpreting The Term "Purchase Money Security Interest" In BAPCPA
      To Include Negative Equity Is The Only Interpretation That Makes
      Sense

This case turns on the extent to which the 2005 Congressional amendments

to the Bankruptcy Code limit a legal right created by and unique to the Bankruptcy

Code, *i.e.*, "strip-down" of car financings by Chapter 13 debtors.   This case also

turns on what Congress intended by the phrase "purchase money security interest"

in §1325(a)(*).[17]

The questions of interpretation of a federal statute raised by the transaction

in this case are questions arising in similar transactions around the country.   The

same questions arise in bankruptcy cases in New York as in California.    The

answers should be the same[18] and should be based on Congressional intent.

In enacting BAPCPA, Congress intended to change consumer bankruptcy

by precluding use of Chapter 7 by debtors with financial means to pay debts.   And

by making §1325(a)(*) a part of BAPCPA, Congress intended to protect

---

[17]   "Technically, this Court is not being asked to define PMSI in Section 679.103 [Florida version of UCC 9-103]. . . . This Court has before it a different issue – what is the intended effect of Congress' 'borrowing' of the term 'purchase money security interest' in the hanging paragraph of Bankruptcy Code Section 1325(a)." *In re Schwalm*, 380 B.R. 630, 634 (Bankr. M.D. Fla. 2008).

[18]   In reversing a District Court's application of the hanging paragraph to the surrender issue, the Sixth Circuit stated "The Court's approval, however, fails to even consider that a primary underlying purpose of the Bankruptcy Code is to provide a uniform, nationwide system by which claims are handled." *Americredit Financial Services, Inc. v. Long (In re Long)*, 2008 WL 564798 (6th Cir. 2008).

automobile financing from the adverse effects of this change, *i.e.*, it intended to "restore the foundation of secured credit."

In interpreting a law protecting automobile financing, it is necessary to assume that the people writing the law knew what automobile financing was.[19] Negative equity transactions is what automobile financing was and is − especially for people who file for bankruptcy within 910 days after buying a car. It does not make sense to interpret §1325(a)(*) to exclude  most car financings from the intended protection from "strip-down."

If car financing transactions that enable the debtor to pay off the negative equity on a trade-in are excluded from the protection of BAPCPA's §1325(a)(*), then financial institutions will change longstanding commercial practices. Moreover, debtors who want to buy a new car by trading in their old car will be denied valuable choices.

Again, such an interpretation of §1325(a)(*) doesn't make sense. As the court in *In re Schwalm*, 380 B.R. 630 (Bankr. M.D. Fla. 2008), concluded, the term "'purchase money security interest,' as used in §1325(a), only makes sense

---

[19]    Just as this Court in *John v. United States*, 247 F.3d 1032 (9th Cir. 2001), assumed that Congress knew where subsistence fishing occurred when it enacted a law to protect subsistence fishing: "Given the crucial role that navigable waters play in traditional subsistence fishing, it defies common sense to conclude that when Congress indicated an intent to protect traditional subsistence fishing, it meant only the limited subsistence fishing that occurs in non-navigable waters."

when viewed as applying to those auto financing transactions, lawful and common in industry practice when BAPCPA was adopted, in which negative equity on a trade-in, gap insurance and service contract premiums are financed." *In re Schwalm*, 380 B.R. at 634-35.

II.   ASSUMING THAT THE NEGATIVE EQUITY CHARGE IS NOT PART OF WELLS FARGO'S PURCHASE MONEY SECURITY INTEREST, THE BANKRUPTCY COURT ERRED IN APPLYING THE DUAL STATUS RULE

Section 1325(a)(*) brings Wells Fargo's claim within the ambit of its protection if it holds a purchase money security interest.  Wells Fargo does, and the Bankruptcy Court Order says so.  The Bankruptcy Court Order recognizes that Wells Fargo's security interest is a protected purchase money security interest to the extent that it secures the purchase price of the Vehicle, accrued finance charges, document fees, optional service contract, gap insurance, license fee, California tire fee, sales tax, and smog certificate.  (ER 9 pp. 76-84).

The language of §1325(a)(*) is broad and unqualified.  There is no limiting language, such as "to the extent of a purchase money security interest," in §1325(a)(*).  Nonetheless, the Bankruptcy Court Order adds such a limitation by adopting a "dual status" rule.

The Bankruptcy Court Order discusses the dual status rule, and the transformation rule.  Both are judge-made rules developed initially to resolve state

law perfection and priority issues and now used primarily to decide the extent of an individual debtor's rights in his or her exempt property under §522(f) of the Bankruptcy Code where there was a refinancing.  See generally, *In re Matthews*, 724 F.2d 798 (9th Cir. 1984).

In the typical §522(f) proceeding, such as *Matthews*, D buys household goods in credit transaction #1 and then, before paying off this debt from transaction #1, enters into consolidated credit transaction #2 with the same creditor.  And transaction #2 is structured so that the creditor retains a security interest in the goods from transaction #1 until the consolidated amount from transactions #1 and #2 is paid in full.  D then files a bankruptcy petition, looks to state law to determine what property he can claim as exempt, claims the household goods as exempt, and then invokes §522(f) to avoid the security interest.

Section 522(f) reflects a policy against a creditor's having a security interest in household goods that it did not enable the debtor to obtain.  Congress made non-purchase money hypothecations of household goods unenforceable because used household goods typically have substantial use value to the consumer but no economic value to the creditor.  *See* H.R. Rep. No. 95-595, 95th Cong., 1st Sess. at 127, 128 (1977) ("household goods have little resale value.  . . . . Such security interests have too often been used by over-reaching creditors. ").

The refinancing/overreaching questions in §522(f) proceedings are not raised by Wells Fargo's single financing that enabled the Debtor to acquire her Vehicle. There are no refinancings in this case; no household goods of marginal value. The car financing at issue in this proceeding, unlike the household goods refinancings in §522(f) proceedings, enabled the Debtor to acquire the Vehicle.[20]

This case is not about refinancing household goods, and is not about how the Bankruptcy Code affects rights that a debtor and a secured creditor would have outside of bankruptcy. Rather, the question is how a 2005 amendment to the Bankruptcy Code affects a "strip-down" right that a debtor has only in Chapter 13

---

[20]    *In re Weiser*, 381 B.R. 263 (Bankr. W.D. Mo. 2007), similarly distinguished automobile financing in §1325(a)(*) proceedings from household good refinancing in §522(f) proceedings, "[C]ourts typically apply the dual status and transformation rules in situations where a prior lender refinances an old loan and adds new collateral. . . . [F]or example, the borrower first purchases a sofa and gives the lender a PMSI in the sofa, and then later purchases a dishwasher, and still later a refrigerator, and so on, executing a new agreement with the same lender each time, carrying over the previous balances from the purchases of the sofa, dishwasher, and refrigerator into each new contract, and granting the lender a security interest in all of the items. In these cases, the value given by the creditor for the new item ( i.e., the refrigerator) has nothing to do with enabling the debtor to acquire rights in or the use of the prior items (the sofa and dishwasher). Since the entire debt is rolled into a new obligation, that new obligation does not represent value given "to enable the debtor to acquire rights in" the items that such debtor already owns. The dual status and transformation rules assist courts in the difficult task of hashing out what part of the remaining debt constitutes value given to enable the borrower to acquire each item. . . . In contrast, when a borrower trades in an old car for the purchase of a new one, only the new car secures the obligation. He no longer owns the old car (the sofa in the prior example), and the obligation on that old car is extinguished. Consequently, the difficulties in parsing out the obligations between debts and collateral are not present, and there is no prior obligation left to be "transformed." Further, since the new lender actually advances funds to pay off the prior lender, the "value given to enable the debtor to acquire rights in" the new car is readily discernable. *In re Weiser*, 381 B.R. at 270.

bankruptcy cases.[21]    This is a question that should be answered by using established principles of statutory interpretation to determine Congress's intent, not by using judge-made rules created to answer a very different question.

## CONCLUSION

For the reasons set out above, Wells Fargo respectfully requests that the Court reverse the Bankruptcy Court Order and hold that car financing transactions that include negative equity are protected in their entirety from "strip-down" by §1325(a)(*) of the Bankruptcy Code.

Dated: March 19, 2008                     HAYNES AND BOONE, LLP


                                          By /s/David G. Epstein
                                              David G. Epstein

                                          SEVERSON & WERSON
                                          A Professional Corporation


                                          By /s/Donald H. Cram, III
                                              Donald H. Cram, III

                                          Attorneys for Appellant Wells Fargo
                                          Financial California, Inc.

---

[21]  *Capital One Auto Finance v. Osborn*, 515 F.3d 817 (8th Cir. 2008)("the hanging paragraph simply removes the bankruptcy code's method of bifurcation [strip-down].  The hanging paragraph has no effect on state-law rights.")

# ADDENDUM

1.    11 U.S.C.  1325(a)

2.    States Allowing Financing of Negative Equity As Part of A Secured Retail
      Installment Sale Contract

TAB  1

## § 1325. Confirmation of plan

**(a)** Except as provided in subsection (b), the court shall confirm a plan if—

　　**(1)** The plan complies with the provisions of this chapter and with the other applicable provisions of this title;

　　**(2)** any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;

　　**(3)** the plan has been proposed in good faith and not by any means forbidden by law;

　　**(4)** the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;

　　**(5)** with respect to each allowed secured claim provided for by the plan—

　　　　**(A)** the holder of such claim has accepted the plan;

　　　　**(B) (i)** the plan provides that—

　　　　　　**(I)** the holder of such claim retain the lien securing such claim until the earlier of—

　　　　　　　　**(aa)** the payment of the underlying debt determined under nonbankruptcy law; or

　　　　　　　　**(bb)** discharge under section 1328; and

　　　　　　**(II)** if the case under this chapter is dismissed or converted without completion of the plan, such lien shall also be retained by such holder to the extent recognized by applicable nonbankruptcy law;

　　　　**(ii)** the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; and

　　　　**(iii)** if—

　　　　　　**(I)** property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts; and

**(II)** the holder of the claim is secured by personal property, the amount of such payments shall not be less than an amount sufficient to provide to the holder of such claim adequate protection during the period of the plan; or

**(C)** the debtor surrenders the property securing such claim to such holder;

**(6)** the debtor will be able to make all payments under the plan and to comply with the plan;

**(7)** the action of the debtor in filing the petition was in good faith;

**(8)** the debtor has paid all amounts that are required to be paid under a domestic support obligation and that first become payable after the date of the filing of the petition if the debtor is required by a judicial or administrative order, or by statute, to pay such domestic support obligation; and

**(9)** the debtor has filed all applicable Federal, State, and local tax returns as required by section 1308.

For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

**(b)**

**(1)** If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

**(A)** the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

**(B)** the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

**(2)** For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with

applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended—

> **(A)**

>> **(i)** for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and

>> **(ii)** for charitable contributions (that meet the definition of "charitable contribution" under section 548 (d)(3) [1] to a qualified religious or charitable entity or organization (as defined in section 548 (d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and

> **(B)** if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

**(3)** Amounts reasonably necessary to be expended under paragraph (2) shall be determined in accordance with subparagraphs (A) and (B) of section 707 (b)(2), if the debtor has current monthly income, when multiplied by 12, greater than—

> **(A)** in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner;

> **(B)** in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or

> **(C)** in the case of a debtor in a household exceeding 4 individuals, the highest median family income of the applicable State for a family of 4 or fewer individuals, plus $525 per month for each individual in excess of 4.

**(4)** For purposes of this subsection, the "applicable commitment period"—

> **(A)** subject to subparagraph (B), shall be—

>> **(i)** 3 years; or

>> **(ii)** not less than 5 years, if the current monthly income of the debtor and the debtor's spouse combined, when multiplied by 12, is not less than—

>>> **(I)** in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner;

**(II)** in the case of a debtor in a household of 2, 3, or 4 individuals, the highest median family income of the applicable State for a family of the same number or fewer individuals; or

**(III)** in the case of a debtor in a household exceeding 4 individuals, the highest median family income of the applicable State for a family of 4 or fewer individuals, plus $525 per month for each individual in excess of 4; and

**(B)** may be less than 3 or 5 years, whichever is applicable under subparagraph (A), but only if the plan provides for payment in full of all allowed unsecured claims over a shorter period.

**(c)** After confirmation of a plan, the court may order any entity from whom the debtor receives income to pay all or any part of such income to the trustee.

TAB  2

## STATES THAT EXPRESSLY ALLOW NEGATIVE EQUITY TO BE FINANCED AS PART OF A SECURED RETAIL INSTALLMENT SALES CONTRACT

1. Alaska:  §45.10.220

2. Arkansas:  §23-112-317

3. California:  Civil Code §2981(e)

4. Colorado:  §5-1-301 (5)

5. Delaware:  5 Del. C. §2907 (e)

6. Florida:  §520.07 (2)

7. Georgia:  §10-1-31

8. Hawaii:  §476-1

9. Idaho:  §28-41-301

10. Illinois:  §815 ILCS 375/2.8.

11. Indiana:  §24-4.5-2.111

12. Iowa:  §537.1301.5

13. Louisiana:  §6:969.6(2)

14. Maryland:  Commercial Law §§12-601 (m), 12-606(b)

15. Michigan:  §492.102(12)

16. Minnesota:  53C.08

17. Mississippi:  §63-19-31

18. Missouri:  §365.020(8)

19. New Hampshire:  §361-A:7

20. New Mexico:  §58-19-7. B.

21. New York:  Personal Property Law §301 (6)

22. North Carolina:  §25A-9

23. Ohio:  <u>Johns v. Ford Motor Credit Company</u>, 49 Ohio St. 3d 84, 551 N.E.2d 179, 1990
      Ohio LEXIS 81

24. Oklahoma:  14A Okl.St. §2-111

25. Oregon:  §83.520

26. Pennsylvania:  69 P.S. §603 13

27. South Carolina:  §37-2-111

28. South Dakota:  §54-3A-2

29. Tennessee:  §47-14-120

30. Texas:  Finance Code §348.006

31. Vermont:  9 V.S.A. §2355(f)(1)(D) and (J)

32. Virginia:  §6.1-330.77

33. Washington:  §63.14.040

34. West Virginia:  §46A-1-102 (4)

35. Wisconsin:  §421.301 (5)

36. Wyoming:  §40-14-211 (a)

**PROOF OF SERVICE**

I, the undersigned, declare that I am over the age of 18 and am not a party to this action. I am employed in the City and County of San Francisco, California; my business address is Severson & Werson, One Embarcadero Center, Suite 2500, San Francisco, CA 94111.

On the date below I served copies of the **Appellant's Brief** on all interested parties and courts in said case addressed as follows:

Shian MacLean
Law Offices of Rodney M. Kleman
400 Camino El Estero
Monterey, CA   93940


I caused an envelope to be deposited in the mail at San Francisco, California, with postage thereon fully prepaid. I am readily familiar with the firm's practice of collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in San Francisco, California in sealed envelopes with postage fully prepaid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration is executed in San Francisco, California, on March 19, 2008.


/s/Bill Bush
                    Bill Bush