**Record on Appeal – Tab 4 (Part 1 of 2)**

1  LAW OFFICES OF
   **RODNEY M. KLEMAN**
2  RODNEY M. KLEMAN #55808
   SHIAN MACLEAN #133765
3  TREVOR MIRKES #224261
   400 Camino El Estero
4  Monterey, CA 93940
   Tel: (831) 649-0200
5
6  Attorney for Debtor
7
8
9                   **UNITED STATES BANKRUPTCY COURT**

10                  **NORTHERN DISTRICT OF CALIFORNIA**

11  In re:  ACAYA , Leticia          Chapter 13
                                      Case No. 06-51741  MM
12
                Debtor(s)
13                                    **POINTS AND AUTHORITIES IN**
                                      **OPPOSITION TO OBJECTION TO**
14                                    **CONFIRMATION OF PLAN BY**
                                      **CREDITOR WELLS FARGO**
15                                    **FINANCIAL**

16                                    Date:  February 16, 2007
                                      Time:  10:00 A.M.
17                                    Judge: Honorable Marilyn Morgan
                                      Place: U.S. Bankruptcy Court
18                                           The Quadrangle, Room 214
                                           1000 S. Main Street, Salinas, CA
19  ──────────────────────────────
20
21
22                  <u>**STATEMENT OF FACTS**</u>
23
24  1.    **THE PROPOSED PLAN**
25
26       On September 7, 2006, debtor filed a Chapter 13 bankruptcy.  Included in this bankruptcy
27  is a secured claim of Wells Fargo Financial (hereinafter "WFF") consisting of a motor vehicle
28  commonly known as a 2005 Chevy Cavalier (hereinafter "Chevy" or "Vehicle").  Debtor

1  proposed to pay WFF the mid Kelly Blue Book value of the vehicle, or $9,757.00, at 7% interest.

2  Debtor proposed this value based upon the age, condition, and options on the Vehicle. Due to

3  the soft market for used cars given the large discounts and 0% financing currently offered on

4  new cars, WFF assent to the proposed value was anticipated per Section 1325(a)(5).

5

6  **2.    OBJECTION TO CONFIRMATION**

7

8        On October 13, 2006, counsel for WFF filed an objection to confirmation of debtor's

9  proposed Chapter 13 plan. Among several objections interposed therein, WFF asserted that it

10  should be entitled to the full contract balance owed at the time of the bankruptcy filing pursuant

11  to the application of 11 U.S.C. 1325(a) because the debt that WFF financed was purchase money

12  for a motor vehicle for the personal use of the debtor that was incurred with 910 days of the

13  bankruptcy filing. See attached WFF Objection as Exhibit 1.

14

15  **3.    THE VEHICLE "PURCHASE"**

16

17        On or about June 15, 2005, 449 days preceding the bankruptcy filing, the debtor took her

18  vehicle, then a 2003 Ford Taurus, to Cardinale Mazda Daewoo VW (hereinafter "Dealer") in

19  response to a letter she received from Dealer offering to sell her a new car. Debtor was

20  dissatisfied with the Ford as the windshield defroster did not work. Debtor paid $9,288.00 for

21  the 2005 Chevy Cavalier (hereinafter "Vehicle" or "Chevy"). In addition to this charge, debtor

22  paid $45.00 for document preparation, $676.64 in sales tax, $2,495 for an optional service

23  contract, $600.00 for GAP insurance, $135.00 for license fees (Est.) and $8.75 in California tire

24  fees. See the attached Purchase Contract as Exhibit 2.

25

26

27

28                                         2

4.    **THE NEGATIVE TRADE-IN**

In order to proceed with the purchase, the debtor "rolled" the loan balance on the Ford Taurus into the new loan financed by WFF. The balance on the Ford loan was $13,683.00 at the time of the new purchase. The Dealer gave debtor a trade-in value for her Ford of $7,000.00. This resulted in a negative trade-in of $6,683.00 which she financed at 14.5%, the same rate she financed the Chevy. Including finance and other charges, and the negative trade-in, debtor paid $29,049.90 for the Chevy. The negative trade-in, or antecedent debt, amounts to 33.5% of the total amount financed by WFF of $19,939.39.

## ARGUMENT

1.    <u>PURSUANT TO THE HANGING PARAGRAPH FOLLOWING 11 U.S.C. SECTION 1325 (a)(9) THE CRAM DOWN OF A SECURITY INTEREST IN A MOTOR VEHICLE IS PERMISSIBLE WHEN ANTECEDENT DEBT IS INCLUDED IN THE PURCHASE CONTRACT</u>

The hanging paragraph following 11 U.S.C. Section 1325(a)(9) of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (hereinafter "BAPCPA") substantially changed the treatment of allowed secured claims in the Chapter 13 plan. Prior to that time, if a creditor had a claim secured by a motor vehicle, the debtor could use Sections 506, 1322, and 1325 to "cram down" the amount owed for the secured claim to the replacement value of the vehicle. <u>In re Rash</u>, 520 U.S. 456, 117 S.Ct. 879, 138 L.E.d.2d 148 (1997). The Section 506 secured claim was then paid with interest under the plan. <u>In re Till</u>, 541 U.S. 465, 124 S.Ct. 1951, 458 L.Ed. 2d 787 (2004). In changing the treatment of motor vehicle under the plan, BAPCPA created the 910 rule. This new rule contained in the hanging paragraph following Section 1325(a)(9)

3

1 | provides that if a security agreement is the basis for a secured claim, and said security agreement
2 | constitutes a "purchase money security interest" in a motor vehicle that was purchased by the
3 | debtor within 910 days of the filing of the petition, then Section 506 cannot be used to establish
4 | the treatment of the secured claim by the plan.  The amount owed under the contract at the time
5 | of the filing of the petition becomes the secured claim irrespective of the value of the collateral.
6 |
7 |      Unlike other Sections of Chapter 13 which refer to the treatment of secured claims (see
8 | for example Section 1322(b)(2) and Section 1325(a)(5)), the 910 rule specifically takes the
9 | added step of requiring that the secured claim be a purchase money security interest.  This differs
10 | from the mere characterization of the security interest as a secured claim.
11 |
12 |      However, the bankruptcy law does not define "purchase money security interest" for
13 | purposes of the 910 rule.  Therefore, the Bankruptcy court should fashion its own definition of
14 | purchase money security interests for the purpose of application of the 910 rule.  In other areas
15 | of the Bankruptcy Code, such as Section 522(f), the vast majority of case law indicates that
16 | bankruptcy courts should apply state law in defining the term "purchase money security
17 | interest."
18 |      In 2001, the State of California adopted the revised Uniform Commercial Code,
19 | renumbering the various sections of the old Uniform Commercial Code.  The revised Code as
20 | adopted in California Section 9103 makes sure that there is no precise definition of "purchase
21 | money security interest" as it applies in consumer cases.  However, in business cases *only*, the
22 | state adopted prior case law which indicated that California was a dual status state as opposed a
23 | "transformation" state.  This means that in a business case, a contract could be dissected with the
24 | result that part of the contract might be deemed to include a purchase money security interest and
25 | part of it may not.  The transformation rule, rejected by the Code in business cases *only* states
26 | that if there is any refinancing or cross-collateralization of the collateral, then the entire amount
27 |
28 |                                  4

1   is transformed to non-purchase money security.  U.C.C. Section 9103 Comment 7.  ***The state***
2   ***expressly declined to adopt the dual status rule in consumer cases, instead leaving it up to the***
3   ***individual courts to fashion a rule based upon the facts and circumstances before it.***  U.C.C.
4   Section 9103 Comment 8.

5

6        California is unlike other states, such as Kansas, which specifically deleted references to
7   consumer transactions in Section 9103(f), (g), and (h) by omitting this language from their
8   adaptation of the Uniform Commercial Code.  Kansas in effect did specifically adopt the dual
9   status rule for the analysis of purchase money security interests in a consumer retail installment
10  contract.  In re Vega, 344 B.R. 616, n.29 (Bankr. KS 2006).

11

12       There appear to be few cases analyzing the meaning of purchase money security interest
13  in the consumer automobile context in California.  However, there is a plethora of law under
14  Bankruptcy Code Section 522(f) dealing with the destruction and transformation of security
15  interests by debtors seeking to avoid liens on household goods and furnishings under Section
16  522(f)B.  Although the cases do not deal with automobiles as collateral, the cases are helpful in
17  that they show the Bankruptcy Court's interpretation of destruction and transformation of
18  purchase money security interest under California state law. The Ninth Circuit  in In re
19  Matthews, 724 F.2d 798, which involved a purchase money loan for furniture, looked to the
20  California Commercial Code 9107 (now 9103 which contains immaterial differences) to define
21  purchase money security, stating that "Purchase money security is an exceptional category in the
22  statutory scheme that affords priority to its holder over other creditors, but only if the security is
23  given for the precise purpose as defined in the statute." ( Id. at page 801.)    In re Mathews
24  involved a lender who subsequently agreed to issue a new loan to give the borrowers a longer
25  time to pay off the original furniture loan.  The new loan was not for the purpose of purchasing
26  the furniture, which they had already purchased, so was not a purchase money loan, and the

27

28                                           5

1    furniture was no longer purchase money security.  Id.

2

3        In re Mattews cites California Commercial code section 9107, defining purchase money

4    security as follows: "A security interest is a "purchase money security interest" to the extent that

5    it is (a)Taken or retained by the seller of the collateral to secure all or part of its price, or (b)

6    Taken by a person who by making advances or incurring an obligation gives value to enable the

7    debtor to acquire rights in or the use of collateral if such value is in fact so used.  Cal. Comm.

8    Code 9107 (West, 1964)."  The present version of 9107, Code section 9103, is attached as

9    Exhibit 3.

10

11        Further, the court quoted the official commentary to the California Commercial Code as

12    follows: "When a purchase money interest is claimed by a secured party who is not a seller, he

13    must of course have given present consideration.  This section therefore provides that the

14    purchase money party must be one who gives value "by making advances or incurring an

15    obligation;" the quoted language excludes from the purchase money category any security

16    interest taken as security for or in satisfaction of a pre-existing claim or antecedent debt." (In re

17    Matthews at 801)

18

19        Accordingly, in California, at least one bankruptcy court determined that in consumer

20    transactions under the Commercial Code, the portion of the claim that represents antecedent debt

21    is not entitled to purchase money security.  Moreover, any argument of WFF that by financing

22    the negative trade-in amount "enabled" the debtor to acquire the collateral is faulty because if

23    this were true, every automobile financing contract would involve such negative equity

24    financing.

25

26        In the present case, WFF cannot claim a purchase money security interest in the negative

27

28                                        6

1  trade-in based upon their payoff of the antecedent debt financed by Bay Federal Credit Union for

2  the Taurus that debtor traded in.  Bay Federal is the only entity that could have claimed a

3  purchase money security interest in that amount as Bay Federal Credit Union's loan did not

4  include antecedent debt and enabled debtor to purchase the Ford.

5

6  **3.      THE EXTENT OF THE CRAM DOWN OF A SECURITY INTEREST IN A**

7  **MOTOR VEHICLE SUBJECT TO THE 910 RULE DEPENDS UPON THE COURT'S**

8  **APPLICATION OF STATE LAW**

9

10         As noted above, the California Commercial Code Section 9103 and the Official

11  Comments related thereto "...leave to the court the proper determination of the proper rules in

12  consumer-goods transactions."

13

14  **A.      "DUAL STATUS" CRAM DOWN**

15

16         A good example of application of the dual status rule is found in In re Vega, 344 B.R. 616

17  (Bankr., D. Kansas, 2006).  This case  held that where there was a negative trade in value

18  included in the secured 910 vehicle loan, only the portion of the loan that was actually used to

19  acquire the vehicle would be allowed as a purchase money lien.  This case, as all of the relevant

20  cases, depends on the state law definition of purchase money security.

21

22         As in the instant debtor's case, the lender in Vega rolled the negative equity in the trade in

23  vehicle into a new loan, and paid off the prior loan.   The vehicle was used for the personal use

24  of the debtor, so the issue in Vega was whether all the 910 vehicle claim was secured by a

25  purchase money security interest (in this case, referred to as PMSI), whether a portion of the debt

26  was secured by a purchase money lien or whether no portion of the debt was secured by a

27

28                                        7

1  purchase money lien.  In this case the debtor did not contest that the actual purchase price of the

2  vehicle was secured by PMSI.   "Here, Debtors argue they are not trying to cram down that part

3  of UAC's claim that is represented by the purchase price of the vehicle..." (Id.at 621).

4

5       The Kansas court cited the Kansas statute defining  PSMI:  "an obligation of an obligor

6  incurred as all or part of the price of the collateral or for value given to enable the debtor to

7  acquire rights in or the use of the collateral if the value is in fact so used."  The court further

8  noted that "A secured party claiming a purchase-money security interest has the burden of

9  establishing the extent to which the security interest is a purchase money security interest." (Id .

10  at 622).    Further, the court held that in Kansas, "the dual-status rule applies, meaning that a

11  creditor's purchase money status is not lost merely because of a refinancing or infusion of new

12  proceeds.  Therefore, a security interest in goods is a PMSI to the extent that the goods are

13  purchase-money collateral, and non-PMSI as to the remainder." (Id. at 623). The court found that

14  Kansas had rejected the transformation rule under which a security interest would lose all of its

15  PMSI character if the collateral secured more than the price of the collateral or if the loan was

16  refinanced  with the infusion of some new proceeds. Kansas had rejected a former provision of

17  the Kansas Commercial Code that generally leaves courts free to  apply case law to determine

18  whether a security interest loses its PMSI status in consumer-goods transactions. (Id. footnote 20

19  at 623).    Therefore, the court allowed a PMSI claim in the amount of the original vehicle claim

20  less the negative trade in value that was included in that claim. The negative trade in amount

21  would thus be treated as an unsecured claim.

22

23       If the court chose to apply the Dual Status Rule in the instant case, it is debtor's position

24  that WFF has the burden to show what amount of their remaining balance is purchase money as

25  they have the access to the accounting that would allow such a calculation.  It is also debtor's

26  position that under this Rule, any payments made by debtor made prior to the bankruptcy filing

27

28                                        8

should be applied to the purchase money security amount financed by WFF and not to the non-purchase money antecedent debt financed by Bay Federal Credit Union as any different result would prejudice unsecured creditors and violate the Bankruptcy Code by treating unsecured creditors in the same class differently.

**B.    "TRANSFORMATION" CRAM DOWN**

A good example of application of the transformation rule is found in In re Peaslee, 2006 WL 3759476 (Bankr. W.D.N.Y. 2006) which examined the same issues regarding the negative trade-in of a vehicle. In Peaslee, GMAC had a secured claim of $17,904.95 on a 910 vehicle and the Debtor's plan proposed treating $6954.95 of the vehicle claim as unsecured, due to the negative trade in value included in the GMAC claim.

The court's decision cited the New York Commercial Code definition of PMSI in Section 9103 as follows:

> (1) "Purchase-money collateral" means goods or software that secures a purchase-money obligation incurred with respect to that collateral; and (2) "purchase-money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.
> (b) Purchase-money security interest in goods. A security interest in goods is a purchase-money security interest: (1) to the extent that the goods are purchase-money collateral with respect to that security interest..."

These sections of the New York commercial code are identical to the current California

9

1  Section 9103 (see Exhibit 3.)

2

3      After a detailed examination of multiple arguments of the debtor and GMAC, as well as

4  the Chapter 13 Trustee's arguments that the court should adopt the transformation rule, rather

5  than the dual-status rule, because of the difficulty of trying to determine from numerous

6  complicated financing arrangements of vehicle dealers and lenders the exact amount of PMSI vs

7  non-PMSI claims, the court went on to hold that New York law allows judges the discretion of

8  choosing to use the dual-status rule or the transformation rule, and due to the "Evidentiary

9  nightmare"... "that would be experienced in the Bankruptcy Courts if they had to unwind the

10  manipulations included in so many of the retail installment contracts where negative equity on a

11  trade in has been rolled -in and refinanced in order to determine...."  "the actual amount of debt

12  that is a purchase money obligation"... "it is reasonable to conclude that Congress would have

13  intended the Bankruptcy Courts to avoid making such determinations." (In re Peaslee at 11).

14

15      In the instant debtor's case, there is no question that the negative equity included in Ms.

16  Acaya's contract should be treated as non-PMSI.  Looking at the California Commercial Code,

17  Section 9103, subsection (h) states:

18

19          "The limitation of the rules in subdivisions (e), (f) and (g) to transactions other

20          than consumer-goods transactions is intended to leave to the court the

21          determination of the proper rules in consumer-goods transactions.  The court may

22          not infer from that limitation the nature of the proper rule in consumer-goods

23          transactions and may continue to apply established approaches."

24

25      This is the same rule used in In re Peaslee to support the court's application of the

26  transformation rule rather than the dual- status rule.  Under California Commercial Code section

27

28                                    10

1  9103 the same conclusion should be reached in the instant case, namely that the value of the

2  secured claim should be calculated pursuant to Section 506(a), the retail value of the vehicle

3  considering its age and condition, with the balance of the claim being classified as unsecured.

4

5

6

7  **3.    CALIFORNIA CIVIL CODE SECTION 2981, THE MOTOR VEHICLE SALES**

8  **AND FINANCE ACT, CANNOT BE USED TO ALTER THE MEANING OF PURCHASE**

9  **MONEY SECURITY INTEREST AS DEFINED BY SECTION 9103 OF THE**

10 **CALIFORNIA COMMERCIAL CODE.**

11

12     In re Peaslee and In re Graupner, 2006 WL 3759457 (Bankr. M.D. GA 2006) appear to be

13 the only two cases, with substantially similar facts, where the bankruptcy court reviewed the

14 state's Motor Vehicle Sales and Finance Act (hereinafter "MVSFA") in determining the nature

15 and extent of the automobile creditor's purchase money security interest in debtor's vehicle.  It

16 should be noted at the outset that New York, Georgia, and California have an substantially

17 similar definitions contained in their respective MVSFA of "Cash Price."  See In Re Graupner,

18 In re Peslee and the California MVSFA, attached as Exhibit 4.

19

20     In re Graupner was factually a very similar case to In re Vega and In re Peaslee, but with

21 the opposite outcome.  In the Georgia version of the Uniform Commercial Code, the definition

22 of PMSI  is practically identical to the Kansas version, and In re Graupner appeared to be headed

23 for the same conclusion as In re Vega and In re Peaslee until another section of the Official Code

24 of Georgia Annotated is introduced, the Motor Vehicle Sales Financing Act, which states that

25 "The cash sale price may also include any amount paid to the buyer or to a third party on behalf

26 of the buyer to satisfy a lease on or a lien on or a security interest in a motor vehicle used as a

27

28                                    11

1  trade-in on the motor vehicle..."   Based on this Georgia Motor Vehicle Sales Financing Act, the

2  court held that all of the vehicle claim was PMSI.  This court's misguided decision was based

3  upon the court's attempt to reconcile Georgia's Commercial Code definition of purchase money,

4  that "an obligation of an obligor incurred as all or part of the *price* of the collateral..." with the

5  Civil Code's definition of "**Cash Price**" which includes the "...payment of a prior credit or lease

6  balance remaining on property being traded in."

7

8         The court's feeble attempt in <u>In re Graupner</u> to reconcile these completely unrelated

9  Code provisions should not be looked to as persuasive authority as the analysis by the Court was

10  seriously flawed.  As aptly noted by the court in <u>In re Peaslee</u> in looking to New York's

11  MVSFA, which had an identical provision to Georgia's MVSFA, "...the price, however it is

12  termed in a retail installment contract, is for the purposes of financial disclosure to the consumer,

13  not for the purposes of determining whether debt is secured by a purchase money obligation and

14  a purchase money security interest under Section 9103 and the Section 1325(a)(9) Hanging

15  Paragraph." <u>In re Peaslee</u> at 9.  Moreover, the Court in <u>In re Peaslee</u> stated that the"...Court is

16  able and required to determine, for the purpose of enforcing the provisions of the Section

17  1325(a)(9) Hanging Paragraph, whether claims of the secured creditors include debt that is or is

18  not secured by a purchase money security interest, irrespective of what any retail installment

19  contract may indicate is the overall 'price' of a motor vehicle acquisition for financial disclosure

20  purposes." <u>Id.</u>

21

22         In the instant case, the court should find that the Civil Code's MVSFA is for purposes of

23  financial disclosure and cannot be used to alter the definition of purchase money security interest

24  under the Commercial Code or the enforcement of the hanging paragraph following Section

25  1325(a)(9) of the Bankruptcy Code.  As such, the negative trade-in cannot be considered

26  purchase money security.

27

28                                                      12

4.    **CONGRESS DID NOT INTEND THE HANGING PARAGRAPH FOLLOWING**
**11 U.S.C. SECTION 1325(a)(9) TO ALLOW ABUSE BY AND A WINDFALL TO**
**AUTOMOBILE CREDITORS**

Congress did not and could not have intended the hanging paragraph following Section
1325(a)(9) to allow abuse by or a windfall to, automobile creditors within the Chapter 13
context.

The 910 rule was designed to end the abusive practice of debtors purchasing cars on the
eve of bankruptcy, then filing bankruptcy and cramming down the value of the cars to the
replacement value.  In re Quevedo, 345 B.R. 238, (Bankr. S.D. Cal. 2006).  Congress did not
intend to create a new abuse by permitting secured creditors to add antecedent debt to the
purchase price of a car and thereby inflate the amount owed on a secured claim beyond all
reason.  Certainly, Congress did not intend someone pay $100,000.00 for a 2005 Chevy Cavalier
if that in fact was the amount included in the rollover debt.

If the Court agrees with the position of WFF in this case, creditors will be free to
manipulate figures to add any type of antecedent debt which they may have with the debtor.  For
instance, WFF or one of its affiliates frequently issues credit cards to their customers and may
attempt to add this debt to the purchase price of an automobile.  If creditors such as WFF are
allowed to blatantly include unsecured antecedent debt in the purchase of an automobile, WFF
could insist that such debt be included prior to finance of the automobile.  This is certainly not
what congress intended.  Instead, Congress intended to stop the abusive practice of debtor's
buying cars in contemplation of bankruptcy and then cramming down the amount owed for the

13

car to the replacement value of the vehicle.  It is noted that under debtor's position, WFF will still be in a better position than they would have been under the old law as they are now entitled to the retail value.

Congress certainly did not intend lender such as WFF to continually add to the price of cars being purchased with antecedent debt at the ultimate expense of unsecured creditors.  The intent of Congress was to protect lenders such as WFF from the effects of depreciation on newly purchase cars.  <u>Quevedo</u>, supra.  It is not intended to create a windfall.

## <u>CONCLUSION</u>

Although the question of whether a negative trade in value should be considered part of a purchase money security interest in a vehicle contract under the 910 rule has not been decided in California, there is ample authority to conclude that is should not be considered a purchase money security interest, and further to conclude that the bankruptcy courts have the authority to decide whether the inclusion of negative trade in value should transform a vehicle subject to the 910 rule so that it may be valued pursuant to Section 506:

The Ninth Circuit has held that a Purchase Money Security Interest is "an exceptional category in the statutory scheme" but is to be applied only if "the security is given for the precise purpose as defined in the statute." (<u>In re Mathews</u>.)

The California Commercial Code provides that courts have the authority, and in fact have the duty, to decide whether the dual status rule or the transformation rule applies to consumer-goods transactions involving security interests that include both Purchase money and payment of antecedent debt. (CA Commercial Code Section 9103 and Comment 8.)

14

1       Public policy requires that the 910 vehicle loan provisions of BAPCPA cannot be used as

2  a windfall for creditors to add large negative trade in values, or other unsecured debt, at high

3  interest rates to consumer automobile loans and remain immune from the valuation provisions of

4  Section 506.  The BAPCPA provisions must be construed both as a "Consumer Protection Act"

5  as well as "Bankruptcy Abuse Prevention."

6

7

8  Respectfully submitted,

9

10  Date: January 26, 2007    /s/ Trevor R. Mirkes

11  TREVOR R. MIRKES
   Attorney for Debtor

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28    15

1  DONALD H. CRAM, III (State Bar No. 160004)
   KATRINA V. STOLC (State Bar No. 226557)
2  DUANE M. GECK (State Bar No. 114823)
   SEVERSON & WERSON, P.C.
3  One Embarcadero Center, Suite 2600
   San Francisco, CA 94111
4  Telephone: (415) 677-5536
   Facsimile:  (415) 677-5664
5  e-mail: dhc@severson. com

6  Attorneys for Creditor
   WELLS FARGO FINANCIAL ACCEPTANCE
7
                    UNITED STATES BANKRUPTCY COURT
8
                    NORTHERN DISTRICT OF CALIFORNIA
9
                           SAN JOSE DIVISION
10
   In re                          )    Case No.  06-51741-MMOR
11 LETICIA I. ACAYA,              )
                                  )    Chapter 13
12        Debtor(s).              )
                                  )
13                                )    Date:    10/25/2006
                                  )    Time:    11:00 AM
14                                )    Judge:   Hon. Marilyn Morgan
                                  )    Place:   280 South 1st Street
15                                )             Room 3070
                                  )             San Jose, CA 95113-3099
16                                )
                                  )
17 ────────────────────────────────

18   **OBJECTION OF WELLS FARGO FINANCIAL ACCEPTANCE TO CONFIRMATION
                              OF PLAN**
19
         TO THE DEBTOR, DEBTOR'S ATTORNEY OF RECORD, THE CHAPTER 13
20 TRUSTEE, AND ALL OTHER INTERESTED PARTIES:

21       Wells Fargo Financial Acceptance (hereinafter "Secured Creditor") objects to the Chapter

22 13 Plan (hereinafter "Plan") of the above captioned debtor(s) (hereinafter "Debtor") for the

23 following reasons:

24                              **STATEMENT OF FACTS:**

25       Secured Creditor has a perfected security interest in Debtor's 2005 Chevrolet Cavalier,

26 Vehicle Identification No. 1G1JC52F857129833 (hereinafter "Vehicle"), pursuant to a Motor

27 Vehicle Contract & Security Agreement dated <u>6/15/2005</u> (hereinafter "Contract") entered into

28 10749/0000/680851    Case: 06-51741    Doc #: 22    Filed: 01/26/2007    Page 1 of 8    **EXHIBIT 1**

Acava 10749-929                        Objection to Plan

1  between Debtor and Secured Creditor's predecessor-in-interest ("Dealer").  A true and correct

2  copy of the Contract is attached hereto as Exhibit A.  Upon execution of the Contract Debtor wa

3  obligated to pay Secured Creditor $19,939.39 at an annual percentage rate of 14.50% over 60

4  monthly payments of $440.15.

5       The net payoff under the Debtor's Contract, as of the petition date, was $17,099.89 and

6  the Debtor's Plan proposes to value the Vehicle at $9,757.00, payable at 7.00% with a monthly

7  payment of $100.  The Plan proposes to pay unsecured claimholders a 0% dividend.

8  **THE PLAN'S PROPOSED VEHICLE VALUE FAILS TO PROVIDE THE PRESENT**
**VALUE OF SECURED CREDITOR'S CLAIM AS REQUIRED**
9  **BY 11 U.S.C. § 1325**

10       Secured Creditor objects to confirmation of Debtors' Plan on the grounds that the Vehicle

11  value set forth in the Plan fails to provide Secured Creditor with the full value of its claim in

12  violation of 11 U.S.C. § 1325.  The present payoff under the Debtor's Contract is $17,099.89 and

13  the Debtor's Plan proposes to value the Vehicle at $9,757.00.  The Bankruptcy Act effective

14  10/17/2005 provides that, for purposes of paragraph 5 of § 1325(a), section 506 shall not apply to

15  a claim described in that paragraph if the creditor has a purchase money security interest securing

16  the debt consisting of a motor vehicle for personal use by the debtor if the debt was incurred

17  within 910 days preceding Debtor's petition date.  Debtor executed the Contract for the Vehicle

18  on 6/15/2005, 449 days preceding the date of the filing of Debtor's petition on 9/07/2006.

19  Therefore, Debtor's attempt to cram down the value of the Vehicle is in violation of § 1325(a)(9)

20  and Secured Creditor's claim should be allowed in its entirety in the amount of $17,099.89.

21  Therefore, in order to confirm the Plan over Secured Creditor's objection, the Plan must provide

22  for payment of Secured Creditor's claim in full in the amount of $17,099.89.

23

24

25

26

27

28

1

### THE PLAN'S PROPOSED INTEREST RATE FAILS TO PROVIDE THE PRESENT VALUE OF SECURED CREDITOR'S CLAIM AS REQUIRED BY 11 U.S.C. § 1325(a)(5)(B)(ii)

2

3

4        Secured Creditor objects to confirmation of Debtors' Plan on the grounds that the interest

5    rate of 7.00% set forth in the Plan fails to provide Secured Creditor with the full value of its claim

6    in violation of 11 U.S.C. § 1325(a)(5)(B)(ii).  In a recent ruling by the Supreme Court, the court

7    held that §1325(a)(5)(B) does not require that the terms of the cram down loan match the terms to

8    which the debtor and creditor agreed prebankruptcy, nor does it require that the cram down terms

9    make the creditor subjectively indifferent between present foreclosure and future payment." *Lee*

10   *M. Till et ux. v. SCS Credit Corporation, 124 S.Ct. 1951* (2004).  The court ruled that the formula

11   approach is the correct method for determining the cram down rate of interest on the secured

12   value of a vehicle being paid through a Chapter 13 Plan.  This approach looks to the national

13   prime rate and requires the bankruptcy court to adjust this rate upwards to compensate the creditor

14   for the "greater risk of nonpayment" bankruptcy debtors frequently pose.  The factors to review in

15   determining the adjustment to the national prime rate of interest include the estate's

16   circumstances, the security's nature, and the reorganization plan's duration and feasibility.

17        In this particular case, the Vehicle is a rapidly depreciating asset.  Secured Creditor

18   requests that the Court's formula approach should look to the national prime rate, which was

19   8.25% at the time of Debtor's petition, and adjust that rate upward by at least 3% in order for

20   Secured Creditor to receive 11.25% interest on its claim.  This prime-plus rate of 11.25% would

21   compensate Secured Creditor for the greater risk of nonpayment that Debtor now poses.

22   ### DEBTOR'S PROPOSED MONTHLY PAYMENT FAILS TO ADEQUATELY PROTECT SECURED CREDITOR AS REQUIRED BY 11 U.S.C. § 1326(a)

23

24        Secured Creditor objects to confirmation of Debtor's Plan on the grounds that Debtor has

25   proposed a monthly payment of only $100 towards Secured Creditor's claim which fails to

26   adequately protect Secured Creditor as required by 11 U.S.C. § 1326(a).

27

28