# Record on Appeal – Tab 4 (Part 2 of 2)

With respect to each allowed secured claim provided for by the plan;

(iii) if –

(I) property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts; and

(II) the holder of such claim is secured by personal property, the amount of such payments shall not be less than an amount sufficient to provide to the holder of such claim adequate protection during the period of the plan.

11 U.S.C. §1325(a)(5)(B)(iii)

Debtor's monthly Plan payment to the Trustee is $280 with a monthly payment of $100 toward Secured Creditor's claim. Debtor's proposed payments do not comply with 11 U.S.C. § 1325(a)(5)(B)(iii) since the monthly payment is not in equal installments and doesn't cover the monthly depreciation of the Vehicle, which serves as collateral for Secured Creditor's claim. Therefore, Debtor's Plan as proposed cannot be confirmed and Secured Creditor requests that the Plan be amended to provide it with a minimum monthly payment of at least $250 commencing with the first Plan payment.

**THE PLAN CANNOT BE CONFIRMED BECAUSE IT IS NOT FEASIBLE AS REQUIRED BY 11 U.S.C. § 1325(a)(6)**

Secured Creditor objects to confirmation of Debtors' Plan on the grounds that, after increasing the value of Secured Creditor's claim to $17,099.89, the Debtor's proposed schedule o plan payments is not feasible. Debtor has provided no competent evidence as to how they will be able to make the Plan payments as proposed. Absent additional competent evidence from the Debtor supporting their ability to make the increased Plan payments, it does not appear that the Plan is feasible. Therefore, confirmation of Debtor's Plan should be denied because the Debtor will be unable to make all the plan payments and comply with the terms of the Plan as required b § 1325(a)(6).

**CONCLUSION:**

WHEREFORE, Secured Creditor respectfully requests that the Court sustain its objection(s) and deny confirmation of Debtor's proposed Plan. Alternatively, Secured Creditor requests the Court order that:

1. The Debtor's Plan be amended to provide for Secured Creditor's claim to be secured in the amount of at least $17,099.89;

2. The Debtor's Plan be amended to provide for Secured Creditor to receive at least 11.25 % interest on its secured claim from the effective date of the Debtor's Plan;

3. The Debtor's Plan be amended to provide for Secured Creditor to receive monthly payments in the amount of at least $250, on account of its secured claim, from the effective date of the Debtor's Plan;

4. The Debtor's Plan not be confirmed until Debtor has provided competent evidence as to how Debtor will make the plan payments and still complete the Plan within the maximum 60-month period;

5. Secured Creditor be awarded its reasonable attorneys' fees and costs incurred in protecting its security interest by objecting to the Debtor's proposed Plan; and

6. Secured Creditor be afforded such further relief as this Court deems necessary and proper.

DATED: October 13, 2006

SEVERSON & WERSON, P.C.

By: [signature]
Donald H. Cram, III / Katrina V. Stolc

Attorneys for Wells Fargo Financial Acceptance

10/11/2006 15:01 FAX 952 915 6550 WELLS FARGO FINANCIAL 005/01

RETAIL INSTALLMENT SALE CONTRACT
SIMPLE INTEREST FINANCE CHARGE

[illegible]

| New/Used | Year | Make and Model | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|---|
| USED | 2005 | [illegible] CAVALIER | 15463 | [illegible] | [illegible] |

[illegible]

STATEMENT OF INSURANCE

[illegible]

| [illegible] | [illegible] | [illegible] | [illegible] | [illegible] |
|---|---|---|---|---|
| 16.50 | [illegible] | [illegible] | [illegible] | [illegible] |

[illegible]

ITEMIZATION OF THE AMOUNT FINANCED

[illegible]

| [illegible] | Amount |
|---|---|
| [illegible] | 41.00 |
| [illegible] | 6423.00 |
| [illegible] | 680.00 |
| [illegible] | 19707.54 |
| [illegible] | 135.00 |
| [illegible] | 1500.00 |
| [illegible] | 0.00 |

[illegible]

AUTO VEHICLE [illegible]

[illegible]

NOTICE [illegible]

[illegible]

THERE IS NO COOLING OFF PERIOD

[illegible]

Page 37

EXHIBIT A

DONALD H. CRAM, III (State Bar No. 160004)
KATRINA V. STOLC (State Bar No. 226557)
DUANE M. GECK (State Bar No. 114823)
SEVERSON & WERSON, P.C.
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 677-5536
Facsimile: (415) 677-5664
e-mail: dhc@severson. com

Attorneys for Creditor
WELLS FARGO FINANCIAL ACCEPTANCE

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re<br>LETICIA I. ACAYA,<br><br>Debtor(s). | Case No. 06-51741-MMOR<br><br>Chapter 13<br><br>Date: 10/25/2006<br>Time: 11:00 AM<br>Judge: Hon. Marilyn Morgan<br>Place: 280 South 1st Street<br>Room 3070<br>San Jose, CA 95113-3099 |

**CERTIFICATE OF SERVICE**

I, the undersigned, declare that I am over the age of 18 and am not a party to this action. am employed in the City and County of San Francisco, California; my business address is Severson & Werson, One Embarcadero Center, Suite 2600, San Francisco, California 94111.

On the date below, I served a copy, with all exhibits (if any), of the following document(s):

- **OBJECTION OF WELLS FARGO FINANCIAL ACCEPTANCE TO CONFIRMATION OF PLAN**

on all interested parties in said case addressed as follows:

Leticia I. Acaya
10540 Geil Street
Castroville, CA 95012

Rodney M. Kleman, Esq.
Law Offices of Rodney M. Kleman
400 Camino El Estero
Monterey, CA 93940

Devin Derham-Burk
Chapter 13 Trustee
P.O. Box 50013
San Jose, CA 95150-0013

[X] **(BY MAIL)** I caused an envelope to be deposited in the mail at San Francisco, California, with first class postage thereon fully prepaid.

I am readily familiar with Severson & Werson's practice of collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service i sealed envelopes with first class postage fully prepaid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration is executed in San Francisco, California, on October 13, 2006.

Bill Bush

Dealer Number | Contract Number | R.O.S. Number | Stock Number NEVADA

| Buyer (and Co-Buyer) Name and Address (Including County and Zip Code) | Creditor - Seller (Name and Address) |
|---|---|
| LETICIA ITURRALDE ACAYA<br>10540 GEIL STREET<br>CASTROVILLE CA 95012 MONTEREY | CARDINALE MAZDA DAEWOO VW<br>500 AUTO CENTER CIRCLE<br>SALINAS CA 93907 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Creditor - Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New Used | Year | Make and Model | Odometer | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|---|
| USED | 2005 | CHEVROLET CAVALIER | 16453 | 1G1JC52F857129833 | [X] personal, family or household<br>[ ] business or commercial |

## FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $ 0.00 is |
|---|---|---|---|---|
| 14.50 % | $ 9110.51 (e) | $ 19939.39 | $ 29049.90 (e) | $ 29049.90 (e) |

(e) means an estimate

YOUR PAYMENT SCHEDULE WILL BE:

| Number of Payments: | Amount of Payments: | When Payments Are Due: |
|---|---|---|
| One Payment of | N/A | |
| One Payment of | N/A | |
| 65 Payments | 440.15 | Monthly, Beginning 07/15/2005 |
| N/A Payments | N/A | Monthly, Beginning |
| One Final Payment | 440.15 | 12/15/2010 |

**Late Charge.** If payment is not received in full within 10 days after it is due, you will pay a late charge of 5% of the part of the payment that is late.
**Prepayment.** If you pay off all your debt early, you may be charged a minimum finance charge.
**Security Interest.** You are giving a security interest in the vehicle being purchased.
**Additional Information:** See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date, minimum finance charges, and security interest.

### ITEMIZATION OF THE AMOUNT FINANCED

1. **Total Cash Price**
   - A. Cash Price of Motor Vehicle and Accessories $ 9288.00 (A)
     - 1. Cash Price Vehicle $ 9288.00
     - 2. Cash Price Accessories $ N/A
     - 3. Other (Nontaxable) N/A
       - Describe ______ $ N/A
       - Describe N/A $ N/A
   - B. Document Preparation Fee (not a governmental fee) $ 45.00 (B)
   - C. Smog Fee Paid to Seller $ N/A (C)
   - D. Sales Tax (on taxable items in A+B+C) $ 676.64 (D)
   - E. Optional DMV Electronic Filing Fee* $ N/A (E)
   - F. (Optional) Service Contract* $ 2495.00 (F)
   - G. (Optional) Service Contract* $ N/A (G)
   - H. Prior Credit or Lease Balance paid by Seller to BAY FED CU $ 6683.00 (H)
     (see downpayment and trade-in calculation)
   - I. (Optional) Gap Contract (to whom paid)* GAP 1 $ 600.00 (I)
   - J. Other (to whom paid)* ______ $ N/A (J)
     For ______

   **Total Cash Price** (A through J) $ 19787.64 (1)
2. **Amounts Paid to Public Officials** ESTIMATED
   - A. License Fees $ 135.00 (A)
   - B. Registration/Transfer/Titling Fees $ N/A (B)
   - C. California Tire Fees* $ 8.75 (C)
   - D. Other N/A $ N/A (D)
   - E. Other N/A $ N/A (E)

   **Total Official Fees** (A through E) $ 143.75 (2)
3. **Amount Paid to Insurance Companies** (Total premiums from Statement of Insurance column a + b)* $ N/A (3)
4. **Smog Certification or Exemption Fee Paid to State** $ 8.00 (4)
5. **Subtotal** (1 through 4) $ 19939.39 (5)
6. **Total Downpayment**
   - A. Agreed Trade-In Value Yr 2003 Make FORD Model TAURUS Odom. 34605 VIN 1FAFP55293A182248 $ 7000.00 (A)
   - B. Less Prior Credit or Lease Balance $ 13683.00 (B)
   - C. Net Trade-In (A less B) (indicate if a negative number) $ -6683.00 (C)
   - D. Deferred Downpayment $ N/A (D)
   - E. Manufacturer's Rebate N/A $ N/A (E)
   - F. Other $ N/A (F)
   - G. Cash $ N/A (G)

   **Total Downpayment** (C through G) (If negative, enter zero on line 6 and enter the amount less than zero as a positive number on line 1H above) $ 0.00 (6)
7. **Amount Financed** (5 less 6) $ 19939.39 (7)

## STATEMENT OF INSURANCE

**NOTICE.** No person is required as a condition of financing the purchase of a motor vehicle to purchase or negotiate any insurance through a particular insurance company, agent or broker. You are not required to buy any other insurance to obtain credit. Your decision to buy or not buy other insurance will not be a factor in the credit approval process.

### Vehicle Insurance

| | Term | Premium |
|---|---|---|
| $ N/A Ded. Comp., Fire & Theft | Mos. | $ N/A |
| $ N/A Ded. Collision N/A | Mos. | $ N/A |
| Bodily Injury $ N/A Limits | Mos. | $ N/A |
| Property Damage $ ______ Limits | Mos. | $ N/A |
| Medical | Mos. | $ N/A |
| | Mos. | $ N/A |
| Total Vehicle Insurance Premiums | | $ ______ (a) |

UNLESS A CHARGE IS INCLUDED IN THIS AGREEMENT FOR PUBLIC LIABILITY OR PROPERTY DAMAGE INSURANCE, PAYMENT FOR SUCH COVERAGE IS NOT PROVIDED BY THIS AGREEMENT.

You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit.

Buyer X [signature]
Co-Buyer X
Seller X [signature]

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

### Application for Optional Credit Insurance

[ ] Credit Life: [ ] Buyer [ ] Co-Buyer [ ] Both
[ ] Credit Disability (Buyer Only)

| | Term | Exp. | Premium |
|---|---|---|---|
| Credit Life | N/A Mos. | | $ N/A |
| Credit Disability | N/A Mos. | | $ N/A |
| Total Credit Insurance Premiums | | | $ N/A (b) |

Insurance Company Name ______

Home Office Address ______

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown above.

You are applying for the credit insurance marked above. Your signature below means that you agree that: (1) You are not eligible for insurance if you have reached your 65th birthday. (2) You are eligible for disability insurance only if you are working for wages or profit 30 hours a week or more on the Effective Date. (3) Only the Primary Buyer is eligible for disability insurance. DISABILITY INSURANCE MAY NOT COVER CONDITIONS FOR WHICH YOU HAVE SEEN A DOCTOR OR CHIROPRACTOR IN THE LAST 6 MONTHS (Refer to "Total Disabilities Not Covered" in your policy for details).
You want to buy the credit insurance.

| Date | X [signature] Buyer Signature | 55 Age |
|---|---|---|
| Date | X Co-Buyer Signature | Age |

**OPTIONAL GAP CONTRACT** A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose to buy a gap contract, the charge is shown in item 1I. See your gap contract for details on the terms it provides. It is a part of this contract.
Term 66 Mos. Name of Gap Contract
You want to buy a gap contract.
Buyer X [signature]

**EXHIBIT 2**

Case 06-51741 Doc #: 22 Filed: 01/26/2007 Page 1 of 4

3. Amount Paid to Insurance Companies (Total premiums from Itemization of Insurance column 2 + 5) $ N/A (3)
4. Smog Certification or Exemption Fee Paid to State $ 8.00 (4)
5. Subtotal (1 through 4) $ 19939.39 (5)
6. Total Downpayment
A. Agreed Trade-In Value Yr 2003 Make FORD Model TAURUS Odom 34605 VIN 1FAFP55293A192248 $ 7000.00 (A)
$ 13583.00
B. Less Prior Credit or Lease Balance $ 6583.00 (B)
C. Net Trade-in (A less B) (indicate if a negative number) $ N/A (C)
D. Deferred Downpayment $ N/A (D)
E. Manufacturer's Rebate $ N/A (E)
F. Other N/A $ N/A (F)
G. Cash $ N/A (G)
Total Downpayment (C through G) $ 0.00 (6)
(If negative, enter zero on line 6 and enter the amount less than zero as a positive number on line 1H above)
7. Amount Financed (5 less 6) $ 19939.39 (7)
*Seller may keep part of these amounts.

disability insurance. DISABILITY INSURANCE MAY NOT COVER CONDITIONS FOR WHICH YOU HAVE SEEN A DOCTOR OR CHIROPRACTOR IN THE LAST 6 MONTHS (Refer to "Total Disabilities Not Covered" in your policy for details).
You want to buy the credit insurance.
Date Buyer Signature X [signature] Age 55
Date Co-Buyer Signature X Age

OPTIONAL GAP CONTRACT A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose to buy a gap contract, the charge is shown in Item 1I. See your gap contract for details on the protection it provides. It is part of this contract.
Term [illegible] Mos. Name of Gap Contract
You want to buy a gap contract.
Buyer X [signature]

**SELLER ASSISTED LOAN**
BUYER MAY BE REQUIRED TO PLEDGE SECURITY FOR THE LOAN, AND WILL BE OBLIGATED FOR THE INSTALLMENT PAYMENTS ON BOTH THIS RETAIL INSTALLMENT SALE CONTRACT AND THE LOAN.
Proceeds of Loan From: N/A N/A
Amount $ N/A Finance Charge $ N/A
Total $ N/A Payable in N/A
installments of $ ______ $ ______
from the Loan is shown in Item 6D.

**AUTO BROKER FEE DISCLOSURE**
If this contract reflects the retail sale of a new motor vehicle, the sale is not subject to a fee received by an autobroker from us unless the following box is checked:
☐ Name of autobroker receiving fee, if applicable:
N/A

OPTIONAL SERVICE CONTRACT(S) You want to purchase the service contract(s) written with the following company(ies) for the term(s) shown below for the charge(s) shown in item 1F and/or 1G above.
1.F Company FIRST EXTENDED 72000
Term N/A Mos. or ______ Miles
1.G Company N/A
Term ______ Mos. or ______ Miles
Buyer X ______

**NOTICE OF RESCISSION RIGHTS**
If Buyer and Co-Buyer sign here, the provisions of the Rescission Rights section on the back giving the Seller the right to rescind if Seller is unable to assign this contract to a financial institution will apply.
Buyer X [signature] Co-Buyer X ______

HOW THIS CONTRACT CAN BE CHANGED. This contract contains the entire agreement between you and us relating to this contract. Any change to the contract must be in writing and both you and we must sign it. No oral changes are binding.
X [signature]
Buyer Signs
X ______
Co-Buyer Signs

OPTION: ☐ N/A You pay no finance charge if the Amount Financed, item 7, is paid in full on or before ______, Year ______, SELLER'S INITIALS ______

THE MINIMUM PUBLIC LIABILITY INSURANCE LIMITS PROVIDED IN LAW MUST BE MET BY EVERY PERSON WHO PURCHASES A VEHICLE. IF YOU ARE UNSURE WHETHER OR NOT YOUR CURRENT INSURANCE POLICY WILL COVER YOUR NEWLY ACQUIRED VEHICLE IN THE EVENT OF AN ACCIDENT, YOU SHOULD CONTACT YOUR INSURANCE AGENT.
WARNING:
YOUR PRESENT POLICY MAY NOT COVER COLLISION DAMAGE OR MAY NOT PROVIDE FOR FULL REPLACEMENT COSTS FOR THE VEHICLE BEING PURCHASED. IF YOU DO NOT HAVE FULL COVERAGE, SUPPLEMENTAL COVERAGE FOR COLLISION DAMAGE MAY BE AVAILABLE TO YOU THROUGH YOUR INSURANCE AGENT OR THROUGH THE SELLING DEALER. HOWEVER, UNLESS OTHERWISE SPECIFIED, THE COVERAGE YOU OBTAIN THROUGH THE DEALER PROTECTS ONLY THE DEALER, USUALLY UP TO THE AMOUNT OF THE UNPAID BALANCE REMAINING AFTER THE VEHICLE HAS BEEN REPOSSESSED AND SOLD.
FOR ADVICE ON FULL COVERAGE THAT WILL PROTECT YOU IN THE EVENT OF LOSS OR DAMAGE TO YOUR VEHICLE, YOU SHOULD CONTACT YOUR INSURANCE AGENT.
THE BUYER SHALL SIGN TO ACKNOWLEDGE THAT HE/SHE UNDERSTANDS THESE PUBLIC LIABILITY TERMS AND CONDITIONS.
S/S X [signature] X ______

**Representations of Buyer:** Seller has relied on the truth and accuracy of the information provided by you in connection with the Trade-in Vehicle. You represent that you have given a true payoff amount on the vehicle traded in. If the payoff amount is more than the amount shown above in item 6.B as "Prior Credit or Lease Balance," you must pay Seller the excess on demand. If the payoff amount is less than the amount shown above in item 6.B as "Prior Credit or Lease Balance," Seller will refund the difference to you.
Buyer X [signature] Co-Buyer X ______

**Notice to buyer:**
**(1) Do not sign this agreement before you read it or if it contains any blank spaces to be filled in. (2) You are entitled to a completely filled in copy of this agreement. (3) You can prepay the full amount due under this agreement at any time. (4) If you default in the performance of your obligations under this agreement, the vehicle may be repossessed and you may be subject to suit and liability for the unpaid indebtedness evidenced by this agreement.**

If you have a complaint concerning this sale, you should try to resolve it with the seller.
Complaints concerning unfair or deceptive practices or methods by the seller may be referred to the city attorney, the district attorney, or an investigator for the Department of Motor Vehicles, or any combination thereof.
After this contract is signed, the seller may not change the financing or payment terms unless you agree in writing to the change. You do not have to agree to any change, and it is an unfair or deceptive practice for the seller to make a unilateral change.
Buyer Signature X [signature] Co-Buyer Signature X ______

***The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.***

**THERE IS NO COOLING OFF PERIOD**
California law does not provide for a "cooling off" or other cancellation period for vehicle sales. Therefore, you cannot later cancel this contract simply because you change your mind, decide the vehicle costs too much, or wish you had acquired a different vehicle. After you sign below, you may only cancel this contract with the agreement of the seller or for legal cause, such as fraud.

**YOU AGREE TO THE TERMS OF THIS CONTRACT. YOU CONFIRM THAT BEFORE YOU SIGNED THIS CONTRACT, WE GAVE IT TO YOU, AND YOU WERE FREE TO TAKE IT AND REVIEW IT. YOU CONFIRM THAT YOU RECEIVED A COMPLETELY FILLED-IN COPY WHEN YOU SIGNED IT.**

Buyer Signature X [signature] 06/15/2005 Date 6-15-05 Co-Buyer Signature X ______ Date ______

Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.
Other Owner Signature X ______ Address ______

**GUARANTY**
To induce us to sell the vehicle to Buyer, each person who signs as a Guarantor individually guarantees the payment of this contract. If Buyer fails to pay any money owing on this contract, each Guarantor must pay it when asked. Each Guarantor will be liable for the total amount owing even if other persons also sign as Guarantor, and even if Buyer has a complete defense to Guarantor's demand for reimbursement. Each Guarantor agrees to be liable even if we do one or more of the following: (1) give the Buyer more time to pay one or more payments; (2) give a full or partial release to any other Guarantor; (3) release any security; (4) accept less from the Buyer than the total amount owing; or (5) otherwise reach a settlement relating to this contract or extend the contract. Each Guarantor acknowledges receipt of a completed copy of this contract and guaranty at the time of signing.
Guarantor waives notice of acceptance of this Guaranty, notice of the Buyer's non-payment, non-performance, and default; and notices of the amount owing at any time, and of any demands upon the Buyer.
Guarantor X N/A Date 06/15/2005 Guarantor X N/A Date 06/15/2005
Address ______ Address ______
Seller Signs [signature] Date 06/15/2005 By X [signature] Title ______

FORM NO. 553-CA

a. **How we will figure Finance Charge.** We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed. Creditor - Seller may receive part of the Finance Charge.

b. **How we will apply payments.** We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose.

c. **How late payments or early payments change what you must pay.** We based the Finance Charge, Total of Payments, and Total Sale Price shown on the front on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.

d. **You may prepay.** You may prepay all or part of the unpaid part of the Amount Financed at any time. If you do so, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the date of your payment. As of the date of your payment, if the minimum finance charge is greater than the earned Finance Charge, you may be charged the difference; the minimum finance charge is as follows: (1) $25 if the original Amount Financed does not exceed $1,000, (2) $50 if the original Amount Financed is more than $1,000 but not more than $2,000, or (3) $75 if the original Amount Financed is more than $2,000.

2. **YOUR OTHER PROMISES TO US**

a. **If the vehicle is damaged, destroyed, or missing.** You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed, or missing.

> **GAP LIABILITY NOTICE**
> In the event of theft or damage to your vehicle that results in a total loss, there may be a gap between the amount you owe under this contract and the proceeds of your insurance settlement and deductible. THIS CONTRACT PROVIDES THAT YOU ARE LIABLE FOR THE GAP AMOUNT. An optional gap contract (debt cancellation contract) for coverage of the gap amount may be offered for an additional charge.

b. **Using the vehicle.** You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.

c. **Security Interest.**
You give us a security interest in:
- The vehicle and all parts or goods installed on it;
- All money or goods received (proceeds) for the vehicle;
- All insurance, maintenance, service, or other contracts we finance for you; and
- All proceeds from insurance, maintenance, service, or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.

This secures payment of all you owe on this contract. It also secures your other agreements in this contract as the law allows. You will make sure the title shows our security interest (lien) in the vehicle.

d. **Insurance you must have on the vehicle.**
You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the premium for the insurance and a finance charge equal to the Annual Percentage Rate shown on the front of this contract or, at our option, the highest rate the law permits. If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce

f. **We will sell the vehicle if you do not get it back.** If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle.
We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us. If you do not pay this amount when we ask, we may charge you interest at the Annual Percentage Rate shown on the face of this contract, not to exceed the highest rate permitted by law, until you pay.

g. **What we may do about optional insurance, maintenance, service, or other contracts.** This contract may contain charges for optional insurance, maintenance, service, or other contracts. If we repossess the vehicle, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

4. **WARRANTIES SELLER DISCLAIMS**
**If you do not get a written warranty, and the Seller does not enter into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose.**
This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide.

5. **Used Car Buyers Guide. The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.**
**Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.**

6. **Applicable Law**
Federal law and California law apply to this contract. If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.

7. **Warranties of Buyer.** You promise you have given true and correct information in your application for credit, and you have no knowledge that will make that information untrue in the future. We have relied on the truth and accuracy of that information in entering into this contract. Upon request, you will provide us with documents and other information necessary to verify any item contained in your credit application.

You waive the provisions of Calif. Vehicle Code Section 1808.21 and authorize the California Department of Motor Vehicles to furnish your residence address to us.

**CREDIT DISABILITY INSURANCE NOTICE**
**CLAIM PROCEDURE**

If you become disabled, you must tell us right away. (You are advised to send this information to the same address to which you are normally required to send your payments, unless a different address or telephone number is given to you in writing by us as the location where we would like to be notified.) We will tell you where to get claim forms. You must send in the completed form to the insurance company as soon as possible and tell us as soon as you do.

If your disability insurance covers all of your missed payment(s), WE CANNOT TRY TO COLLECT WHAT YOU OWE OR FORECLOSE UPON OR REPOSSESS ANY COLLATERAL UNTIL THREE CALENDAR MONTHS AFTER your first missed payment is due or until the insurance company pays or rejects your claim, whichever comes first. We can, however, try to collect, foreclose, or repossess if you have any money due and owing us or are otherwise in default when your disability claim is made or if a senior mortgage or lien holder is foreclosing.

If the insurance company pays the claim within the three calendar months, we must accept the money as though you paid on time. If the insurance company rejects the claim within the three calendar months or accepts the claim within the three

as the law allows. You will make sure the title shows our security interest (lien) in the vehicle.

d. **Insurance you must have on the vehicle.**
You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the premium for the insurance and a finance charge equal to the Annual Percentage Rate shown on the front of this contract or, at our option, the highest rate the law permits. If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

e. **What happens to returned insurance, maintenance, service, or other contract charges.** If we get a refund of insurance, maintenance, service, or other contract charges, you agree that we may subtract the refund from what you owe.

3. **IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES**

a. **You may owe late charges.** You will pay a late charge on each late payment as shown on the front. Acceptance of a late payment or late charge does not excuse your late payment or mean that you may keep making late payments. If you pay late, we may also take the steps described below.

b. **You may have to pay all you owe at once.** If you break your promises (default), we may demand that you pay all you owe on this contract at once, subject to any right the law gives you to reinstate this contract.
Default means:
- You do not pay any payment on time;
- You start a proceeding in bankruptcy or one is started against you or your property; or
- The vehicle is lost, damaged or destroyed.
- You break any agreements in this contract.

The amount you will owe will be the unpaid part of the Amount Financed plus the earned and unpaid part of the Finance Charge, any late charges, and any amounts due because you defaulted.

c. **You may have to pay collection costs.** You will pay our reasonable costs to collect what you owe, including attorney fees, court costs, collection agency fees, and fees paid for other reasonable collection efforts. You agree to pay a charge not to exceed $15 if any check you give to us is dishonored.

d. **We may take the vehicle from you.** If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it. If your vehicle has an electronic tracking device, you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you at your expense. If you do not ask for these items back, we may dispose of them as the law allows.

e. **How you can get the vehicle back if we take it.** If we repossess the vehicle, you may pay to get it back (redeem). You may redeem the vehicle by paying all you owe, or you may have the right to reinstate this contract and redeem the vehicle by paying past due payments and any late charges, providing proof of insurance, and/or taking other action to cure the default. We will provide you all notices required by law to tell you when and how much to pay and/or what action you must take to redeem the vehicle.

different address or telephone number is given to you in writing by us as the location where we would like to be notified.) We will then send you the claim forms. You must send in the completed form to the insurance company as soon as possible and tell us as soon as you do.

If your disability insurance covers all of your missed payment(s), WE CANNOT TRY TO COLLECT WHAT YOU OWE OR FORECLOSE UPON OR REPOSSESS ANY COLLATERAL UNTIL THREE CALENDAR MONTHS AFTER your first missed payment is due or until the insurance company pays or rejects your claim, whichever comes first. We can, however, try to collect, foreclose, or repossess if you have any money due and owing us or are otherwise in default when your disability claim is made or if a senior mortgage or lien holder is foreclosing.

If the insurance company pays the claim within the three calendar months, we must accept the money as though you paid on time. If the insurance company rejects the claim within the three calendar months or accepts the claim within the three calendar months on a partial disability and pays less than for a total disability, you will have 35 days from the date that the rejection or the acceptance of the partial disability claim is sent to pay past due payments, or the difference between the past due payments and what the insurance company pays for the partial disability, plus late charges. You can contact us, and we will tell you how much you owe. After that time, we can take action to collect or foreclose or repossess any collateral you may have given.

If the insurance company accepts your claim but requires that you send in additional forms to remain eligible for continued payments, you should send in these completed additional forms no later than required. If you do not send in these forms on time, the insurance company may stop paying, and we will then be able to take action to collect or foreclose or repossess any collateral you may have given.

**Rescission Rights**

a. Seller agrees to deliver the vehicle to you on the date this contract is signed by Seller and you. You understand that it may take a few days for Seller to verify your credit and assign the contract. You agree that if Seller is unable to assign the contract to any one of the financial institutions with whom Seller regularly does business under an assignment acceptable to Seller, Seller may rescind (cancel) the contract.

b. Seller shall give you written notice (or in any other manner in which actual notice is given to you) within 10 days of the date this contract is signed if Seller elects to rescind. Upon receipt of such notice, you must immediately return the vehicle to Seller in the same condition as when sold, reasonable wear and tear excepted. Seller must give back to you all consideration received by Seller, including any trade-in vehicle.

c. If you do not immediately return the vehicle, you shall be liable for all expenses incurred by Seller in taking the vehicle from you, including reasonable attorney's fees.

d. While the vehicle is in your possession, all terms of the contract, including those relating to use of the vehicle and insurance for the vehicle, shall be in full force and you shall assume all risk of loss or damage to the vehicle. You must pay all reasonable costs for repair of any damage to the vehicle until the vehicle is returned to Seller.

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

The preceding NOTICE applies only if the "personal, family or household" box in the "Primary Use for Which Purchased" section of this contract is checked. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

Seller assigns its interest in this contract to ______ (Assignee) under the terms of Seller's agreement(s) with Assignee.

☐ Assigned with recourse ☐ Assigned without recourse ☐ Assigned with limited recourse

Seller ______ By ______ Title ______

Form No. 553-CA 1/05

# COMMERCIAL CODE
# SECTION 9101-9110

9101. This division may be cited as the Uniform Commercial Code-Secured Transactions.

9102. (a) In this division:

(1) "Accession" means goods that are physically united with other goods in such a manner that the identity of the original goods is not lost.

(2) "Account," except as used in "account for," means a right to payment of a monetary obligation, whether or not earned by performance, (i) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of, (ii) for services rendered or to be rendered, (iii) for a policy of insurance issued or to be issued, (iv) for a secondary obligation incurred or to be incurred, (v) for energy provided or to be provided, (vi) for the use or hire of a vessel under a charter or other contract, (vii) arising out of the use of a credit or charge card or information contained on or for use with the card, or (viii) as winnings in a lottery or other game of chance operated or sponsored by a state, governmental unit of a state, or person licensed or authorized to operate the game by a state or governmental unit of a state. The term includes health care insurance receivables. The term does not include (i) rights to payment evidenced by chattel paper or an instrument, (ii) commercial tort claims, (iii) deposit accounts, (iv) investment property, (v) letter-of-credit rights or letters of credit, or (vi) rights to payment for money or funds advanced or sold, other than rights arising out of the use of a credit or charge card or information contained on or for use with the card.

(3) "Account debtor" means a person obligated on an account, chattel paper, or general intangible. The term does not include persons obligated to pay a negotiable instrument, even if the instrument constitutes part of chattel paper.

(4) "Accounting," except as used in "accounting for," means a record that is all of the following:

(A) Authenticated by a secured party.

(B) Indicating the aggregate unpaid secured obligations as of a date not more than 35 days earlier or 35 days later than the date of the record.

(C) Identifying the components of the obligations in reasonable detail.

(5) "Agricultural lien" means an interest in farm products that meets all of the following conditions:

(A) It secures payment or performance of an obligation for either of the following:

(i) Goods or services furnished in connection with a debtor's farming operation.

(ii) Rent on real property leased by a debtor in connection with its farming operation.

(B) It is created by statute in favor of a person that does either of the following:

(i) In the ordinary course of its business furnished goods or services to a debtor in connection with a debtor's farming operation.

(ii) Leased real property to a debtor in connection with the debtor's farming operation.

(C) Its effectiveness does not depend on the person's possession of the personal property.

Page 44

**EXHIBIT 3**

| | |
|---|---|
| "Proceeds of a letter of credit" | Section 5114. |
| "Prove" | Section 3103. |
| "Sale" | Section 2106. |
| "Securities account" | Section 8501. |
| "Securities intermediary" | Section 8102. |
| "Security" | Section 8102. |
| "Security certificate" | Section 8102. |
| "Security entitlement" | Section 8102. |
| "Uncertificated security" | Section 8102. |

(c) Division 1 (commencing with Section 1101) contains general definitions and principles of construction and interpretation applicable throughout this division.

9103. (a) In this section:

(1) "Purchase money collateral" means goods or software that secures a purchase money obligation incurred with respect to that collateral.

(2) "Purchase money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.

(b) A security interest in goods is a purchase money security interest as follows:

(1) To the extent that the goods are purchase money collateral with respect to that security interest.

(2) If the security interest is in inventory that is or was purchase money collateral, also to the extent that the security interest secures a purchase money obligation incurred with respect to other inventory in which the secured party holds or held a purchase money security interest.

(3) Also to the extent that the security interest secures a purchase money obligation incurred with respect to software in which the secured party holds or held a purchase money security interest.

(c) A security interest in software is a purchase money security interest to the extent that the security interest also secures a purchase money obligation incurred with respect to goods in which the secured party holds or held a purchase money security interest if both of the following conditions are satisfied:

(1) The debtor acquired its interest in the software in an integrated transaction in which it acquired an interest in the goods.

(2) The debtor acquired its interest in the software for the principal purpose of using the software in the goods.

(d) The security interest of a consignor in goods that are the subject of a consignment is a purchase money security interest in inventory.

(e) In a transaction other than a consumer-goods transaction, if the extent to which a security interest is a purchase money security interest depends on the application of a payment to a particular obligation, the payment must be applied as follows:

(1) In accordance with any reasonable method of application to which the parties agree.

(2) In the absence of the parties' agreement to a reasonable method, in accordance with any intention of the obligor manifested at or before the time of payment.

(3) In the absence of an agreement to a reasonable method and a timely manifestation of the obligor's intention, in the following order:

(A) To obligations that are not secured.

(B) If more than one obligation is secured, to obligations secured by purchase money security interests in the order in which those obligations were incurred.

(f) In a transaction other than a consumer-goods transaction, a purchase money security interest does not lose its status as such,

even if any of the following conditions are satisfied:

(1) The purchase money collateral also secures an obligation that is not a purchase money obligation.

(2) Collateral that is not purchase money collateral also secures the purchase money obligation.

(3) The purchase money obligation has been renewed, refinanced, consolidated, or restructured.

(g) In a transaction other than a consumer-goods transaction, a secured party claiming a purchase money security interest has the burden of establishing the extent to which the security interest is a purchase money security interest.

(h) The limitation of the rules in subdivisions (e), (f), and (g) to transactions other than consumer-goods transactions is intended to leave to the court the determination of the proper rules in consumer-goods transactions. The court may not infer from that limitation the nature of the proper rule in consumer-goods transactions and may continue to apply established approaches.

9104. (a) A secured party has control of a deposit account if any of the following conditions is satisfied:

(1) The secured party is the bank with which the deposit account is maintained.

(2) The debtor, secured party, and bank have agreed in an authenticated record that the bank will comply with instructions originated by the secured party directing disposition of the funds in the deposit account without further consent by the debtor.

(3) The secured party becomes the bank's customer with respect to the deposit account.

(b) A secured party that has satisfied subdivision (a) has control, even if the debtor retains the right to direct the disposition of funds from the deposit account.

9105. A secured party has control of electronic chattel paper if the record or records comprising the chattel paper are created, stored, and assigned in such a manner that each of the following conditions is satisfied:

(1) A single authoritative copy of the record or records exists which is unique, identifiable, and, except as otherwise provided in paragraphs (4), (5), and (6), unalterable.

(2) The authoritative copy identifies the secured party as the assignee of the record or records.

(3) The authoritative copy is communicated to and maintained by the secured party or its designated custodian.

(4) Copies or revisions that add or change an identified assignee of the authoritative copy can be made only with the participation of the secured party.

(5) Each copy of the authoritative copy and any copy of a copy is readily identifiable as a copy that is not the authoritative copy.

(6) Any revision of the authoritative copy is readily identifiable as an authorized or unauthorized revision.

9106. (a) A person has control of a certificated security, uncertificated security, or security entitlement as provided in Section 8106.

(b) A secured party has control of a commodity contract if either of the following conditions is satisfied:

(1) The secured party is the commodity intermediary with which the commodity contract is carried.

(2) The commodity customer, secured party, and commodity intermediary have agreed that the commodity intermediary will apply any value distributed on account of the commodity contract as

ney collateral also secures the

en renewed, refinanced, consoli-

ter-goods transaction, a secured
ity interest has the burden of
ity interest is a purchase money

ions (e), (f), and (g) to transac-
ions is intended to leave to the
les in consumer-goods transac-
nitation the nature of the proper
may continue to apply estab-

1, 2001.

-9307, 9316, 9337, was added Stats 1974
980 ch 1156 § 3. Stats 1984 ch 927 § 7,
1, 1997, repealed Stats 1999 ch 991 § 34,

c., of another jurisdiction, and incoming
53 ch 819, effective January 1, 1965, and

chase-money security interest in consumer
1 9-324 provide special priority rules for
ts. This section explains when a security

**Obligation"; "Purchase-Money Secu-**
collateral" and "purchase-money obliga-
hat constitutes a purchase-money security
)(2), the definition of "purchase-money
n to enable" includes obligations for ex-
he collateral, sales taxes, duties, finance
uisit, demurrage, administrative charges,
and other similar obligations.
uires a close nexus between the acquisi-
security interest does not qualify as a
roperty on unsecured credit and subse-
e price.
**ity Interests in Inventory.** Subsection
chase-money security interests in inven-

Debtor (D), retaining a security interest
ns, existing and future, of D to S. S then
ing a security interest in Item-2 to secure
D then pays to S Item-1's price. D then
o takes Item-2 free of S's security inter-

Under subsection (b)(2), S's security interest in *Item-1* securing *Item-2's unpaid price* would be a purchase-money security interest. This is so because S has a purchase-money security interest in Item-1, Item-1 secures the price of (a "purchase-money obligation incurred with respect to") Item-2 ("other inventory"), and Item-2 itself was subject to a purchase-money security interest. Note that, to the extent Item-1 secures the price of Item-2, S's security interest in Item-1 would not be a purchase-money security interest under subsection (b)(1). The security interest in Item-1 is a purchase-money security interest under subsection (b)(1) only to the extent that Item-1 is "purchase-money collateral," i.e., only to the extent that Item-1 "secures a purchase-money obligation incurred with respect to that collateral" (i.e., Item-1). See subsection (a)(1).

5. **Purchase-Money Security Interests in Goods and Software.** Subsections (b) and (c) limit purchase-money security interests to security interests in goods, including fixtures, and software. Otherwise, no change in meaning from former Section 9-107 is intended. The second sentence of former Section 9-115(5)(f) made the purchase-money priority rule (former Section 9-312(4)) inapplicable to investment property. This section's limitation makes that provision unnecessary.

Subsection (c) describes the limited circumstances under which a security interest in goods may be accompanied by a purchase-money security interest in software. The software must be acquired by the debtor in a transaction integrated with the transaction in which the debtor acquired the goods, and the debtor must acquire the software for the principal purpose of using the software in the goods. "Software" is defined in Section 9-102.

6. **Consignments.** Under former Section 9-114, the priority of the consignor's interest is similar to that of a purchase-money security interest. Subsection (d) achieves this result more directly, by defining the interest of a "consignor," defined in Section 9-102, to be a purchase-money security interest in inventory for purposes of this Article. This drafting convention obviates any need to set forth special priority rules applicable to the interest of a consignor. Rather, the priority of the consignor's interest as against the rights of lien creditors of the consignee, competing secured parties, and purchasers of the goods from the consignee can be determined by reference to the priority rules generally applicable to inventory, such as Sections 9-317, 9-320, 9-322, and 9-324. For other purposes, including the rights and duties of the consignor and consignee as between themselves, the consignor would remain the owner of goods under a bailment arrangement with the consignee. See Section 9-319.

7. **Provisions Applicable Only to Non-Consumer-Goods Transactions.**

a. **"Dual-Status" Rule.** For transactions other than consumer-goods transactions, this Article approves what some cases have called the "dual-status" rule, under which a security interest may be a purchase-money security interest to some extent and a non-purchase-money security interest to some extent. (Concerning consumer-goods transactions, see subsection (h) and Comment 8.) Some courts have found this rule to be explicit or implicit in the words "to the extent," found in former Section 9-107 and continued in subsections (b)(1) and (b)(2). The rule is made explicit in subsection (e). For non-consumer-goods transactions, this Article rejects the "transformation" rule adopted by some cases, under which any cross-collateralization, refinancing, or the like destroys the purchase-money status entirely.

Consider, for example, what happens when a $10,000 loan secured by a purchase-money security interest is refinanced by the original lender, and, as part of the transaction, the debtor borrows an additional $2,000 secured by the collateral. Subsection (f) resolves any doubt that the security interest remains a purchase-money security interest. Under subsection (b), however, it enjoys purchase-money status only to the extent of $10,000.

b. **Allocation of Payments.** Continuing with the example, if the debtor makes a $1,000 payment on the $12,000 obligation, then one must determine the extent to which the security interest remains a purchase-money security interest-$9,000 or $10,000. Subsection (e)(1) expresses the overriding principle, applicable in cases other than consumer-goods transactions, for determining the extent to which a security interest is a purchase-money security interest under these circumstances: freedom of contract, as limited by principle of reasonableness. An unconscionable method of application, for example, is not a reasonable one and so would not be given effect under subsection (e)(1). In the absence of agreement, subsection (e)(2) permits the obligor to determine how payments should be allocated. If the obligor fails to manifest its intention, obligations that are not secured will be paid first. (As used in this Article, the concept of "obligations that are not secured" means obligations for which the debtor has not created a security interest. This concept is different from and should not be confused with the concept of an "unsecured claim" as it appears in Bankruptcy Code Section 506(a).) The obligor may prefer this approach, because unsecured debt is likely to carry a higher interest rate than secured debt. A creditor who would prefer to be secured rather than unsecured also would prefer this approach.

(2) Collateral that is not purchase money collateral also secures the purchase money obligation.

(3) The purchase money obligation has been renewed, refinanced, consolidated, or restructured.

(g) In a transaction other than a consumer-goods transaction, a secured party claiming a purchase money security interest has the burden of establishing the extent to which the security interest is a purchase money security interest.

(h) The limitation of the rules in subdivisions (e), (f), and (g) to transactions other than consumer-goods transactions is intended to leave to the court the determination of the proper rules in consumer-goods transactions. The court may not infer from that limitation the nature of the proper rule in consumer-goods transactions and may continue to apply established approaches.

Added Stats 1999 ch 991 § 35 (SB 45), operative July 1, 2001.

**Former Sections:**

Former § 9103, similar to present UCC §§ 9301, 9303–9307, 9316, 9337, was added Stats 1974 ch 997 § 8, effective January 1, 1976, amended Stats 1980 ch 1156 § 3, Stats 1984 ch 927 § 7, Stats 1996 ch 176 § 8, ch 497 § 10, operative January 1, 1997, repealed Stats 1999 ch 991 § 34, operative July 1, 2001.

Former § 9103, relating to accounts, contract rights, etc., of another jurisdiction, and incoming goods subject to security interest, was enacted Stats 1963 ch 819, effective January 1, 1965, and repealed Stats 1974 ch 997 § 7.

**Historical Derivation:**

Former UCC § 9107, as enacted Stats 1963 ch 819.

**Official Comments on Uniform Commercial Code:**

1. **Source.** Former Section 9-107.

2. **Scope of This Section.** Under Section 9-309(1), a purchase-money security interest in consumer goods is perfected when it attaches. Sections 9-317 and 9-324 provide special priority rules for purchase-money security interests in a variety of contexts. This section explains when a security interest enjoys purchase-money status.

3. **"Purchase-Money Collateral"; "Purchase-Money Obligation"; "Purchase-Money Security Interest."** Subsection (a) defines "purchase-money collateral" and "purchase-money obligation." These terms are essential to the description of what constitutes a purchase-money security interest under subsection (b). As used in subsection (a)(2), the definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.

The concept of "purchase-money security interest" requires a close nexus between the acquisition of collateral and the secured obligation. Thus, a security interest does not qualify as a purchase-money security interest if a debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price.

4. **Cross-Collateralization of Purchase-Money Security Interests in Inventory.** Subsection (b)(2) deals with the problem of cross-collateralized purchase-money security interests in inventory. Consider a simple example:

**Example:** Seller (S) sells an item of inventory (Item-1) to Debtor (D), retaining a security interest in Item-1 to secure Item-1's price and all other obligations, existing and future, of D to S. S then sells another item of inventory to D (Item-2), again retaining a security interest in Item-2 to secure Item-2's price as well as all other obligations of D to S. D then pays to S Item-1's price. D then sells Item-2 to a buyer in ordinary course of business, who takes Item-2 free of S's security interest.

Under subsection (b)(2), S's security
purchase-money security interest. Th
Item-1, Item-1 secures the price of
Item-2 ("other inventory"), and Ite
Note that, to the extent Item-1 secu
not be a purchase-money security in
is a purchase-money security intere
"purchase-money collateral," i.e.,
obligation incurred with respect to tl

5. **Purchase-Money Security Inter**
purchase-money security interests to
Otherwise, no change in meaning fr
former Section 9-115(5)(f) made the
plicable to investment property. Thi
Subsection (c) describes the limited
be accompanied by a purchase-mone
by the debtor in a transaction inte
goods, and the debtor must acquire
the goods. "Software" is defined in

6. **Consignments.** Under former Se
to that of a purchase-money security
defining the interest of a "consigno
interest in inventory for purposes of
forth special priority rules applicat
consignor's interest as against the ri
ties, and purchasers of the goods fr
ity rules generally applicable to inv
other purposes, including the righ
themselves, the consignor would re
the consignee. See Section 9-319.

7. **Provisions Applicable Only to**
a. **"Dual-Status" Rule.** For transa
proves what some cases have calle
be a purchase-money security inter
to some extent. (Concerning cons
Some courts have found this rule tc
former Section 9-107 and continue
subsection (e). For non-consumer-g
adopted by some cases, under whi
the purchase-money status entirely
Consider, for example, what happe
interest is refinanced by the origin
additional $2,000 secured by the
interest remains a purchase-mone
purchase-money status only to the
b. **Allocation of Payments.** Conti
on the $12,000 obligation, then
remains a purchase-money securi
overriding principle, applicable in
the extent to which a security int
stances: freedom of contract, as li
of application, for example, is not
tion (e)(1). In the absence of agr
payments should be allocated. If
secured will be paid first. (As use
means obligations for which the
ent from and should not be conf
Bankruptcy Code Section 506(a)
is likely to carry a higher interest
rather than unsecured also woul

After the unsecured debt is paid, payments are to be applied first toward the obligations secured by purchase-money security interests. In the event that there is more than one such obligation, payments first received are to be applied to obligations first incurred. See subsection (e)(3). Once these obligations are paid, there are no purchase-money security interests and no additional allocation rules are needed.

Subsection (f) buttresses the dual-status rule by making it clear that (in a transaction other than a consumer-goods transaction) cross-collateralization and renewals, refinancings, and restructurings do not cause a purchase-money security interest to lose its status as such. The statutory terms "renewed," "refinanced," and "restructured" are not defined. Whether the terms encompass a particular transaction depends upon whether, under the particular facts, the purchase-money character of the security interest fairly can be said to survive. Each term contemplates that an identifiable portion of the purchase-money obligation could be traced to the new obligation resulting from a renewal, refinancing, or restructuring.

c. **Burden of Proof.** As is the case when the extent of a security interest is in issue, under subsection (g) the secured party claiming a purchase-money security interest in a transaction other than a consumer-goods transaction has the burden of establishing whether the security interest retains its purchase-money status. This is so whether the determination is to be made following a renewal, refinancing, or restructuring or otherwise.

8. **Consumer-Goods Transactions; Characterization Under Other Law.** Under subsection (h), the limitation of subsections (e), (f), and (g) to transactions other than consumer-goods transactions leaves to the court the determination of the proper rules in consumer-goods transactions. Subsection (h) also instructs the court not to draw any inference from this limitation as to the proper rules for consumer-goods transactions and leaves the court free to continue to apply established approaches to those transactions.

This section addresses only whether a security interest is a "purchase-money security interest" under this Article, primarily for purposes of perfection and priority. See, e.g., Sections 9-317, 9-324. In particular, its adoption of the dual-status rule, allocation of payments rules, and burden of proof standards for non-consumer-goods transactions is not intended to affect or influence characterizations under other statutes. Whether a security interest is a "purchase-money security interest" under other law is determined by that law. For example, decisions under Bankruptcy Code Section 522(f) have applied both the dual-status and the transformation rules. The Bankruptcy Code does not expressly adopt the state law definition of "purchase-money security interest." Where federal law does not defer to this Article, this Article does not, and could not, determine a question of federal law.

**Cross References:**

Effect of after-acquired security with respect to antecedent debt: UCC § 9108.
Filing requisite for perfection of security interest: UCC § 9310.
Priorities of conflicting security interests: UCC § 9322.

**Collateral References:**

Cal Forms Pl & Practice (Matthew Bender) ch 500 "Sales: Sales Under Commercial Code".
Secured Trans Under the UCC (Matthew Bender) Part I, "Overview of Secured Financing".
Witkin Procedure (4th ed) Enforcement of Judgment §§ 80, 90.
Witkin Summary (9th ed) Secured Transactions in Personal Property §§ 27, 28, 54.
Cal Jur 3d (Rev) Creditors' Rights and Remedies §§ 82, 211.
Miller & Starr, Cal Real Estate 3d §§ 10:237, 10:251, 11:178, 11:179, 11:182.

*Law Review Articles:*

Preserving the purchase money status of refinanced or commingled purchase money debt. 35 Stan LR 1133.
Qualifying as a third-party purchase money financier: A hurdle to be cleared, the advantages to be gained. 13 UCC LJ 225.

## NOTES OF DECISIONS

*Decisions Under Former UCC § 9107*

1. Purchase Money Security Interest
2. Set-offs

**1. Purchase Money Security Interest**

In a bankruptcy proceeding, the lien on inventory items subsequently acquired as replacement for the original items subject to lien is a "purchase money security interest". Holzman v L. H. J. Enterprises, Inc. (1973, CA9 Cal) 476 F2d 949.

The seller of a franchised bicycle de[...] from the buyer a down payment, a [...] and a signed security agreement tha[...] tioning after-acquired property, speci[...] his fixtures, equipment, accessories. [...] 100 bicycles, and on the buyer's su[...] the seller, without having filed a fin[...] (Cal. U. Com. Code, §§ 9203, 940[...] with the security agreement, reposse[...] entire stock, which, by then, include[...] inal bicycles and nearly 200 others [...] third parties. Under such circumstanc[...] a purchase money security interest [...] Code, § 9107) in his original prope[...] thus exempt from the bulk transfer la[...] Com. Code, § 6103, subds. (1), (3), [...] interest in the inventory replacemen[...] could not qualify as a purchase mone[...] est, and their repossession constitute[...] (Cal. U. Com. Code, § 6102) that, b[...] failed to file the 10-day notice to cre[...] U. Com. Code, § 6105, was void. Suc[...] goods could therefore be applied to se[...] one of the third parties who, as anothe[...]

## § 9104. Control of depo[...]

(a) A secured party has c[...] ing conditions is satisfie[...]

(1) The secured party i[...] maintained.

(2) The debtor, secured [...] record that the bank w[...] secured party directing [...] without further consent b[...]

(3) The secured party be[...] deposit account.

(b) A secured party that [...] the debtor retains the rig[...] posit account.

Added Stats 1999 ch 991 § 35 (S[...] (SB 2002), operative July 1, 200[...]

**Former Sections:**

Former § 9104, similar to present [...] 1, 1965, amended Stats 1967 ch 7[...] ch 1156 § 4, Stats 1996 ch 176 §[...] § 1, and repealed Stats 1999 ch 9[...]

**Amendments:**

**2000 Amendment:** Added "dep[...]

**Note**—Stats 2000 ch 1003 provi[...] SEC. 56. The provisions of this [...] operative on July 1, 2001.

California Home

Wednesday, January 17, 2007

Welcome to California

DMV Home Page

Online Services

DMV Locations & Hours

Publications

Forms

New Arrivals

- New to California?
- FAQs
- Site Map

Title & Registration Information

- Vehicle Registration
- Boat Registration

License and ID Card Information

- Driver License
- ID Cards
- Commercial License
- Vehicle Industry & Commercial Permits

Special Plates

- Personalized Plates
- Disabled Placards

Other Information

- Press Room
- Your DMV Records
- Other Services
- About DMV
- Contact Us
- Legal Notice and Disclaimer

Department of Motor Vehicles

search

My CA This Site

## Civil Code

**Motor Vehicle Sales and Finance Act**

2981. As used in this chapter, unless the context otherwise requires:

(a) "Conditional sale contract" means:

***(1) A contract for the sale of a motor vehicle between a buyer and a seller, with or without accessories, under which possession is delivered to the buyer and either of the following:***

***(A) The title vests in the buyer thereafter only upon the payment of all or a part of the price, or the performance of any other condition.***

*(B)* A lien on the property is to vest in the seller as security for the payment of part or all of the price, or for the performance of any other condition.

(2) A contract for the bailment of a motor vehicle between a buyer and a seller, with or without accessories, by which the bailee or lessee agrees to pay as compensation for use a sum substantially equivalent to or in excess of the aggregate value of the vehicle and its accessories, if any, at the time the contract is executed, and by which it is agreed that the bailee or lessee will become, or for no other or for a nominal consideration has the option of becoming, the owner of the vehicle upon full compliance with the terms of the contract.

(b) "Seller" means a person engaged in the business of selling or leasing motor vehicles under conditional sale contracts.

(c) "Buyer" means the person who buys or hires a motor vehicle under a conditional sale contract.

(d) "Person" includes an individual, company, firm, association, partnership, trust, corporation, limited liability company, or other legal entity.

(e) "Cash price" means the amount for which the seller would sell and transfer to the buyer unqualified title to the motor vehicle described in the conditional sale contract, if the property were sold for cash at the seller's place of business on the date the contract is executed, and shall include taxes to the extent imposed on the cash sale and the cash price of accessories or services related to the sale, ***including, but not limited to,*** delivery, installation, alterations, modifications, improvements, document preparation fees, a service contract, a ***vehicle contract cancellation option agreement,*** and payment of a prior credit or lease balance remaining on property being traded in.

(f) "Downpayment" means a payment ***that*** the buyer pays or agrees to pay to the seller in cash or property value or money's worth at or prior to delivery by the seller to the buyer of the motor vehicle described in the conditional sale contract. The term shall also include the amount of any portion of the downpayment the payment of which is deferred until not later than the due date of the second otherwise scheduled payment, if the amount of the deferred downpayment is not subject to a finance charge. The term does not include any administrative finance charge charged, received or collected by the seller as provided in this chapter.

(g) "Amount financed" means the amount required to be disclosed pursuant to paragraph (8) of subdivision (a) of Section 2982.

(h) "Unpaid balance" means the difference between subdivision (e) and ***subdivision*** (f), plus all insurance premiums (except for credit life or disability insurance when the amount thereof is included in the finance charge), which are included in the contract balance, and the total amount paid or to be paid ***as follows:***

***(1) To a public officer in connection with the transaction.***

***(2) For*** license, certificate of title, and registration fees imposed by law, and the amount of the state fee for issuance of a certificate of compliance or certificate of waiver pursuant to Section 9889.56 of the Business and Professions Code.

(i) "Finance charge" has the meaning set forth for that term in Section 226.4 of Regulation Z. The term shall not include delinquency charges or collection costs and fees as provided by subdivision (k) of Section 2982, extension or deferral agreement charges as provided by Section 2982.3, or amounts for insurance, repairs to or preservation of the motor vehicle, or preservation of the security interest therein advanced by the holder under the terms of the contract.

(j) "Total of payments" means the amount required to be disclosed pursuant to subdivision (h) of Section 226.18 of Regulation Z. The term includes any portion of the downpayment ***that*** is deferred until not later than the second otherwise scheduled payment and ***that*** is not subject to a finance charge. The term shall not include amounts for which the buyer may later become obligated under the terms of the contract in connection with insurance, repairs to or preservation of the motor vehicle, preservation of the security interest therein, or otherwise.

(k) "Motor vehicle" means a vehicle required to be registered under the Vehicle Code ***that*** is bought for use primarily for personal or family purposes, and does not mean any vehicle ***that*** is bought for use primarily for business or commercial purposes or a mobilehome, as defined in Section 18008 of the Health and Safety Code ***that*** is sold on or after July 1, 1981

**EXHIBIT 4**

Page 50

"Motor vehicle" does not include any trailer *that* is sold in conjunction with a vessel and *that* comes within the definition of "goods" under Section 1802.1.

(l) "Purchase order" means a sales order, car reservation, statement of transaction or any other such instrument used in the conditional sale of a motor vehicle pending execution of a conditional sale contract. The purchase order shall conform to the disclosure requirements of subdivision (a) of Section 2982 and Section 2984.1, and subdivision (m) of Section 2982 shall *apply*.

(m) "Regulation Z" means a rule, regulation or interpretation promulgated by the Board of Governors of the Federal Reserve System ("Board") under the federal Truth in Lending Act, as amended (15 U.S.C. 1601, et seq.), and an interpretation or approval issued by an official or employee of the Federal Reserve System duly authorized by the board under the Truth in Lending Act, as amended, to issue *the* interpretations or approvals.

(n) "Simple-interest basis" means the determination of a finance charge, other than an administrative finance charge, by applying a constant rate to the unpaid balance as it changes from time to time either:

(1) Calculated on the basis of a 365-day year and actual days elapsed (although the seller may, but need not, adjust its calculations to account for leap years); reference in this chapter to the "365-day basis" shall mean this method of determining the finance charge, or

(2) For contracts entered into prior to January 1, 1988, calculated on the basis of a 360-day year consisting of 12 months of 30 days each and on the assumption that all payments will be received by the seller on their respective due dates; reference in this chapter to the "360-day basis" shall mean this method of determining the finance charge.

(o) "Precomputed basis" means the determination of a finance charge by multiplying the original unpaid balance of the contract by a rate and multiplying that product by the number of payment periods elapsing between the date of the contract and the date of the last scheduled payment.

*(p) "Service contract" means "vehicle service contract" as defined in subdivision (c) of Section 12800 of the Insurance Code.*

*(q) "Surface protection product" means the following products installed by the seller after the motor vehicle is sold:*

*(1) Undercoating.*

*2) Rustproofing.*

*(3) Chemical or film paint sealant or protectant.*

*(4) Chemical sealant or stain inhibitor for carpet and fabric.*

*(r) "Theft deterrent device" means the following devices installed by the seller after the motor vehicle is sold:*

*(1) A vehicle alarm system.*

*(2) A window etch product.*

*(3) A body part marking product.*

*(4) A steering lock.*

*(5) A pedal or ignition lock.*

*(6) A fuel or ignition kill switch.*

(Amended Sec. 2, Ch. 128, Stats. 2005. Effective January 1, 2006. Operative July 1, 2006.)

Vehicle Code Table of Contents | Vehicle Code Appendix A Table of Contents

Back to Top of Page

© 2003 State of California
Conditions of Use Privacy Policy

## TABLE OF CONTENTS

I. TABLE OF AUTHORITIES .......... i

II. STATEMENT OF FACTS .......... 1

III. ARGUMENT

1. Pursuant to the Hanging Paragraph following 11 U.S.C. Section 1325(a)(9) the cram down of a security interest in a motor vehicle is permissible when antecedent debt is included in the purchase contract .......... 3

2. The extent of the cram down of a security interest in a motor vehicle subject to the 910 rule depends upon the court's application of state law .......... 7

   A. "Dual Status" cram down

   B. "Transformation" cram down

3. California Civil Code Section 2981, the Motor Vehicle Sales and Finance Act, cannot be used to alter the meaning of purchase money security interest as defined by Section 9103 of the California Commercial Code .......... 11

4. Congress did not intend the Hanging Paragraph following 11 U.S.C. Section 1325(a)(9) to allow abuse by and a windfall to automobile creditors .......... 13

IV. CONCLUSION .......... 14

V. EXHIBITS

1. Objection to Confirmation filed by Wells Fargo Financial

2. Automobile Purchase Contract

3. California Uniform Commercial Code Section 9-103

4. California Motor Vehicle Sales and Finance Act (Civil Code Section 2981)

# TABLE OF AUTHORITIES

## CASES

In re Graupner, 2006 WL 3759457 (Bankr. M.D. GA 2006) ..........11

In re Matthews, 724 F.2d 798 (9th Cir. 1984) ..........5

In re Peaslee, 2006 WL 3759476 (Bankr. W.D.N.Y. 2006) ..........9

In re Quevedo, 345 B.R. 238, (Bankr. S.D. Cal. 2006) ..........13

In re Rash, 520 U.S. 456, 117 S.Ct. 879, 138 L.E.d.2d 148 (1997) ..........3

In re Till, 541 U.S. 465, 124 S.Ct. 1951, 458 L.Ed. 2d 787 (2004) ..........3

In re Vega, 344 B.R. 616 (Bankr. KS 2006) ..........5

## STATUTES

11 U.S.C. Section 1325 ..........3

11 U.S.C. Section 506 ..........3

11 U.S.C. Section 1322 ..........3

11 U.S.C. Section 522(f) ..........3

C.A. U.C.C. Section 9-103 ..........4

C.A. U.C.C. Section 9-107 (Former Statute) ..........5