# Record on Appeal – Tab 7

DONALD H. CRAM, III (State Bar No. 160004)
KATRINA V. STOLC (State Bar No. 226557)
DUANE M. GECK (State Bar No. 114823)
SEVERSON & WERSON, P.C.
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
Telephone: (415) 677-5536
Facsimile: (415) 677-5664
e-mail: dhc@severson. com

Attorneys for Creditor
WELLS FARGO FINANCIAL ACCEPTANCE

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| In re<br>LETICIA I. ACAYA,<br><br>Debtor(s). | Case No. 06-51741-MMOR<br><br>Chapter 13<br><br>Date: 02/16/2007<br>Time: 10:00 AM<br>Judge: Hon. Marilyn Morgan<br>Place: U.S. Bankruptcy Court<br>The Quadrangle, Room 214<br>1000 S. Main Street<br>Salinas, CA |

**BRIEF IN SUPPORT OF OBJECTION OF WELLS FARGO FINANCIAL ACCEPTANCE TO CONFIRMATION OF PLAN**

TO THE DEBTOR, DEBTOR'S ATTORNEY OF RECORD, THE CHAPTER 13 TRUSTEE, AND ALL OTHER INTERESTED PARTIES:

Wells Fargo Financial Acceptance (hereinafter "Secured Creditor") objects to the Chapter 13 Plan (hereinafter "Plan") of the above captioned debtor(s) (hereinafter "Debtor") for the following reasons:

**STATEMENT OF FACTS:**

Secured Creditor has a perfected security interest in Debtor's 2005 Chevrolet Cavalier, Vehicle Identification No. 1G1JC52F857129833 (hereinafter "Vehicle"), pursuant to a Motor Vehicle Contract & Security Agreement dated **6/15/2005** (hereinafter "Contract") entered into

between Debtor and Secured Creditor's predecessor-in-interest ("Dealer"). A true and correct copy of the Contract is attached hereto as Exhibit A.

A the time of the purchase, Debtor paid $9,288.00 for the Vehicle, $45.00 for document preparation, $676.64 in sales tax, $2,495.00 for an optional service contract, $600.00 for GAP insurance, $135.00 for estimated license fees, $8.75 in California tire fees, and $8.00 for smog certification.

In order to proceed with the purchase, Debtor traded-in her 2003 Ford Taurus. The balance owed on the Ford to Bay Federal Credit Union was $13,683.00. Debtor and Dealer agreed to value the trade-in vehicle at $7,000, and resulted $6,683 negative equity was financed along with the purchase of the new vehicle.

In sum, upon execution of the Contract Debtor was obligated to pay Secured Creditor $19,939.39 at an annual percentage rate of 14.50% over 60 monthly payments of $440.15. The negative equity in the trade-in vehicle amounted to 33.5% of the loan.

On 09/07/2006, Debtor filed a petition for relief under Chapter 13. The net payoff under the Debtor's Contract, as of the petition date, was $17,099.89 and the Debtor's Plan proposed to value the Vehicle at $9,757.00, payable at 7.00% with a monthly payment of $100. The Plan proposed to pay unsecured claimholders a 0% dividend.

Secured Creditor objected to confirmation of Debtor's Chapter 13 Plan asserting that pursuant to 11 U.S.C. § 1325, its claim should be allowed in its entirety in the amount of $17,099.89.

///

///

///

///

///

///

**ARGUMENT**

Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") of 2005 added the following language ("hanging paragraph") at the end of subsection 1325(a):

> [f]or purposes of [§ 1325(a)(5)], section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle ... acquired for the personal use of the debtor.

11 U.S.C. 1325(a)(9).

According to the "hanging" paragraph, section 506 does not apply to claims 1)secured by purchase money security interests in 2) motor vehicles 3) acquired by a debtor for personal use 4) within 910 days prior to the bankruptcy filing. The "hanging" paragraph now prevents the bifurcation of the claims of secured creditors into secured and unsecured claims based on value of the creditor's collateral otherwise allowed under section 506(a).

Pursuant to the plain language of the Bankruptcy Code, the Congress accorded special status to motor vehicle lenders by prohibiting cram-down. What Debtor is attempting to do by going through a strained analysis based upon a single distinguishable case where the debt was refinanced is to try to make an end-run around the plain meaning of the statute.

In the instant case, there is no contention that Debtor financed purchase of the Vehicle with proceeds from the loan obtained from Secured Creditor. There is no dispute that Debtor purchased a motor vehicle for personal use within 910 days prior to the bankruptcy filing. The only issue that is contended is whether Secured Creditor holds a purchase-money security interest in the Vehicle.

**I. SECURED CREDITOR HOLDS A PURCHASE MONEY SECURITY INTEREST IN THE VEHICLE AND ANTI-BIFURCATION PROVISION OF THE "HANGING" PARAGRAPH PREVENTS CRAM-DOWN OF ITS CLAIM BECAUSE THE TERM "PRICE," AS USED IN THE CALIFORNIA DEFINITION OF "PURCHASE MONEY OBLIGATION," INCLUDES THE AMOUNT OF THE NEGATIVE EQUITY**

Section 9103 of California Uniform Commercial Code ("California U.C.C.") states that "a

security interest in goods is a purchase money security interest to the extent that the goods are purchase money collateral with respect to that security interest." Cal. U. Com. Code, § 9103(b). Purchase money collateral is defined as "goods … that secure a purchase money obligation incurred with respect to that collateral." Cal. U. Com. Code, § 9103(a)(1). Purchase money obligation, in turn, is defined as "an obligation … uncured as all or part of the price of the collateral or for value given to enable debtor to acquire rights in or the use of the collateral if the value is in fact so used." Cal. U. Com. Code, § 9103(a)(2).

The Official Comment 3 on U.C.C. further states:

> As used in subsection (a)(2), the definition of "purchase-money obligation," "the price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and *other similar obligations*."

Cal. U. Com. Code, § 9103, com. 3.

At least one bankruptcy court has held that the financing of negative equity in a trade-in vehicle with the purchase of a new vehicle does not alone preclude the lender from holding a purchase money security interest in the new vehicle and the anti-bifurcation provision of the "hanging" paragraph is applicable. *In re Graupner*, 2006 WL 3759457 (Bankr.M.D.Ga. 2006). Facts in *Graupner* are very similar to those if the instant case. In determining whether a lender held a purchase-money security interest when it financed purchase of a new vehicle along with negative equity in a trade-in vehicle, the court focused its attention on the term "price" as found in the definition of "purchase money obligation" in Georgia version of the Uniform Commercial Code[1] ("Georgia U.C.C."), which is the same as the definition found in California U.C.C. The *Graupner* court found that the term "price" was not clear from a plain reading of the statute. The court noted that "[t]he term is simply not definite or certain in its meaning or extent." *Id.* 801. The *Graupner* court considered the Georcia U.C.C. definition of "purchase-money obligation" *in*

[1] (2) "Purchase money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or use of the collateral if the value in fact so used. O.C.G.A. § 11-9-103 (2002). This definition is the same as in the California statute.

*pari materia* with provisions of Georgia Motor Vehicle Sales Finance Act[2] ("MVSFA"). The *Graupner* court concluded that under Georgia law, in the context of the sale of a motor vehicle in accordance with Georgia's MVSFA, the term "price," as used in the Georgia definition of "purchase money security interest," includes any amount paid to satisfy a security interest in a motor vehicle used as a trade-in. The court further held that the creditor held a purchase money security in the vehicle and the anti-bifurcation provision of the "hanging" paragraph was in fact applicable.

Section 2981(e) of the California Automobile Sales Finance Act ("ASFA") similarly states that "cash price" includes any amount paid to satisfy a security interest in a motor vehicle used as a trade-in:

> "Cash price" means the amount for which the seller would sell and transfer to the buyer unqualified title to the motor vehicle described in the conditional sale contract, if the property were sold for cash at the seller's place of business on the date the contract is executed, and shall include taxes to the extent imposed on the cash sale and the cash price of accessories or services related to the sale, including, but not limited to, delivery, installation, alterations, modifications, improvements, document preparation fees, a service contract, a vehicle contract cancellation option agreement, and payment *of a prior credit or lease balance remaining on property being traded in*."

Cal. Civ. Code, § 2981(emphasis added).

Based on the foregoing, the term "price," as used in the California definition of "purchase money obligation," includes the amount of the negative equity, and, therefore, Secured Creditor holds a purchase money security interest in the Vehicle and anti-bifurcation provision of the "hanging" paragraph prevents cram-down of its claim.

///

---

[2] The Georgia MVSFA reads in pertinent part:

(1) "Cash sale price" means the price stated in a retail installment contract for which the seller would have sold to the buyer and the buyer would have bought from the seller the motor vehicle which is the subject matter of the retail installment contract if such sale had been a sale for cash instead of a retail installment transaction. The cash sale price may include any taxes; registration, certificate of title, license, and other fees; and charges for accessories and their installation and for delivery, servicing, repairing, or improving the motor vehicle. The cash sale price may also include any amount paid to the buyer or to a third party on behalf if the buyer to satisfy a lease on or a lien on or a security interest in a motor vehicle used as a trade-in on the motor vehicle which is the subject of a retail installment transaction under this article. O.C.G.A. § 10-1-31 (2000).

## II. THE COURT SHOULD APPLY THE DUAL-STATUS AND NOT THE TRANSFORMATION RULE BECAUSE THE MAJOR PORTION OF THE LOAN WAS USED TO PURCHASE THE NEW VEHICLE, AND THE AMOUNT OF NEGATIVE EQUITY IS CLEARLY STATED IN THE CONTRACT

Should the Court decide that the amount used to finance the negative equity is not a purchase-money obligation, the Secured Creditor still holds purchase-money lien for the portion of the loan used to acquire the new vehicle.

The U.C.C. leaves to the courts determination of the proper rules in consumer-goods transactions based upon the facts and circumstances of a case. Cal. U. Com. Code, § 910(h). Two competing rules have emerged - the transformation rule and the dual-status rule.

The transformation rule states that if collateral secures more than its own purchase price, the entire loan loses its purchase-money status. *In re Linkater*, 48 B.R. 916, 919 (Bankr. D.Nev.1985). The transformation rule, however, is typically applied in cases where the consolidated contract does not allocate payments between the various debts. *Id.* 919.

On the other hand, the dual status rule states that the existence of a nonpurchase-money security interest in goods does not terminate a purchase money security interest in those goods, to the extent that the collateral continues to secure its own price. *Id.* 919. The rationale behind the dual status rule came from the language of U.C.C. § 9-107 (similar to the current §9103(b)), which allowed "a purchase money security in goods 'to the extent' that it secures the purchase price of the goods." *Id.* The policies underlying the dual-status rule are "to encourage security agreements that benefit both buyer and seller, and to facilitate the sales of consumer goods." *Id.*

The Ninth Circuit in *In re Matthews*, 724 F.2d 798 (9th Cir. 1984) indicated that purchase-money status of security interest is not destroyed when a purchase-money collateral secures more than the purchase price. *Id.* Fn.3.

In *Matthews*, the lender loaned money to debtors to purchase a piano and a stereo. The loan was secured by the debtors' "household goods and other personal property," including the piano and the stereo. Lender later agreed to refinance the loan for a longer term and issued a new loan from which debtors paid off the old loan. The *Matthews* court held that refinancing of loans

"by paying off the old loan and extending a new one extinguishes the purchase money character of the original loan because *the proceeds of the new loan are not used to acquire rights in the collateral.*" *Id.* at 800 (emphasis added).

The facts of the instant case are distinguishable from those in *Matthews*. There was no refinancing or consolidation of loans in the instant case. The proceeds of the loan were actually used to acquire rights in the collateral, along with financing of the negative trade-in.

Although the court in *Matthews* did not discuss at length debtors' alternate contention that collateral cannot secure more than its own value without destroying the purchase money security interest, it clearly stated that "the weight of authority appears to be against debtors on this point." *Id.* Fn.3. The *Matthews* court, thus, pointed out that different rules may apply to different factual situations and circumstances. Although the court applied a transformation rule in a case of refinancing where no money was used to purchase the collateral, it indicated that it would apply a dual-status rule in the case of a collateral securing more than its purchase price, as in the instant case.

Debtor relies in her analysis on the New York bankruptcy court decision *In re Peaslee*, 2006 WL 3759476 (Bankr.W.D.N.Y.2006) that held that the transformation rule should be applied in situations where lender financed a negative trade-in. *Id.* at 11. However, *Peaslee* is distinguishable from the instant case because in *Peaslee* the lender failed to meet its burden of proof as to the actual amount of the negative equity financed. Ultimately, *Peaslee* stands for proposition that where a lender failed to meet its burden of proof and show what amount was used to finance the negative trade-in, the entire loan is held to be a nonpurchase-money obligation. The *Peaslee* court adopted transformation rule because "it would be virtually impossible for the Court to determine either the actual amount of the negative equity or the actual amount of the purchase money obligation." *Id.* at 10. Unlike the motor vehicle contracts in *Peaslee,* the standard California motor vehicle contract clearly states the actual amount of the negative equity and the actual amount used to acquire a new vehicle.

Therefore, in the event the Court decides that the amount used to finance the negative equity is not a purchase-money obligation, the Secured Creditor still holds purchase-money lien for the portion of the loan used to acquire the new vehicle.

**CONCLUSION:**

WHEREFORE, Secured Creditor respectfully requests that the Court sustain its objection(s) and deny confirmation of Debtor's proposed Plan. Alternatively, Secured Creditor requests the Court order that:

1. The Debtor's Plan be amended to provide for Secured Creditor's claim to be secured in the amount of at least $17,099.89;

2. The Debtor's Plan be amended to provide for Secured Creditor to receive at least 11.25 % interest on its secured claim from the effective date of the Debtor's Plan;

3. The Debtor's Plan be amended to provide for Secured Creditor to receive monthly payments in the amount of at least $250, on account of its secured claim, from the effective date of the Debtor's Plan;

4. The Debtor's Plan not be confirmed until Debtor has provided competent evidence as to how Debtor will make the plan payments and still complete the Plan within the maximum 60-month period;

5. Secured Creditor be awarded its reasonable attorneys' fees and costs incurred in protecting its security interest by objecting to the Debtor's proposed Plan; and

6. Secured Creditor be afforded such further relief as this Court deems necessary and proper.

DATED: February 9, 2006

SEVERSON & WERSON, P.C.

By: /s/ Katrina Stolc
Donald H. Cram, III / Katrina V. Stolc

Attorneys for Wells Fargo Financial Acceptance

10749/0000/600817.1

RETAIL INSTALLMENT SALE CONTRACT
SIMPLE INTEREST FINANCE CHARGE

Dealer Number ____ Contract Number ____ R.O.S. Number ____ Stock Number NEVADA

| Buyer (and Co-Buyer) Name and Address (Including County and Zip Code) | Creditor - Seller (Name and Address) |
|---|---|
| LETICIA ITURRALDE ACAYA<br>10540 GEIL STREET<br>CASTROVILLE CA 95012 MONTEREY | CARDINALE MAZDA DAEWOO VW<br>500 AUTO CENTER CIRCLE<br>SALINAS CA 93907 #1029-07235 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Creditor - Seller (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New Used | Year | Make and Model | Odometer | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|---|
| USED | 2005 | CHEVROLET CAVALIER | 16453 | 1G1JC52F857129833 | [X] personal, family or household<br>[ ] business or commercial |

## FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $0.00 is |
|---|---|---|---|---|
| 14.50 % | $ 9110.51 (e) | $ 19939.39 | $ 29049.90 (e) | $ 29049.90 (e) |

(e) means an estimate

YOUR PAYMENT SCHEDULE WILL BE:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| One Payment of | N/A | |
| One Payment of | N/A | |
| 65 Payments | 440.15 | Monthly, Beginning 07/15/2005 |
| N/A Payments | N/A | Monthly, Beginning |
| One Final Payment | 440.15 | 12/15/2010 |

Late Charge. If payment is not received in full within 10 days after it is due, you will pay a late charge of 5% of the part of the payment that is late.
Prepayment. If you pay off all your debt early, you may be charged a minimum finance charge.
Security Interest. You are giving a security interest in the vehicle being purchased.
Additional Information: See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date, minimum finance charges, and security interest.

## STATEMENT OF INSURANCE

NOTICE. No person is required as a condition of financing the purchase of a motor vehicle to purchase or negotiate any insurance through a particular insurance company, agent or broker. You are not required to buy any other insurance to obtain credit. Your decision to buy or not buy other insurance will not be a factor in the credit approval process.

**Vehicle Insurance**

| | Term | Premium |
|---|---|---|
| $ N/A Ded. Comp., Fire & Theft | ___ Mos. | $ N/A |
| $ N/A Ded. Collision N/A | ___ Mos. | $ N/A |
| Bodily Injury $ N/A Limits | ___ Mos. | $ N/A |
| Property Damage $ ___ Limits | ___ Mos. | $ N/A |
| Medical | ___ Mos. | $ N/A |
| | ___ Mos. | $ N/A |
| Total Vehicle Insurance Premiums | | $ N/A (a) |

UNLESS A CHARGE IS INCLUDED IN THIS AGREEMENT FOR PUBLIC LIABILITY OR PROPERTY DAMAGE INSURANCE, PAYMENT FOR SUCH COVERAGE IS NOT PROVIDED BY THIS AGREEMENT.

You may buy the physical damage insurance this contract requires (see back) from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit.

Buyer X [signature]
Co-Buyer X
Seller X [signature]

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

**Application for Optional Credit Insurance**

[ ] Credit Life: [ ] Buyer [ ] Co-Buyer [ ] Both
[ ] Credit Disability (Buyer Only)

| | Term | Exp. | Premium |
|---|---|---|---|
| Credit Life | N/A Mos. | ___ | $ N/A |
| Credit Disability | N/A Mos. | ___ | $ N/A |
| Total Credit Insurance Premiums | | | $ ___ (b) |

Insurance Company Name ____
Home Office Address ____

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown above.

You are applying for the credit insurance marked above. Your signature below means that you agree that: (1) You are not eligible for insurance if you have reached your 65th birthday. (2) You are eligible for disability insurance only if you are working for wages or profit 30 hours a week or more on the Effective Date. (3) Only the Primary Buyer is eligible for disability insurance. DISABILITY INSURANCE MAY NOT COVER CONDITIONS FOR WHICH YOU HAVE SEEN A DOCTOR OR CHIROPRACTOR IN THE LAST 6 MONTHS (Refer to "Total Disabilities Not Covered" in your policy for details).

You want to buy the credit insurance.

Date ____ Buyer Signature [signature] Age 55

Date ____ Co-Buyer Signature X ____ Age ____

**OPTIONAL GAP CONTRACT** A gap contract (debt cancellation contract) is not required to obtain credit and will not be provided unless you sign below and agree to pay the extra charge. If you choose to buy a gap contract, the charge is shown in item 1I. See your gap contract for details on the protection it provides. It is part of this contract.

Term 72 Mos. ____ GAP 1 Name of Gap Contract

You want to buy a gap contract.
Buyer X [signature]

**OPTIONAL SERVICE CONTRACT(S)** You want to purchase the service contract(s) written with the following company(ies) for the term(s) shown below for the charge(s) shown in item 1F and/or 1G above.

1.F Company FIRST EXTENDED
Term 72 Mos. or 72000 Miles
1.G Company N/A
Term N/A Mos. or N/A Miles
Buyer X

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to the contract must be in writing and both you and we must sign it. No oral changes are binding.

X [signature]
Buyer Signs

## ITEMIZATION OF THE AMOUNT FINANCED

1. Total Cash Price
   - A. Cash Price of Motor Vehicle and Accessories $ 9288.00 (A)
     1. Cash Price Vehicle $ 9288.00
     2. Cash Price Accessories $ N/A
     3. Other (Nontaxable) N/A $ N/A
        Describe N/A $ N/A
        Describe ____ $ ____
   - B. Document Preparation Fee (not a governmental fee) $ 45.00 (B)
   - C. Smog Fee Paid to Seller $ N/A (C)
   - D. Sales Tax (on taxable items in A+B+C) $ 676.64 (D)
   - E. Optional DMV Electronic Filing Fee* $ N/A (E)
   - F. (Optional) Service Contract* $ 2495.00 (F)
   - G. (Optional) Service Contract* $ N/A (G)
   - H. Pay Credit or Lease Balance paid by Seller to BAY FED CU $ 6683.00 (H) (see downpayment and trade-in calculation)
   - I. (Optional) Gap Contract (to whom paid)* GAP 1 $ 600.00 (I)
   - J. Other (to whom paid)* $ N/A (J)
     For ____

   Total Cash Price (A through J) $ 19787.64 (1)
2. Amounts Paid to Public Officials ESTIMATED
   - A. License Fees $ 135.00 (A)
   - B. Registration/Transfer/Titling Fees $ N/A (B)
   - C. California Tire Fees* N/A $ 8.75 (C)
   - D. Other N/A $ N/A (D)
   - E. Other $ N/A (E)

   Total Official Fees (A through E) $ 143.75 (2)
3. Amount Paid to Insurance Companies (Total premiums from Statement of Insurance column a + b)* $ N/A (3)
4. Smog Certification or Exemption Fee Paid to State $ 8.00 (4)
5. Subtotal (1 through 4) $ 19939.39 (5)
6. Total Downpayment
   - A. Agreed Trade-In Value Yr 2003 Make FORD Model TAURUS Odom 34605 VIN 1FAFP55293A182248 $ 7000.00 (A)
   - B. Less Prior Credit or Lease Balance $ 13683.00 (B)
   - C. Net Trade-In (A less B) (indicate if a negative number) $ -6683.00 (C)
   - D. Deferred Downpayment $ N/A (D)
   - E. Manufacturer's Rebate N/A $ N/A (E)
   - F. Other $ N/A (F)
   - G. Cash $ N/A (G)

   Total Downpayment (C through G) $ 0.00 (6)
   (If negative, enter zero on line 6 and enter the amount less than zero as a positive number on line 1H above)
7. Amount Financed (5 less 6) $ 19939.39 (7)

*Seller may keep part of these amounts

**SELLER ASSISTED LOAN**
BUYER MAY BE REQUIRED TO PLEDGE SECURITY FOR THE LOAN, AND WILL BE OBLIGATED FOR THE INSTALLMENT PAYMENTS ON BOTH THIS RETAIL INSTALLMENT SALE CONTRACT AND THE LOAN.

Proceeds of Loan From N/A N/A
Amount $ N/A Finance Charge $ N/A
Total $ N/A Payable in N/A
installments of $ ____ $ ____
from this Loan is shown in item 6D

**AUTO BROKER FEE DISCLOSURE**
If this contract reflects the retail sale of a new motor vehicle, the sale is not subject to a fee received by an autobroker from us unless the following box is checked:
[ ] Name of autobroker receiving fee, if applicable: N/A

**NOTICE OF RESCISSION RIGHTS**
If Buyer and Co-Buyer sign here, the provisions of the Rescission Rights section on the back giving the Seller the right to rescind if Seller is unable to assign this contract to a financial institution will apply.

Buyer X [signature] Co-Buyer X ____

**EXHIBIT A**

## OTHER IMPORTANT AGREEMENTS

1. **FINANCE CHARGE AND PAYMENTS**

   a. **How we will figure Finance Charge.** We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed. Creditor - Seller may receive part of the Finance Charge.

   b. **How we will apply payments.** We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose.

   c. **How late payments or early payments change what you must pay.** We based the Finance Charge, Total of Payments, and Total Sale Price shown on the front on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.

   d. **You may prepay.** You may prepay all or part of the unpaid part of the Amount Financed at any time. If you do so, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the date of your payment. As of the date of your payment, if the minimum finance charge is greater than the earned Finance Charge, you may be charged the difference; the minimum finance charge is as follows: (1) $25 if the original Amount Financed does not exceed $1,000, (2) $50 if the original Amount Financed is more than $1,000 but not more than $2,000, or (3) $75 if the original Amount Financed is more than $2,000.

2. **YOUR OTHER PROMISES TO US**

   a. **If the vehicle is damaged, destroyed, or missing.** You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed, or missing.

   **GAP LIABILITY NOTICE**

   In the event of theft or damage to your vehicle that results in a total loss, there may be a gap between the amount you owe under this contract and the proceeds of your insurance settlement and deductible. THIS CONTRACT PROVIDES THAT YOU ARE LIABLE FOR THE GAP AMOUNT. An optional gap contract (debt cancellation contract) for coverage of the gap amount may be offered for an additional charge.

   b. **Using the vehicle.** You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.

   c. **Security Interest.**
   You give us a security interest in:
   - The vehicle and all parts or goods installed on it;
   - All money or goods received (proceeds) for the vehicle;
   - All insurance, maintenance, service, or other contracts we finance for you; and
   - All proceeds from insurance, maintenance, service, or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.

   This secures payment of all you owe on this contract. It also secures your other agreements in this contract as the law allows. You will make sure the title shows our security interest (lien) in the vehicle.

   d. **Insurance you must have on the vehicle.**
   You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the premium for the insurance and a finance charge equal to the Annual Percentage Rate shown on the front of this contract or, at our option, the highest rate the law permits. If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

   e. **What happens to returned insurance, maintenance, service, or other contract charges.** If we get a refund of insurance, maintenance, service, or other contract charges, you agree that we may subtract the refund from what you owe.

3. **IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES**

   a. **You may owe late charges.** You will pay a late charge on each late payment as shown on the front. Acceptance of a late payment or late charge does not excuse your late payment or mean that you may keep making late payments. If you pay late, we may also take the steps described below.

   b. **You may have to pay all you owe at once.** If you break your promises (default), we may demand that you pay all you owe on this contract at once, subject to any right the law gives you to reinstate this contract.
   Default means:
   - You do not pay any payment on time;
   - You start a proceeding in bankruptcy or one is started against you or your property; or
   - The vehicle is lost, damaged or destroyed;
   - You break any agreements in this contract.

   The amount you will owe will be the unpaid part of the Amount Financed plus the earned and unpaid part of the Finance Charge, any late charges, and any amounts due because you defaulted.

   c. **You may have to pay collection costs.** You will pay our reasonable costs to collect what you owe, including attorney fees, court costs, collection agency fees, and fees paid for other reasonable collection efforts. You agree to pay a charge not to exceed $15 if any check you give to us is dishonored.

   d. **We may take the vehicle from you.** If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it. If your vehicle has an electronic tracking device, you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you at your expense. If you do not ask for these items back, we may dispose of them as the law allows.

   e. **How you can get the vehicle back if we take it.** If we repossess the vehicle, you may pay to get it back (redeem). You may redeem the vehicle by paying all you owe, or you may have the right to reinstate this contract and redeem the vehicle by paying past due payments and any late charges, providing proof of insurance, and/or taking other action to cure the default. We will provide you all notices required by law to tell you when and how much to pay and/or what action you must take to redeem the vehicle.

   f. **We will sell the vehicle if you do not get it back.** If you do not redeem the vehicle, we will sell it. We will send you a written notice of sale before selling the vehicle.
   We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us. If you do not pay this amount when we ask, we may charge you interest at the Annual Percentage Rate shown on the face of this contract, not to exceed the highest rate permitted by law, until you pay.

   g. **What we may do about optional insurance, maintenance, service, or other contracts.** This contract may contain charges for optional insurance, maintenance, service, or other contracts. If we repossess the vehicle, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

4. **WARRANTIES SELLER DISCLAIMS**
   **If you do not get a written warranty, and the Seller does not enter into a service contract within 90 days from the date of this contract, the Seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose.**
   This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide.

5. **Used Car Buyers Guide. The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.**
   **Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.**

6. **Applicable Law**
   Federal law and California law apply to this contract. If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.

7. **Warranties of Buyer.** You promise you have given true and correct information in your application for credit, and you have no knowledge that will make that information untrue in the future. We have relied on the truth and accuracy of that information in entering into this contract. Upon request, you will provide us with documents and other information necessary to verify any item contained in your credit application.

You waive the provisions of Calif. Vehicle Code Section 1808.21 and authorize the California Department of Motor Vehicles to furnish your residence address to us.

**CREDIT DISABILITY INSURANCE NOTICE**
**CLAIM PROCEDURE**

If you become disabled, you must tell us right away. (You are advised to send this information to the same address to which you are normally required to send your payments, unless a different address or telephone number is given to you in writing by us as the location where we would like to be notified.) We will tell you where to get claim forms. You must send in the completed form to the insurance company as soon as possible and tell us as soon as you do.

If your disability insurance covers all of your missed payment(s), WE CANNOT TRY TO COLLECT WHAT YOU OWE OR FORECLOSE UPON OR REPOSSESS ANY COLLATERAL UNTIL THREE CALENDAR MONTHS AFTER your first missed payment is due or until the insurance company pays or rejects your claim, whichever comes first. We can, however, try to collect, foreclose, or repossess if you have any money due and owing us or are otherwise in default when your disability claim is made or if a senior mortgage or lien holder is foreclosing.

If the insurance company pays the claim within the three calendar months, we must accept the money as though you paid on time. If the insurance company rejects the claim within the three calendar months or accepts the claim within the three calendar months on a partial disability and pays less than for a total disability, you will have 35 days from the date that the rejection or the acceptance of the partial disability claim is sent to pay past due payments, or the difference between the past due payments and what the insurance company pays for the partial disability, plus late charges. You can contact us, and we will tell you how much you owe. After that time, we can take action to collect or foreclose or repossess any collateral you may have given.

If the insurance company accepts your claim but requires that you send in additional forms to remain eligible for continued payments, you should send in these completed additional forms no later than required. If you do not send in these forms on time, the insurance company may stop paying, and we will then be able to take action to collect or foreclose or repossess any collateral you may have given.

**Rescission Rights**

a. Seller agrees to deliver the vehicle to you on the date this contract is signed by Seller and you. You understand that it may take a few days for Seller to verify your credit and assign the contract. You agree that if Seller is unable to assign the contract to any one of the financial institutions with whom Seller regularly does business under an assignment acceptable to Seller, Seller may rescind (cancel) the contract.

b. Seller shall give you written notice (or in any other manner in which actual notice is given to you) within 10 days of the date this contract is signed if Seller elects to rescind. Upon receipt of such notice, you must immediately return the vehicle to Seller in the same condition as when sold, reasonable wear and tear excepted. Seller must give back to you all consideration received by Seller, including any trade-in vehicle.

c. If you do not immediately return the vehicle, you shall be liable for all expenses incurred by Seller in taking the vehicle from you, including reasonable attorney's fees.

d. While the vehicle is in your possession, all terms of the contract, including those relating to use of the vehicle and insurance for the vehicle, shall be in full force and you shall assume all risk of loss or damage to the vehicle. You must pay all reasonable costs for repair of any damage to the vehicle until the vehicle is returned to Seller.

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

The preceding NOTICE applies only if the "personal, family or household" box in the "Primary Use for Which Purchased" section of this contract is checked. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

Seller assigns its interest in this contract to Wells Fargo Financial (Assignee) under the terms of Seller's agreement(s) with Assignee.

☐ Assigned with recourse ☒ Assigned without recourse ☐ Assigned with limited recourse

Seller: CARDINALE MAZDA VOLKSWAGEN By: [signature] Title: [signature]

Form No. 553-CA 1/99

EXHIBIT A