Case No. C07-02851-JF

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION


**WELLS FARGO FINANCIAL CALIFORNIA, INC., SUCCESSOR BY MERGER TO WELLS FARGO FINANCIAL ACCEPTANCE CALIFORNIA, INC.,**

**APPELLANT**

**VS.**

**LETICIA I. ACAYA**

**APPELLEE**


**APPELLEE'S BRIEF**

Appeal from an Order of the U.S. Bankruptcy Court for the Northern District of California, San Jose Division (No. 06-51741 MM) on Objection to Confirmation of Chapter 13 Plan

The Honorable Marilyn Morgan, United States Bankruptcy Judge


Shian MacLean
Law Offices of Rodney M. Kleman
400 Camino El Estero
Monterey CA 93940
831-649-0200

Attorney for Appellee Leticia I. Acaya

# TABLE OF CONTENTS

STATEMENT OF ISSUES PRESENTED ..................................................2

STATEMENT OF FACTS ....................................................................2

ARGUMENT ....................................................................................3

     1.     DID CONGRESS INTEND SECTION 1325(a)(*) TO ENCOURAGE OR PROMOTE A POLICY OF FINANCING NEGATIVE EQUITY BY AUTOMOBILE FINANCE LENDERS? ..............................................3

     2.     DOES THE FINANCING OF NEGATIVE EQUITY "ENABLE" A BORROWER TO ACQUIRE RIGHTS IN A MOTOR VEHICLE? ....................5

     3.     IS NEGATIVE EQUITY IN A TRADE-IN SIMILAR TO SALES TAXES, SERVICE CONTRACTS, GAP INSURANCE, OR OTHER ADD-ONS SPECIFIED IN CALIFORNIA COMMERCIAL CODE SECTION 9103 ET. SEQ.?..........................................................................................6

     4.     EFFECTS OF THE HANGING PARAGRAPH ......................................7

     5.     WHY DOES SECTION 1325(a)(*) INCLUDE THE LIMITATION OF "PURCHASE MONEY SECURITY INTEREST"? ...............................7

     6.     CALIFORNIA COMMERCIAL CODE SECTION 9103 ET. SEQ. ....................10

     7.     "DUAL STATUS" CRAM DOWN ......................................................12

     8.     "TRANSFORMATION" CRAM DOWN ...............................................16

     9.     CALIFORNIA CIVIL CODE SECTION 2981, THE MOTOR VEHICLE SALES ACT, CANNOT BE USED TO ALTER THE MEANING OF PURCHASE MONEY SECURITY INTEREST AS DEFINED BY SECTION 9103 OF THE CALIFORNIA COMMERCIAL CODE ...............................................18

10.    CONGRESS DID NOT INTEND THE HANGING PARAGRAPH FOLLOWING
11 U.S.C. SECTION 1325(a)(9) TO ALLOW ABUSE BY AND A WINDFALL
TO AUTOMOBILE CREDITORS ......................................................................20

CONCLUSION............................................................................................................21

# Table of Authorities

*Cases*

*Americredit v. Long,*
   2008 WL 564798 (6th Cir. 2009) ...............................................9

*Hernandez v. Atlantic Finance Co. of Los Angeles,*
   105 Cal. App. 3rd 65 (Cal. Ct. App. (2nd Dist.) 1980) ..................18

*In re Blakeslee,*
   377 B.R. 724 (Bankr. M.D. Fla. 2007) ..............................15, 17

*In re Conyers,*
   379 B.R. 576 (Bankr. M.D.N.C. 2007) ...............................15

*In re Johnson,*
   380 B.R. 236 (Bankr. D. Oregon, 2007) .......................9, 15, 19

*In re Lavigne,*
   2007 WL 3469454 (Bankr. E.D. Va, 2007) ..........................14

*In re Look,*
   2008 WL 618926 (Bankr. D. Maine 2008) ..........................17

*In re Matthews,*
   724 F.2d 798 (9th Cir., 1984) .......................................8, 9

*In re Pajot,*
   371 B.R. 139 (Bankr. E.D. Virginia, 2007) ......................14, 15

*In re Peaslee,*
   373 B.R. 252 (W.D.N.Y. 2007) .............................14, 16, 17

*In re Petrocci.,*
   378 B.R. 489 (Bankr. N.D. N.Y. 2007) ..............................3

*In re Quevedo,*
    345 B.R. 238 (Bankr. S.D.Cal.2006) ................................................................20

*In re Rash,*
    520 U.S. 456 (1997) ........................................................................................7

*In re Riach,*
    2008 WL 474384 (Bankr. D. Oregon, 2008) .....................................................13

*In re Till,*
    541 U.S. 465 (2004) ........................................................................................7

*In re Trejos,*
    352 B.R. 249 (Bankr. D. Nevada 2006) ..............................................................9

*In re Trejos,*
    374 B.R. 210 (9th Cir. BAP 2007) ....................................................................9

*In re Vega,*
    344 B.R. 616 (Bankr., D. Kansas, 2006) .....................................................12, 13

*In re Westfall,*
    376 B.R 210 (Bankr. N.D. Ohio 2007) .....................................................4, 9, 13

*Juarez v. Arcadia Financial, Ltd.,*
    152 Cal. App. 4th 889 (Cal Ct. App. (4th Dist.) 2007) .......................................18

*Thompson v. 10,000 RV Sales, Inc.,*
    130 Cal. App. 4th 950 (Cal. Ct. App. (4th Dist.) 2005) ......................................19

*Statutes*

United States Code
    Title 11
        Section 506 ..........................................................................................7
        Section 1322(b)(2) ..............................................................................8, 9
        Section 1325 ................................................................................passim

Title 49
        Section 30102 ..................................................................................................7

Uniform Commercial Code

        Section 9103 ...............................................................................................12, 19

California Commercial Code

        Section 9103 ...............................................................................6, 10, 11, 12, 19, 20

California Civil Code

        Section 2981 ...............................................................................................18, 19
        Section 2982 ...................................................................................................19
        Section 2984.2 .................................................................................................6

New York Commercial Code
        Section 9103 ...................................................................................................16

Other Authorities

Keith M. Lundin, Chapter 13 Bankruptcy,
        3d ed 451.5-1 (200+Supp. 2007-1) ...........................................................................9

## STATEMENT OF ISSUES PRESENTED

**1.**      **Did the Bankruptcy Court err in applying the dual status rule to the security interest of Wells Fargo?**

**2.**      **Did the Bankruptcy Court err in determining that the negative trade-in amount financed by Wells Fargo was not secured by a purchase money security interest?**

## STATEMENT OF FACTS

On September 7, 2006, debtor Leticia Acaya filed a Chapter 13 bankruptcy. Included in this bankruptcy is a secured claim of Wells Fargo Financial ("Wells Fargo") consisting of a motor vehicle commonly known as a 2005 Chevy Cavalier. Debtor proposed to pay Wells Fargo the mid Kelly Blue Book value of the vehicle, or $9,757.00, at 7% interest. Debtor proposed this value based upon the age, condition, and options on the Vehicle.

On October 13, 2006, counsel for Wells Fargo filed an objection to confirmation of debtor's proposed Chapter 13 plan. Among several objections interposed therein, Wells Fargo asserted that it should be entitled to the full contract balance owed at the time of the bankruptcy filing pursuant to the application of 11 U.S.C. 1325(a) because the debt that Wells Fargo financed was purchase money for a motor vehicle for the personal use of the debtor that was incurred with 910 days of the bankruptcy filing.

On or about June 15, 2005, 449 days preceding the bankruptcy filing, the debtor took her vehicle, then a 2003 Ford Taurus, to Cardinale Mazda Daewoo VW ("Dealer") in response to a letter she received from Dealer offering to sell her a new car. Debtor was dissatisfied with the Ford as the windshield defroster did not work. Debtor paid $9,288.00 for the 2005 Chevy

2

1  Cavalier. In addition to this charge, debtor paid $45.00 for document preparation, $676.64 in
2  sales tax, $2,495 for an optional service contract, $600.00 for GAP insurance, $135.00 for license
3  fees (Est.) and $8.75 in California tire fees.

4        The balance on the Ford loan was $13,683.00 at the time of the new purchase. The
5  Dealer gave debtor a trade-in value for her Ford of $7,000.00. This resulted in a negative trade-
6  in of $6,683.00 which she financed at 14.5%, the same rate she financed the Cavalier. Including
7  finance and other charges, and the negative trade-in, debtor paid $29,049.90 for the Cavalier.
8  The negative trade-in, or antecedent debt, amounts to 33.5% of the total amount financed by
9  Wells Fargo of $19,939.39.

10
11  <center>**ARGUMENT**</center>
12
13      **1. DID CONGRESS INTEND SECTION 1325(a)(*) TO ENCOURAGE OR**
14        **PROMOTE A POLICY OF FINANCING NEGATIVE EQUITY BY**
15              **AUTOMOBILE FINANCE LENDERS?**
16        Wells Fargo argues that negative trade-in financing is common, and Congress must have
17  known about the extent of negative equity financing and must have intended to require Chapter
18  13 debtors to pay the negative trade-in amounts in full if the vehicle loan is a 910 loan for
19  personal use by the debtor as described in Section 1325. Furthermore, since the relevant new
20  code sections are entitled "Giving Secured Creditors Fair Treatment in Chapter 13...", Wells
21  Fargo argues that including negative trade-in amounts in the definition of purchase money
22  security interest "serves the underlying purposes and policies of the UCC because such a reading
23  "permits the *continued expansion of commercial practices* through custom, usage, and *agreement*
24  *of the parties*." [Appellant's Brief, page 24, citing In re Petrocci. 370 B.R. 489, 504 (Bankr.
25  N.D.N.Y. 2007)].
26        Wells Fargo appears to be making a public policy argument that expansion of commercial
27
28  <center>3</center>

1  practices should be encouraged by bankruptcy courts, and what is good for Wells Fargo is good
2  for Chapter 13 debtors, and that Congress intended Section 1325 to protect the expansion of
3  commercial practices including the financing of negative equity in trade-in vehicles. If this
4  expansion of credit is such a great idea, will Wells Fargo be offering similar financing of
5  negative equity for home mortgage borrowers to "enable" consumers who have negative equity in
6  their homes to purchase another home? This underlying argument of Wells Fargo, that financing
7  negative equity in a trade-in is good public policy, should be rejected by the Court.

8      The case of In re Westfall, 376 B.R. 210 (Bankr. N.D. Ohio, 2007), adopted the dual
9  status rule to deal with financing of a negative trade-in, and crafted a decision in which the
10  "purchase money security interest will be protected by the hanging paragraph" but at the same
11  time found that "use of the dual-status rule may discourage lender from promoting excessive
12  spending by allowing the financing of larger and larger amounts of negative equity." The court
13  noted that "The Court has witnessed amounts of negative equity that most reasonable persons
14  would find unimaginable... The products sold by car dealerships only increase the burden and
15  these sale add-ons are likely to increase as it is reported that finance and insurance sales have
16  regularly accounted for over 40% of car dealership profits." In re Westfall, 376 B.R. 210, 220.

17      Wells Fargo, arguing for a policy that supports negative trade-in financing, states "If car
18  financing transactions that enable the debtor to pay off the negative equity on a trade-in are
19  excluded from the protection of BAPCPA's Section 1325(a)(*), then financial institutions will
20  change longstanding commercial practices." But it should be the policy of the courts to
21  encourage Wells Fargo and other financial institutions to change the practice of financing larger
22  and larger amounts of negative equity. Appellant's Brief devotes page after page to discuss the
23  development of negative equity financing but never even raises the possibility that such negative
24  equity financing contributes to more and more car buyers filing for Chapter 13 bankruptcy.
25  Unsophisticated car buyers with limited incomes are the most likely sign a contract to finance
26  negative equity, and then find themselves unable to pay their bills and file bankruptcy. If the
27
28                                         4

1   Court considers the efficiency of legal rules based on costs and benefits to society, the financing
2   of negative equity in automobile loans simply puts more consumers at risk of insolvency and
3   makes it more likely that more bankruptcies will be filed.

4

5           2. **DOES THE FINANCING OF NEGATIVE EQUITY "ENABLE" A**
6               **BORROWER TO ACQUIRE RIGHTS IN A MOTOR VEHICLE?**

7

8           A second underlying argument of Wells Fargo is that the financing of negative equity
9   "enables" debtors to purchase new vehicles. Merriam-Webster OnLine defines enable as follows:
10          **1a**: to provide with the means or opportunity <training that enables people to earn a living>
11            **b**: to make possible, practical, or easy <a deal that would enable passage of a new law>
12            **c**:  to cause to operate <software that enables the keyboard>
13          **2**: to give legal power, capacity, or sanction to <a law enabling admission of a state>
14          Did the addition of over $6,000.00 negative equity in the sales contract signed by Leticia
15  Acaya "enable" her to pay off the negative equity in her trade-in vehicle? Did it "enable" her to
16  acquire rights in or the use of the collateral? Or did it actually make it more difficult for her to
17  pay off the negative equity and to acquire the new vehicle?   What would truly enable this debtor
18  to pay off the negative equity would be to have more income, or to wait to buy a new vehicle.
19  What would enable her to acquire rights in the new vehicle would be to <u>not</u> have to pay an
20  additional $6,000.00 at 14% interest in addition to the other obligations in her contract. This
21  court should reject the idea that the unsophisticated buyer with limited income is "enabled" to
22  purchase a vehicle by the addition of thousands of dollars of additional debt. For debtors like
23  Leticia Acaya the additional negative equity financing does not mean they are "provided with the
24  means or opportunity" to pay the sales contract, and the negative equity financing does not make
25  it "possible, practical or easy" to pay the sales contract. The negative equity financing means it is
26  more likely that they will be filing bankruptcy. The negative equity financing only enables the

27

28                                          5

1  prior car creditor, in this case Bay Federal Credit Union, to be paid off and it enables Wells Fargo

2  to charge interest of 14% on an additional $6,000.00 of debt.

3

4  **3. IS NEGATIVE EQUITY IN A TRADE-IN SIMILAR TO SALES TAXES,**

5  **SERVICE CONTRACTS, GAP INSURANCE, OR OTHER ADD-ONS**

6  **SPECIFIED IN CALIFORNIA COMMERCIAL CODE SECTION 9103 et. seq.?**

7  In addition to Wells Fargo's arguments that negative equity financing is good for

8  "expansion of commerce" and that negative equity financing "enables" debtors of limited

9  financial means to purchase new vehicles, Wells Fargo's third underlying argument is that

10  negative equity financing is similar to the financing of sales tax, registration fees, service

11  contracts or gap insurance. Wells Fargo's main argument on this subject is that since negative

12  trade-in financing is so common, it must be similar to taxes, registration fees, service contracts

13  and gap insurance. But if we examine the actual add-ons in the Acaya contract, it is clear that the

14  negative equity financing is different from the other add-ons. First, it is by far the largest add-on,

15  $6,683.00 compared with $2495.00 for the next largest add-on which is the service contract, and

16  much larger than the total of all other add-ons ($3968.39). The service contract and gap

17  insurance are different also because they are third party executory contracts that can be rejected

18  in Chapter 13, and also because Civil Code Section 2984.2 allows the creditor to have a security

19  interest in the proceeds and returned price of any service contract. If these executory contracts

20  were rejected as they often are in Chapter 13 cases, Wells Fargo would receive the unexpended

21  balance of the service contract back from the third-party provider, and Wells Fargo would receive

22  the unexpended portion of the gap insurance back from the insurance company. Furthermore,

23  service contracts and gap insurance are different from the negative equity financing because they

24  provide insurance to the consumer against future expenses to repair the vehicle or against future

25  underinsured loss of the vehicle. Taxes and registration fees are different from the negative

26  trade-in financing because they are mandated by law and serve a public purpose. None of the

28  6

1  other add-ons specified in the California Commercial Code are similar either in scope or purpose
2  to the negative equity from the trade-in vehicle.
3
4  ### 4. EFFECTS OF THE HANGING PARAGRAPH
5  The hanging paragraph following 11 U.S.C. Section 1325(a)(9) of the Bankruptcy Abuse
6  Prevention and Consumer Protection Act of 2005 (hereinafter "BAPCPA") substantially changed
7  the treatment of allowed secured claims in the Chapter 13 plan. Prior to that time, if a creditor
8  had a claim secured by a motor vehicle, the debtor could use Sections 506 and 1325 to "cram
9  down" the amount owed for the secured claim to the replacement value of the vehicle. In re
10  Rash, 520 U.S. 456, 117 S.Ct. 879, 138 L.E.d.2d 148 (1997). The Section 506 secured claim
11  was then paid with interest under the plan. In re Till, 541 U.S. 465, 124 S.Ct. 1951, 458 L.Ed. 2d
12  787 (2004). This new rule contained in the hanging paragraph following Section 1325(a)(9)
13  provides that if a security agreement is the basis for a secured claim, and said security agreement
14  constitutes a "purchase money security interest" in a motor vehicle that was purchased by the
15  debtor within 910 days of the filing of the petition, then Section 506 cannot be used to establish
16  the treatment of the secured claim by the plan. The amount owed under the contract at the time
17  of the filing of the petition becomes the secured claim irrespective of the value of the collateral.
18
19  ### 5.    WHY DOES SECTION 1325(a)(*) INCLUDE THE LIMITATION OF
20  ### "PURCHASE MONEY SECURITY INTEREST"?
21  11 U.S.C. Section 1325(a)(*) states as follows:
22  **For purposes of paragraph (5), section 506 shall not apply to a claim described in that**
23  **paragraph if the creditor has a purchase money security interest securing the debt that is**
24  **the subject of the claim, the debt was incurred within 910 day preceding the date of the**
25  **filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined**
26  **in section 30102 of title 49) acquired for the personal use of the debtor...**
27
28                                        7

1
2
3    We must assume that Congress applied the phrase "Purchase money security interest" in
4    1325 for some reason. If Congress meant for all of the debt secured by the vehicle to be
5    protected from cram-down, why use the phrase "purchase money security interest?" "Purchase
6    money security interest is an exceptional category in the statutory scheme that affords priority to
7    its holder over other creditors, but only if the security is given for the precise purpose as defined
8    in the statute" according to the Ninth Circuit in In re Matthews, 724 F.2d 798 (9th Cir., 1984).
9    Former Section 1325 did not have any mention of "purchase money security interest" and a claim
10   under former Section 1325 was not limited to "purchase money security interest". So Congress
11   added a new limitation which was not a carry-over from the previous law.
12       If Congress meant to allow the vehicle creditor to have a security interest to the extent of
13   all of the debtor's obligations in a contract, it could have said so.  For example, Section
14   1322(b)(2) states "Subject to subsections (a) and (c) of this section, the plan may- ..... (2) modify
15   the rights of holders of secured claims, other than a claim secured only by a security interest in
16   real property that is the debtor's principal residence..."  This language is clear and the bankruptcy
17   courts have had no problem enforcing this prohibition on cram-down of loans secured only by a
18   security interest in real property that is the debtor's principal residence.
19       The effect of this specific language in Section 1325(a)(*) limiting the amount of the
20   contract that is protected from cram-down is to exclude the portion of the debt that is used to pay
21   off a prior debt. Appellant argues that In re Matthews applies only to loans for household goods
22   such as furniture and appliances, where the creditor extends new loans for household goods and
23   keeps a security interest in previously purchased household goods which were not purchased with
24   the proceeds of the subsequent loan.  However, what has happened in the world of expanding
25   commerce and expanding consumer credit is that vehicle lenders have copied the strategy of
26   furniture and appliance store lenders and are now financing not only the new collateral but also
27
28                                          8

1   paying off the prior loans secured by a trade-in vehicle. The analysis in <u>In re Matthews</u> regarding

2   purchase money security interest applies as much to a vehicle finance lender that pays off a

3   previous preexisting loan as it does to a furniture finance lender that pays rolls a previous loan

4   into a new loan secured by new collateral.   <u>In re Johnson</u>, 380 B.R. 236 (Bankr. D. Oregon,

5   2007) addresses the same issues of negative equity financing as the present case, and finds that <u>In</u>

6   <u>re Matthews</u> is "instructive for this case," and that "the financed negative equity is nothing more

7   than a refinance of the pre-existing debt owed on the Trade-in.  Accordingly, it does not create

8   the requisite close nexus between "value given" and the Johnsons' acquisition of rights in the

9   Vehicle." <u>In re Johnson</u> at page 247.

10          Unlike other Sections of Chapter 13 which refer to the treatment of secured claims such

11  as Section 1322(b)(2), the 910 rule specifically takes the added step of requiring that the secured

12  claim be a purchase money security interest.  This differs from the mere characterization of the

13  security interest as a secured claim.

14      Wells Fargo uses one sentence from a commentary (Keith M. Lundin, <u>Chapter 13</u>

15  <u>Bankruptcy</u>, 3rd ed 451.5-1 (200 + Supp. 2007-1)) which is cited in <u>Americredit v. Long</u>, 2008

16  WL 564798 (6th Cir. 2008), a case that does not deal with any negative trade in, to argue that

17  "Based upon the legislative history, there is little doubt that the "hanging-sentence architects

18  intended only good things for car lenders and other lienholders" (Wells Fargo brief at page 13).

19  Other courts that have considered the hanging paragraph do not agree at all with this rosy view

20  that the intent of Congress is clear. <u>In re Westfall</u>,  376 B.R. 210, 216, discussing the intent of

21  Congress states "As several courts have recognized, the Congressional intent behind the hanging

22  paragraph is unclear.....there is very little evidence to reflect what Congress intended by the

23  language it chose to enact in the hanging paragraph" (Citations omitted).    And <u>In re Trejos</u>, 352

24  B.R. 249, 253-254 (Bankr. D. Nevada 2006)  [affirmed by <u>In re Trejos</u>, 374 B.R. 210 (Ninth Cir.

25  BAP, 2007] noted "the number and diversity of these opinions reflects that the hanging paragraph

26  is a poorly drafted provision... Making practical sense of this provision... requires bankruptcy

27

28                                        9

judges to adopt the approach of the White Queen, and believe in "as many as six impossible things before breakfast." LEWIS CARROLL, ALICE'S ADVENTURES IN WONDERLAND & THROUGH THE LOOKING GLASS..." (multiple cites omitted).

### 6. CALIFORNIA COMMERCIAL CODE SECTION 9103 ET. SEQ.

California Commercial Code Section 9103 reads (in part) as follows:

**California Commercial Code Section 9103  Purchase-money security interest; application of payments; burden of establishing**

   **(a) In this section:**

   **(1) "Purchase money Collateral" means goods or software that secures a purchase money obligation incurred with respect to that collateral.**

      **(2) "Purchase money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for the value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.**

   **(b) A security interest in goods is a purchase money security interest as follows:**

      **(1) To the extent that the goods are purchse money collateral with respect to that security interest.**

   **(h) The limitation of the rules in subdivisions (e), (f) and (g) to transactions other than consumer goods transactions is intended to leave to the court the determination of the proper rules in consumer-goods transactions.  The court may not infer from that limitation the nature of the proper rule in consumer-goods transactions and may continue to apply established approaches.**

California Commercial Code Section 9103 et. seq. has never included negative equity financing in its definition of purchase money security interest.

Comment 3 states:

**3. "Purchase-Money Collateral"; "Purchase-Money Obligation"; "Purchase-Money**

10

1    Security Interest."  Subsection (a) defines "purchase-money collateral" and "purchase-

2    money obligation".  These terms are essential to the description of what constitutes a

3    purchase-money security interest under subsection (b).  As used in subsection (a)(2), the

4    definition of  "purchase-money obligation," the "price" of collateral or the "value given to

5    enable" includes obligations for expenses incurred in connection with acquiring rights in

6    the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage

7    in transit, demurrage, administrative charges, expenses of collection and enforcement,

8    attorney's fees, and other similar obligations.

9       The concept of "purchase-money security interest" requires a close nexus between the

10   acquisition of collateral and the secured obligation.  Thus, a security interest does not

11   qualify as a purchase-money security interest if a debtor acquires property on unsecured

12   credit and subsequently creates the security interest to secure the purchase price.

13      It should be noted that the California Automobile Sales Finance Act was enacted in 1962,

14   and was amended in 1999 to add financing of a negative trade-in amount; however the provisions

15   of Section 9103 or of Comment 3 have never been altered to specify negative equity financing as

16   an expense incurred in connection with acquiring rights in the collateral.   Instead, as seen below,

17   Comment 8 leaves the decision to the courts to determine if a disputed security interest is a

18   purchase money security interest.

19      In 2001, the State of California adopted the revised Uniform Commercial Code,

20   renumbering the various sections of the old Uniform Commercial Code.  The revised Code as

21   adopted in California Section 9103 has no precise definition of "purchase money security

22   interest" as it applies in consumer cases.  In business cases *only*, the state adopted prior case law

23   which indicated that California was a dual status state as opposed  to a transformation state.  This

24   means that in a business case, a security interest could be bifurcated with the result that part of

25   the security interest might be a purchase money security interest and part of it may be unsecured.

26   The transformation rule, rejected by the Code in business cases *only* states that if there is any

27

28                              11

1  refinancing or cross-collateralization of the collateral, then the entire amount is transformed to

2  non-purchase money security. U.C.C. Section 9103 Comment 7. *The state expressly declined to*

3  *adopt the dual status rule in consumer cases, instead leaving it up to the individual courts to*

4  *fashion a rule based upon the facts and circumstances before it.* U.C.C. Section 9103

5  Comment 8.

6        Most states have similar or identical provisions in their commercial codes, and there are

7  now a growing number of bankruptcy court cases that have adopted the same approach as In re

8  Acaya and have ruled that negative trade-in financing is not a purchase money security interest,

9  and that under the dual-status rule, the creditor is protected under Section 1325(a)(*) only to the

10  extent of the actual purchase price of the vehicle and (sometimes) other add-on such as sales

11  taxes, service contracts, and gap insurance that are specified in state versions of the UCC. The

12  following section is a survey of several of these cases.

13

14                    **7.    "DUAL STATUS" CRAM DOWN**

15        One of the first cases to apply the dual status rule is In re Vega, 344 B.R. 616 (Bankr., D.

16  Kansas, 2006). This case held that where there was a negative trade-in value included in the

17  secured 910 vehicle loan, only the portion of the loan that was actually used to acquire the

18  vehicle would be allowed as a purchase money lien. This case depends on the Kansas state law

19  definition of purchase money security.

20        The lender in Vega rolled the negative equity in the trade-in vehicle into a new loan, and

21  paid off the prior loan. The debtor did not contest that the actual purchase price of the vehicle

22  was secured by PMSI. "Here, Debtors argue they are not trying to cram down that part of UAC's

23  claim that is represented by the purchase price of the vehicle..." (In re Vega.at 621).

24        The Kansas court cited the Kansas statute defining PSMI: "an obligation of an obligor

25  incurred as all or part of the price of the collateral or for value given to enable the debtor to

26  acquire rights in or the use of the collateral if the value is in fact so used." The court further

27

28                                          12

1  noted that "A secured party claiming a purchase-money security interest has the burden of
2  establishing the extent to which the security interest is a purchase money security interest." (In re
3  Vega. at page 622).   Further, the court held that in Kansas, "the dual-status rule applies,
4  meaning that a creditor's purchase money status is not lost merely because of a refinancing or
5  infusion of new proceeds. Therefore, a security interest in goods is a PMSI to the extent that the
6  goods are purchase-money collateral, and non-PMSI as to the remainder." The court found that
7  Kansas had rejected the transformation rule under which a security interest would lose all of its
8  PMSI character if the collateral secured more than the price of the collateral or if the loan was
9  refinanced with the infusion of some new proceeds. Kansas had rejected a former provision of
10 the Kansas Commercial Code that generally leaves courts free to  apply case law to determine
11 whether a security interest loses its PMSI status in consumer-goods transactions. (Id. footnote 20
12 at 623).   Therefore, the court allowed a PMSI claim in the amount of the original vehicle claim
13 less the negative trade in value that was included in that claim. The negative trade in amount
14 would thus be treated as an unsecured claim.
15     In California, as in the Oregon, New York, Virginia, Ohio and North Carolina cases cited
16 below, state law gives courts and judges the authority, in consumer cases, to use the dual status
17 or the transformation rule.
18   In re Riach, (Bankr. D. Oregon, 2008) found that under Oregon's Article 9 the negative equity
19 was not an expense incurred in connection with acquiring the vehicle, it was an antecedent debt.
20 The court used the dual status rule to pro-rate the amounts to be paid under the hanging
21 paragraph and the amounts to be treated as a general unsecured claim.
22     In re Westfall, 376 B.R. 210 (Bankr. N.D. Ohio, 2007) looked to "a uniform federal
23 definition of purchase money security interest" rather than to state law,  however arrived at the
24 same result as In re Acaya in that the court applied the dual status rule to protect the actual
25 purchase money security interest of the creditor but treated the negative trade in as unsecured.
26 This case includes very extensive discussion of the meaning of Comment 8 and other authorities
27
28                                           13

1  regarding whether to apply state law or "uniform federal law". While most cases have applied
2  state law, this shows that the same result, i.e. using the dual status rule, can be reached via state
3  law or federal law.

4      In re Lavigne, 2007 WL 3469454 (Bankr. E.D. Va, 2007) consolidated four different
5  negative equity cases and found in each case that the negative trade-in financing did not give the
6  creditors a purchase money security interest. The court stated "Creditors now urge the Court to
7  expand the definition of "price" to swallow the well-established rule that purchase money
8  collateral cannot secure a non-purchase money obligation." The court specifically rejected the
9  creditors' arguments that "price" as defined in the Virginia retail installment sales statute could be
10  read in pari materia with the Virginia version of the UCC to reach the conclusion that financing
11  of negative equity could be a purchase money security interest. The court also specifically
12  rejected the reasoning of In re Peaslee, 373 B.R. 252, (W.D.N.Y. 2007), disagreeing with the
13  holding of In re Peaslee that the liability for the negative equity was incurred in connection with
14  acquiring the vehicle, and the Peaslee holding that negative equity enabled the debtors to
15  purchase the vehicles. "The elimination of prior indebtedness...is simply not essential to the
16  acquisition of a new motor vehicle." In re Lavigne, 2007 WL 3469454 at *8. The court used the
17  dual status rule to protect only the actual purchase money security interest, and in this case also
18  found that the extended warranty and insurance policies could not be included in the purchase
19  money security interest.

20      In re Pajot, 371 B.R. 139 (Bankr. E.D. Virginia, 2007) also consolidated four different
21  cases and found that negative equity was not part of the price of the new vehicles. The court held
22  that the dual status rule was appropriate, at least where negative equity amounts were easy to
23  determine and had not been obfuscated by creditors' methods of accounting for vehicle trade-ins,
24  and recognizing that a court could be inclined to use the transformation rule where the creditor
25  over-valued a trade-in in order to sell an overpriced used car, or otherwise created an "evidentiary
26  nightmare" in which the creditors' accounting made it difficult or impossible to sort out the

27

28                                    14

amounts credited to the trade-in. (In re Pajot at pages157-158). Interestingly, this court used the dual status rule to find that gap insurance was not part of the price of the vehicle, but an extended warranty was part of the price, and also found that the manufacturers' rebates had to be applied to the purchase price of the vehicle and could not be used to reduce the amount of the negative trade-in shown on the contract.

In re Conyers, 379 B.R. 576 (Bankr. M.D.N.C. 2007) also held that the financing of negative trade-in did not constitute a purchase money security interest, and applied the dual status rule to allow only the actual purchase money debt to be protected pursuant to Section 1325(a)(*).

In re Johnson, 380 B.R. 236 (Bankr. D. Oregon, 2007) is a well reasoned and extensive review of the cases on the issue of negative equity and reviews the debate over using state law versus federal law, the debate over the meaning of "price of the collateral", "value given to enable the debtor to acquire rights" "in pari materia" and other points of disagreement. In re Johnson applied the dual status rule to apportion the amount of the purchase money security interest and the amount of the general unsecured claim of Daimler-Chrysler. The court found that "Given that financing negative equity is increasingly common, it was not an oversight that the legislature did not include negative equity in the list of "expenses incurred in connection with acquiring rights in the collateral" set forth in Official Comment 3," citing In re Blakeslee, 377 B.R. 724 (Bankr. M.D. Fla. 2007). The legislature referred to here is the Florida legislature, but this applies just as much to the Oregon legislature or the California legislature, and no record has been found by this writer of any state that has changed its commercial code to include negative trade-in in the list of add-ons in Comment 3.

Article 9 of the UCC and the California Commercial Code represent a long-standing policy of encouraging creditors to extend purchase money loans, and such statutes give special protection to such loans; but this protection is not intended for the payment of prior loans. To extend the special protection to payment of prior loans would alter the long standing principals of

15

1  Article 9 at the expense of unsecured creditors and would contribute to the failure of many
2  Chapter 13 plans.

3

4         8.      "TRANSFORMATION" CRAM DOWN

5

6         Application of the transformation rule is found in In re Peaslee, 358 B.R. 545 (Bankr.
7  W.D.N.Y. 2006) [Reversed on appeal, In re Peaslee, 373 B.R. 252 (W.D.N.Y., 2007)]which
8  examined the same issues regarding the negative trade-in of a vehicle.  In Peaslee, GMAC had a
9  secured claim of $17,904.95 on a 910 vehicle and the Debtor's plan proposed treating $6954.95
10  of the vehicle claim as unsecured, due to the negative trade in value included in the GMAC
11  claim.
12         The court's decision cited the New York Commercial Code definition of PMSI  in Section
13  9103 as follows:
14         (1) "Purchase-money collateral" means goods or software that secures a
15         purchase-money obligation incurred with respect to that collateral; and (2)
16         "purchase-money obligation" means an obligation of an obligor incurred as
17         all or part of the price of the collateral or for value given to enable the
18         debtor to acquire rights in or the use of the collateral if the value is in fact so
19         used.
20         (b) Purchase-money security interest in goods. A security interest in goods is
21         a purchase-money security interest: (1) to the extent that the goods are
22         purchase-money collateral with respect to that security interest..."
23         These sections of the New York commercial code are identical to the current California
24  Section 9103.
25         After a detailed examination of  multiple arguments of the debtor and GMAC, as well as
26  the Chapter 13 Trustee's arguments that the court should adopt the transformation rule, rather
27

28                                                16

1   than the dual-status rule, because of the difficulty of trying to determine from numerous

2   complicated financing arrangements of vehicle dealers and lenders the exact amount of PMSI vs

3   non-PMSI claims, the court went on to hold that New York law allows judges the discretion of

4   choosing to use the dual-status rule or the transformation rule, and due to the "Evidentiary

5   nightmare"... "that would be experienced in the Bankruptcy Courts if they had to unwind the

6   manipulations included in so many of the retail installment contracts where negative equity on a

7   trade in has been rolled -in and refinanced in order to determine...." "the actual amount of debt

8   that is a purchase money obligation"... "it is reasonable to conclude that Congress would have

9   intended the Bankruptcy Courts to avoid making such determinations." (In re Peaslee at p.560).

10      In re Peaslee was then reversed by the District Court in 2007. The District Court adopted

11   the argument that refinancing of negative equity can be viewed as an expense incurred in

12   connection with acquiring rights in the new vehicle. However, it can be said that the District

13   Court's reversal of Peaslee had at least one basic finding in common with the cases cited above

14   that followed the dual status rule and did not allow purchase money security status to the

15   negative trade-in financing: they all found that the transformation rule was too severe and was

16   not intended or supported by the hanging paragraph.

17      Since Peaslee, many cases have used the dual status rule to disallow negative equity

18   financing as a purchase money security interest and this is the majority trend of bankruptcy courts

19   around the country. Cases that have adopted the transformation rule include In re Blakeslee, 377

20   B.R. 724 (Bankr. M.D. Fla. 2007). The lower court's decision in Peaslee found "manipulations"

21   as its reason for choosing the transformation rule, and is distinguished from Acaya, where the

22   court found that the portion of the loan used to pay off a prior loan was easily ascertainable, due

23   to the fact that California, like most states, has detailed requirements for disclosing exactly what

24   amounts are used to pay off a negative trade-in.

25      Another case that did not use the dual status rule is In re Look, 2008 WL 618926 (Bankr. D.

26   Maine 2008) which rejected the state rules for the use of dual status or transformation as

27

28                               17

1  irrelevant and used "plain language" of Section 1325(a)(*) to allow a cram-down of the entire

2  secured amount.

3

4  **9.    CALIFORNIA CIVIL CODE SECTION 2981 ET. SEQ., THE AUTOMOBILE**

5  **SALES AND FINANCE ACT, CANNOT BE USED TO ALTER THE MEANING OF**

6  **PURCHASE MONEY SECURITY INTEREST AS DEFINED BY SECTION 9103 OF**

7  **THE CALIFORNIA COMMERCIAL CODE.**

8

9      In each of the cases dealing with negative equity the court has reviewed the state's version

10  of the Automobile Sales Finance Act.   These state statutes appear to be similar to the California

11  Automobile Sales Finance Act, California Civil Code Section 2981 et. seq, known as the Rees-

12  Levering Act.

13      The purpose of this act is to protect unsophisticated car buyers by requiring detailed

14  disclosures in the contracts written by dealers and later assigned to lenders such as Wells Fargo.

15  "The legislative purpose in enacting the Rees-Levering Automobile Sales Finance Act was to

16  provide more comprehensive protection for the unsophisticated motor vehicle consumer" <u>Juarez</u>

17  <u>v. Arcadia Financial, Ltd</u>, 152 Cal. App. 4th 889 (Cal. Ct. App. (4th Dist.) 2007). The Rees-

18  Levering Act was designed to protect the unwary naive purchaser who is the victim of financing

19  arrangements controlled jointly by the seller and lender.  <u>Hernandez v. Atlantic Finance Co. of</u>

20  <u>Los Angeles</u>, 105 Cal. App. 3rd 65 (Cal. Ct. App. (2nd Dist.)1980). "When the Legislature

21  amended the ASFA in 1999 to revise the definition of "cash price" and the requirements for

22  itemizing the amount financed, its purpose was "to clarify how a creditor deals with the financing

23  of the vehicle if a trade-in is involved in a credit sale transaction and the amount of an existing

24  lien on the vehicle exceeds the value of the trade-in.... The amended statute conforms with

25  Regulation Z, which permits the financing of prior credit balances on trade-in vehicles as long as

26  the amount financed is clearly and separately disclosed in the "itemization of amount financed.""

27

28                              18

1 Thompson v. 10,000 RV Sales, Inc., 130 Cal App 4th 950 (Cal. Ct. App. (4th Dist.) 2005). The

2 California ASFA is a disclosure statute and its purpose is to protect unsophisticated automobile

3 buyers, so how could it be construed to alter long standing provisions of Article 9 and to allow

4 unlimited amounts of negative equity to be given the preferred status of a purchase money

5 security interest?

6       Wells Fargo argues that the treatment of negative equity in state laws affecting motor

7 vehicle financing is indicative of how Congress intended to treat negative equity in BAPCPA

8 (Appellant's Brief, page 17). Wells Fargo argues that since "cash price" is defined in Section

9 2981 to include "Payment of a prior credit or lease balance remaining on property being traded

10 in" Congress must have intended the negative trade-in balance to be part of the purchase money

11 obligation defined in Commercial Code Section 9103. But looking at the actual details of

12 California Civil Code Section 2981 et. seq. we can see that the contract disclosure requirements

13 of Section 2982 require specific and detailed disclosures on a dealer's contract, including

14 disclosure of "The cash price, exclusive of document preparation fees, business partnership fees,

15 taxes imposed on the sale, pollution control certification fees, prior credit or lease balance on

16 property traded in..." (emphasis added) as a separate item in the contract, and it requires the

17 negative trade-in amounts to be disclosed as a separate item in another part of the contract. This

18 indicates that negative equity is not part of the cash price of the vehicle. And see In re Johnson,

19 380 B.R. 236 at page 244 which states that the Oregon Motor Vehicle Retail Installment Sales

20 Act requires the negative trade-in amount to be listed separately from the cash sale price of the

21 motor vehicle, which indicates that negative equity is not part of the cash sale price.

22       It should be noted that most states appear to have substantially similar provisions in their

23 respective motor vehicle sales finance acts.

24       It should be noted further that the California ASFA has no reference to purchase money

25 security interest, so how could it redefine or change the definitions and interpretive comments of

26 Commercial Code Section 9103? In this regard it is helpful to remember that the definitions of

27

28                                   19

1   "Cash price" and other definitions in Section 9103 are prefaced with the limitation "As used in

2   this chapter, <u>unless the context otherwise requires</u>:" (emphasis added)

3

4

5

6   **10.**   <u>**CONGRESS DID NOT INTEND THE HANGING PARAGRAPH FOLLOWING**</u>

7   <u>**11 U.S.C. SECTION 1325(a)(9) TO ALLOW ABUSE BY AND A WINDFALL TO**</u>

8   <u>**AUTOMOBILE CREDITORS**</u>

9

10       Congress did not and could not have intended the hanging paragraph following Section

11   1325(a)(9) to allow abuse by or a windfall to, automobile creditors within the Chapter 13

12   context.

13       The 910 rule was designed to end the abusive practice of debtors purchasing cars on the

14   eve of bankruptcy, then filing bankruptcy and cramming down the value of the cars to the

15   replacement value. <u>In re Quevedo</u>, 345 B.R. 238, (Bankr. S.D. Cal. 2006). Congress did not

16   intend to create a new abuse by permitting secured creditors to add unlimited antecedent debt to

17   the purchase price of a car.

18

19   //

20   //

21   //

22

23

24

25

26

27

28                                                                20

1
2
3
4
### CONCLUSION
5
6
The In re Acaya decision anticipated and articulated what is now the majority trend in
7
cases dealing with negative equity in automobile financing.  In re Acaya upholds the authority of
8
judges to use the dual status rule provided in California Commercial Codes Section 9103 to
9
insure that purchase money security - "an exceptional category in the statutory scheme" - is
10
applied only if the security is given for the precise purpose as defined in the statute.
11
Appellee respectfully requests that this Court affirm the Bankruptcy Court Order.
12
13
14
15
16
Respectfully submitted,
17
18
Date: April 24, 2008
19

/s/ Shian MacLean
SHIAN MACLEAN
Attorney for Debtor
20
21
22
23
24
25
26
27
28

21