Case No. C07-02851-JF

# United States District Court
# Northern District of California
# San Jose Division

———————

**WELLS FARGO FINANCIAL CALIFORNIA, INC.,
SUCCESSOR BY MERGER TO WELLS FARGO FINANCIAL
ACCEPTANCE CALIFORNIA, INC.,**

*Appellant,*

**vs.**

LETICIA I. ACAYA,

*Appellee.*

———————

# Appellant's Reply Brief

———————

Appeal from an Order of the United States Bankruptcy Court for the Northern District of
California, San Jose Division (No. 06-51741 MM),
on Objection to Confirmation of Chapter 13 Plan

The Honorable Marilyn Morgan, United States Bankruptcy Judge

———————

DAVID G. EPSTEIN (PRO HAC VICE)
**HAYNES AND BOONE, LLP**
901 Main Street, Suite 3100
Dallas, TX 75202-3789
Telephone: (214) 651-5000

DONALD H. CRAM, III (SBN 160004)
**SEVERSON & WERSON**
A Professional Corporation
One Embarcadero Center, 26th Floor
San Francisco, CA 94111-3600
Telephone: (415) 398-3344

Attorneys for Appellant
**Wells Fargo Financial California, Inc.**

# CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a)

Certificate of Compliance With Type-Volume Limitations, Typeface Requirements, and Type Style Requirements

1.     This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,281 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word XP in 14 point font size and New Times Roman type style.

Dated: May 9, 2008

HAYNES AND BOONE, LLP

By /s/David G. Epstein
   David G. Epstein

SEVERSON & WERSON
A Professional Corporation

By /s/Donald H. Cram, III
   Donald H. Cram, III

Attorneys for Appellant Wells Fargo Financial California, Inc.

# TABLE OF CONTENTS

*Page*

I.    THE ISSUE BEFORE THE COURT IN THIS CASE IS AN ISSUE OF
      INTERPRETATION AND APPLICATION OF §1325(a)(*) OF THE
      BANKRUPTCY CODE ........................................................................ 1

      A.    Reflecting Established Business Practices ......................................... 2

      B.    Looking to Statutory Scheme as Whole ............................................. 4

      C.    Attributing Rational Purpose to Congress .......................................... 6

II.   EXISTING STATE LAWS AFFECTING MOTOR VEHICLE
      FINANCING ARE RELEVANT AS INDICATIVE OF
      CONGRESSIONAL INTENT AND CONSISTENT WITH WELLS
      FARGO'S POSITION ........................................................................... 7

      A.    Distinguishing *Butner* ..................................................................... 7

      B.    Looking to How a California Bankruptcy Court Views California
            Civil Code §2981 in Interpreting §1325(a)(*) .................................... 9

      C.    Looking at How Courts View UCC §9-103 in Interpreting
            §1325(a)(*) ...................................................................................... 11

III.  THERE IS NO FACTUAL BASIS FOR DEBTOR'S USE OF THE TERM
      "ABUSE," AND THERE IS NO LEGAL BASIS FOR THE DEBTOR'S
      USE OF THE TERM "WINDFALL" ..................................................... 16

IV.   CONCLUSION .................................................................................... 18

# TABLE OF AUTHORITIES

*Page(s)*

*Cases*

*Barnhill v. Johnson,*
      503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992) .................................. 3

*In re Burt,*
      378 B.R. 352 (Bankr. Utah 2007)................................................................ 8

*Butner v. United States,*
      440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) .................................. 7, 8

*Carpenters Health & Welfare Trust Funds v. Robertson (In re Rufener Constr.),*
      53 F.3d 1064 (9th Cir. 1995) ......................................................................... 4

*Christensen v. C.I.R.*
      2008 WL 1777474 (9th Cir. 2008) ........................................................... 4, 5

*In re Cohrs,*
      373 B.R. 107 (Bankr. E.D. Cal. 2007)...................................9, 10, 11, 12, 13

*Diaz v. Gates,*
      420 F23d  897 (9th Cir. 2005) ..................................................................... 6

*In re Dunlap,*
      383 B.R. 113 (Bankr. E.D. Wis. 2008).................................................... 3, 4

*In re Grand Chevrolet, Inc.,*
      25 F.3d 728 (9th Cir. 1994) ........................................................................ 15

*In re Johnson,*
      380 B.R. 236 (Bankr. Ore. 2007)....................................................13, 14, 15

*Longview Fibre Co. v. Rasmussen,*
      980 F.2d 1307 (9th Cir. 1992) ..................................................................... 6

*In re Peaslee,*
      373 B.R. 252 (W.D. N.Y. 2007)............................................................... 3, 8

*In re Petrocci,*
      370 B.R. 489 (Bankr. N.D.N.Y. 2007)...................................................... 10

## TABLE OF AUTHORITIES

*Page(s)*

*In re Purdy,*
    373 B.R. 142 (Bankr. N.D. Fla. 2007)............................................................ 6

*In re Townsend,*
    2008 WL 920610 (Bankr. Kan. 2008)...................................................... 14, 15

*United States v. Ron Pair Enterprises,*
    489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) .............................. 14

*In re Vinson,*
    2008 WL 319678 (Bankr. S.C. 2008)............................................................. 5

*In re Wear,*
    2008 WL 217172 (Bankr. W.D. Wash. 2008)............................................... 14

*W. Coast Truck Lines, Inc. v. Arcata Cmty. Recycling Ctr., Inc.,*
    846 F.2d 1239(9th Cir. 1988) ........................................................................ 4

*In re Wright,*
    492 F.3d 829 (7th Cir. 1999) ......................................................................... 5

*Statutes*

United States Code
    Title 11
            Section 506 ........................................................................5, 8

            Section 522 ........................................................................... 7

            Section 547 ........................................................................7, 15

            Section 1325 .................................................................*passim*

Uniform Commercial Code

            Section 9-103 ...........................................................11, 13, 14, 16

California Civil Code

            Section 2981 ......................................................................9, 10

10749/0929/669165.1

# TABLE OF AUTHORITIES

*Page(s)*

California Commercial Code

      Section 9103 ................................................................ 9, 10, 11

      Section 9201 ................................................................ 10

*Other Authorities*

H.R. Rep. No. 109-31, pt. 1, at 554 (2005)............................................. 5

Barry E. Adler, *The Questionable Axiom of Butner v. United States*,
    http://papers.ssrn.com/sol3/papers.cfm?abstract_id=954153Da ................... 7

## I.    THE ISSUE BEFORE THE COURT IN THIS CASE IS AN ISSUE OF INTERPRETATION AND APPLICATION OF §1325(a)(*) OF THE BANKRUPTCY CODE

In entering a final order confirming the Debtor's Chapter 13 plan and denying an objection to confirmation of the Debtor's Chapter 13 Plan filed on behalf of Wells Fargo Financial California, Inc., a successor to by merger to Wells Fargo Financial Acceptance California, Inc. ("Wells Fargo"), the Bankruptcy Court was applying and interpreting Chapter 13 of the Bankruptcy Code.  Section 1325(a)(1) expressly conditions plan confirmation on the debtor's proving and the bankruptcy judge's finding that, "The plan complies with the provisions of this chapter [Chapter 13]."

The essence of Wells Fargo's objection was that the Debtor's plan did not comply with §1325(a)(*)  and so could not be confirmed under §1325(a)(1).  The essence of Wells Fargo's opening brief is that the Bankruptcy Court erred in interpreting and applying §1325(a)(*) -- that excluding automobile financing transactions with a negative equity component from BAPCPA's strip-down protection is an erroneous interpretation and application of §1325(a)(5)(*).

The Appellee's brief can be read as also treating the question before the Court in this case as a question of what Congress intended by enacting §1325(a)(*).  At least three of the ten numbered points in the Appellee's brief (1,

5, and 10) raise questions related to what Congress intended in enacting §1325(a)(*).

## A.    Reflecting Established Business Practices

In the first of the numbered arguments in the Appellee's brief, the Debtor seems to be arguing that Congress or the courts should prevent other people from being able to buy a new car the way she did.  The Bankruptcy Court describes the way that the Debtor bought her new Cavalier as follows:

> Acaya financed the purchase of the Cavalier with a loan from the dealer, executing a Motor Vehicle Contract and Security Agreement * * * **To facilitate the purchase,** Acaya traded in her 2003 Ford Taurus * * * The dealer rolled into the new loan the negative equity of $6,683, which is the difference between the outstanding balance on the Ford Taurus and that vehicle's trade in value. * * * The dealer subsequently assigned the Motor Vehicle Contract & Security Agreement to WFFA." (emphasis added).

(ER 9, p. 76-77).

The transaction in this case is a common transaction.  Most people buy cars on credit, financing the purchase of the car with dealer.  Most new car financings involve a trade-in.  Many involve a trade-in with a negative equity.

The Debtor now argues that is not how people *should* buy cars – that is not how the world *should* work: "the financing of negative equity in automobile loans simply puts more consumers at risk of insolvency and makes it more likely that

more bankruptcies will be filed." Appellee's Brief, p. 5. That argument raises interesting questions about this country's economic and social policies – questions that perhaps Congress should at some point address.

The "underlying argument of Wells Fargo" is not that financing negative equity in a trade-in is a good public policy" (But cf. Appellee's Brief, p. 4). Rather, Wells Fargo in its opening brief argues that, (1) negative equity automobile financing is an established business practice, and (2) it is good public policy to interpret statutes regulating commercial behavior in a way that is consistent with established business practices.[1]

And, this argument is supported by UCC §1-102 and case law. Consider the following statement from *In re Dunlap*, 383 B.R. 113, 118-119 (Bankr. E.D. Wis. 2008):

> Rolling in the balance due on a trade-in vehicle as part of the amount financed for the purchase of a new vehicle is a common practice in the automobile industry, which clearly facilitates commerce. *Peaslee II*, declares that Uniform Commercial Code provisions are intended "to permit the continued expansion of commercial practices through custom usage and agreement of the parties." Wis. Stat. § 401.102(1) declares that the Uniform Commercial Code provisions "shall be liberally

---

[1] In his dissenting opinion in *Barnhill v. Johnson*, 503 U.S. 393, 403, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992), Justice Stevens stated: "Insofar as possible, it is wise to interpret statutes regulating commercial behavior consistent with established practices in the business community."

construed and applied to promote its underlying purposes and policies." These declarations are consistent with this court's conclusion that negative equity is part of Nissan's PMSI.

## B.    Looking to Statutory Scheme as Whole

In interpreting and applying §1325(a)(*) courts should consider not only the business context but also the statutory context.  The United States Court of Appeals for the Ninth Circuit recently explained its methodology in interpreting a provision of the Internal Revenue Code in *Christensen v. C.I.R.*, 2008 WL 1777474 (9th Cir. 2008):

> [w]e do more than view words or sub-sections in isolation. We derive meaning from context, and this requires reading the relevant statutory provisions as a whole." *Carpenters Health & Welfare Trust Funds v. Robertson (In re Rufener Constr.),* 53 F.3d 1064, 1067 (9th Cir. 1995) (citations omitted).  In addition, we look to the language of the statutory scheme as a whole to interpret the particular statutory provision. *W. Coast Truck Lines, Inc. v. Arcata Cmty. Recycling Ctr., Inc.,* 846 F.2d 1239, 1242 (9th Cir. 1988).

Section 1325(a)(*) is a part of BAPCPA.  Looking at BAPCPA as a whole, BAPCPA channels individual debtors with financial means from Chapter 7 to Chapter 13.  Prior to BAPCPA, most of these debtors filed for Chapter 7.

Without some limitation on strip down in BAPCPA, Chapter 13 debtors, most of whom are in Chapter 13 because of BAPCPA, could replace a secured debt of what the debtor agreed to pay with a new lower secured debt of what the

bankruptcy court concluded the car was then worth. Section 1325(a)(*) was added to address that issue – to give secured creditors "fair treatment" in post-BAPCPA consumer bankruptcy.[2]

Section 1325(a)(*) is part of Public Law 109-8, Section 306, 119 Stat. 80, entitled "Giving Secured Credit Fair Treatment in Chapter 13." *In re Wright*, 492 F.3d 829, 832 (7th Cir. 2007), looked to this Public Law caption and concluded: "This implies replacing a contract defeating provision such as [Section] 506 with the agreement freely negotiated." See also, *Christensen v. C.I.R.*, 2008 WL 1777474 (9th Cir, 2008) ("Here our first indication of the statute's scope is set out in the title").

---

[2] *In re Vinson*, 2008 WL 319678 (Bankr. S.C. 2008), Involved the very same question now before this Court. The court held "[T]he negative equity was an item rolled into the contract and financed to assist the Debtors in the ultimate goal of taking the car home, and it did not destroy the purchase money nature of the debt." In so holding, the court explained, "[T]his result is also consistent with the legislative history of the flush language and reflects Congress's intent to protect certain secured creditors under § 506. * * *. Members of Congress dissenting from enactment of the S.256 also recognized that [S.256] would largely eliminate the possibility of loan bifurcations in chapter 13 cases. Under current law a debtor is permitted to bifurcate a loan between the secured and unsecured portions. The debt is treated as a secured debt up to the allowed value of the property securing the debt. The remainder of the debt is treated as a non-priority unsecured debt. Section 306 of [S.256] prevents such bifurcation (including with regard to the interest and penalty provisions) with respect to any loan for the purchase of a vehicle in the 910 days before bankruptcy. H.R. REP. No. 109-31, pt. 1, at 554 (2005), *as reprinted in* E-2 COLLIER ON BANKRUPTCY at App. Pt. 10-903 (Lawrence P. King et al. eds., 15th ed. Revised 2005).

## C.    Attributing Rational Purpose to Congress

As the Ninth Circuit instructed in *Longview Fibre Co. v. Rasmussen*, 980 F.2d 1307, 1311 (9th Cir. 1992), statutory construction involves "attributing a rational purpose to Congress."  Similar statements can be found in other Ninth Circuit opinions[3] and in opinions of bankruptcy courts interpreting BAPCPA. For example, "it is absurd to construe a statute in a way that does not make sense or is in opposition to the stated goals of its enactment."  *In re Purdy*, 373 B.R. 142, 157 (Bankr. N.D. Fla. 2007).

The stated purpose of §1325(a)(*) is to provide fair treatment to secured creditors in Chapter 13.  It makes no sense to interpret §1325(a)(*) so as to exclude most car financings from this fair treatment.  It makes no sense to interpret a provision, introduced initially by a senator from Michigan, in a way that makes it much more difficult for people to buy automobiles.

It is not that the social policies advocated by the Debtor in the Appellee's brief are absurd.  Rather, it is absurd to attribute these social policies to the Congress that enacted BAPCPA.

---

[3]  "As Judge Learned Hand wrote, 'statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning. If the statute as construed one way makes sense, and as construed another does not make any sense and is wholly arbitrary, the wholly arbitrary construction is a dubious attribution of fecklessness to the legislature.'" *Diaz v. Gates*, 420 F23d  897, 905 (9th Cir. 2005) (concurring opinion by Judge Kleinfeld)

## II.    EXISTING STATE LAWS AFFECTING MOTOR VEHCILE FINANCING ARE RELEVANT AS INDICATIVE OF CONGRESSIONAL INTENT AND CONSISTENT WITH WELLS FARGO'S POSITION

At least three (possibly four) of the ten numbered points in the Appellee's brief focus on California law. State law can be an important part of bankruptcy law. There are Bankruptcy Code provisions such as §522 on exemptions and §547 on preferences that expressly incorporate state laws. Section 1325(a)(*) does not expressly incorporate state law.

### A.    Distinguishing *Butner*

There are reported cases that address the role of state law in bankruptcy. *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) is the most cited (and mis-cited) case.

*Butner* involved the question of the effect of bankruptcy on a state law right of a mortgagee to rents. No provision of the Bankruptcy Act was involved in *Butner*. "Rather, *Butne*r was a case in which the bankruptcy process threatened to interfere with a state law entitlement and the courts had to decide how to address such interference." See Barry E. Adler, *The Questionable Axiom of Butner v. United States*, http://papers.ssrn.com/sol3/papers.cfm?abstract_id=954153.

The question before this Court could not be more different from the question that the Supreme Court addressed in *Butner*. There is no state law

entitlement to strip down car loans.  None of the California statutes discussed in the Appellee's brief provides for the strip down of car loans.  This is a case in which the Debtor is arguing that she has an entitlement under Chapter 13 of the Bankruptcy Code.  Moreover, unlike *Butner*, which involved the effect of the bankruptcy process, not any  particular Bankruptcy Act provision, on a state law right, this case involves the effect of one Bankruptcy Code provision – §1325 (a)(*)  on others – §§506 and 1325(a)(5).

State law is relevant because we have to assume that when Congress added protection for "purchase money" car financing transactions to BAPCPA, Congress knew what it had previously done as well as what state legislatures had previously done with regard to purchase money financing of motor vehicles.  That is why Wells Fargo's opening brief discussed: (1) Truth in Lending (TILA), (2) state motor vehicle sales law, and (3) the Uniform Commercial Code (UCC)  – to highlight what Congress is deemed to have understood when it enacted §1325(a)(*) and, thus, to understand what Congress intended.  That is why the courts in cases such as, *General Motors Acceptance Corp. v. Peaslee*, 373 B.R. 252 (W.D.N.Y. 2007) and *In re Burt*, 378 B.R. 352 (Bankr. D. Utah 2007), looked to these statutes in concluding that Congress intended to protect car financings with negative equity components from Chapter 13 "strip downs."

10749/0929/669165.1

- 8 -

**B.    Looking to How a California Bankruptcy Court Views California Civil Code §2981 in Interpreting §1325(a)(*)**

Again, we look at state law because Congress is presumed to know what state legislatures had already done with regard to purchase money financing of motor vehicles.   Appellee's brief argues "California Civil Code Section 2981, the Motor Vehicle Sales Act, cannot be used to alter the meaning of purchase money security interest as defined by section 9103 of the California Commercial Code." Appellee's Brief, pp. 18-20.

Debtor's argument is not the relevant argument.   We should be arguing about what §2981 tells us about §1325(a)(*) of the Bankruptcy Code, not about what it tells about §9103 of the California Commercial Code.

Furthermore, Debtor's argument about the relationship of §2981 and §9103 is wrong.  *In re Cohrs*,  373 B.R. 107, 110-11 (Bankr. E.D. Cal. 2007) discusses this relationship at length:

> [O]ther California law supports the notion that financing negative equity owed on a vehicle traded in as part of the purchase of a new vehicle is considered part of the price paid for the new vehicle. Cal. Civil Code § 2981(e) provides:
>
> "'Cash price' means the amount for which the seller would sell and transfer to the buyer unqualified title to the motor vehicle described in the conditional sale contract, if the property were sold for cash at the seller's place of business on the date the contract is executed,

and shall include taxes to the extent imposed on the cash sale and the cash price of accessories or services related to the sale, including, but not limited to, delivery, installation, alterations, modifications, improvements, document preparation fees, a service contract, a vehicle contract cancellation option agreement, and *payment of a prior credit or lease balance remaining on the property being traded in.*" [Emphasis added.]

And, not only does section 2981 suggest to the court that section 9103 should be interpreted consistently to include negative equity within the definition of a purchase money obligation, but California's version of Article 9 of the Uniform Commercial Code is expressly made subject to section 2981. Cal. Comm. Code § 9201(b) provides that "[a] transaction subject to this division is subject to any applicable rule of law which establishes a different rule for consumers [including] ... the Automobile Sales Finance Act, Chapter 2b (commencing with Section 2981)...."

The court agrees, given section 9201(b), that sections 9103(a)(2) and section 2981 should be interpreted consistently. *See also In re Petrocci,* 370 B.R. 489 (Bankr. N.D.N.Y. 2007). As a result, in the context of auto sales, the value given to acquire a vehicle includes negative equity in a vehicle traded in as part of the purchase price of a new vehicle. Hence, a lender financing such a transaction acquires a purchase money security interest and the debtor incurs a corresponding purchase money obligation.

Therefore, section 1325(a)(*) is applicable and the debtor may not strip down Americredit's secured claim to the value the truck had on the petition date.

### C.    Looking at How Courts View UCC §9-103 in Interpreting §1325(a)(*)

The *Cohrs* opinion also explained how the Uniform Commercial Code definition of "purchase money security interest" supports treating car financings with negative equity components as "purchase money security interests" in §1325(a):

> [C]alifornia's version of the Uniform Commercial Code ties the definition of a "purchase money security interest" to the definitions of "purchase money collateral" and "purchase money obligation." Under section 9103, a debt for the "price" or the "value given to enable the debtor to acquire rights in" a car is a "purchase money obligation. * * * The phrase, "value given to enable the debtor to acquire rights in" purchase money collateral is broad enough to include the "negative equity" financed by a lender like Americredit.[4]
>
> This interpretation is supported by a Comment of the drafters of the Uniform Commercial Code. * * * This court reads section 9103 and Comment 3 to require only a "close nexus" between the acquisition of the property

---

[4] The Debtor now argues that she should not have been "enabled" to buy the car on credit – that what would "truly enable this debtor" is "to wait to buy a new vehicle." Appellee's Brief, p. 5. Again, it is an argument that raises interesting social questions. It is also an argument that makes a novel use of the word "enable." The Debtor seems to use "enable" as requiring that the credit transaction be one that that can be repaid. *Id.* ("to pay the sales contract"). The definition of "purchase money security interest" in §9-103 provides the conventional use of "enable:" "enable the debtor to acquire rights in the collateral." The financing of negative equity **did** enable the debtor to acquire rights in the collateral. Using the language of the online dictionary definition in the Appellee's brief on page 5, the financing of negative equity "made it possible, practical, or easy" for the Debtor to acquire rights in the Cavalier. Or, to use again the language of the bankruptcy court opinion – "facilitate the purchase." (ER 9, p. 77).

and the secured obligation. That is, it must be part of a single transaction and all components of the obligation incurred must have been for the purpose of acquiring the property securing the new obligation.

So, if a debtor borrows money both to finance a new vehicle and to pay off a debt encumbering his or her existing vehicle, but does not trade in that vehicle to the seller, this court would conclude that the inclusion of the pay-off amount in the loan destroys its purchase money character. But here, the debtor traded in his existing vehicle to the seller as part of the value given to acquire the truck.

The *Cohrs* reasoning is reflected in the opening brief filed by Wells Fargo and is consistent with Wells Fargo's position.

The Debtor in Appellee's brief mischaracterizes Wells Fargo's "main" argument as, "since negative trade-in financing is so common, it must be similar to taxes, registration fees, service contracts and gap insurance." Appellee's Brief, p. 6. One of Wells Fargo's arguments is that courts do and should consider existing business practices in interpreting and applying commercial statutes. Another of Wells Fargo's arguments is that "expenses incurred in connection with acquiring rights in the collateral" do not have to "be similar to taxes, registration fees, service contracts and gap insurance."

Appellee's brief also mischaracterizes service contracts and gap insurance as executory contracts that can be rejected with funds returned to the Debtor. Appellee's Brief, p. 6. That is not correct, nor is it relevant.

10749 0929 669165.1

Similarly, there is no basis in the Official Comment to §9-103 to give relevance to the Debtor's argument that negative equity is the "largest add-on." Appellee's Brief, p. 6. As *Cohrs* and other reported decisions emphasize, the test is a "close nexus" test.

Later in the Appellee's brief, the Debtor quotes from *In re Johnson*, 380 B.R. 236 (Bankr. Ore. 2007) for the proposition that the requisite close nexus is lacking. Appellee's Brief, p. 9. The bankruptcy court in *Johnson* quoted and based its decision on the following language in Official Comment 3 to §9-103:

> [T]he "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.

According to the *Johnson* opinion, "[N]egative equity is not similar in nature or scope to the 'other expenses incurred in connection with acquiring rights in the collateral' contemplated by Official Comment 3." *In re Johnson*, 380 B.R. at 243. This application of the *ejusdem generis* rule is erroneous. The phrase, "obligations for expenses incurred in acquiring rights in the collateral," begins the list in the Official Comment excerpt set out above and is set off by commas from the rest of the items that follow, thereby indicating that an expense incurred in acquiring rights in the collateral qualifies as a purchase-money obligation

regardless of whether it is "similar in nature or scope" to the rest of the items in the list.  Cf., *United States v. Ron Pair Enterprises*, 489 U.S. 235, 241-242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

*Johnson* also erroneously concludes, "[T]hat liability necessarily preceded the acquisition," is relevant in applying §1325(a)(*).  *In re Johnson,* 380 B.R. at 243.[5]  Neither *Johnson* nor the Debtor refer to any language in Bankruptcy Code §1325(a)(*) or UCC §9-103 that provide a basis for this "pre-existing debt" to someone else limitation.   Neither *Johnson* nor the Debtor acknowledge that the Debtor had no such obligation until the Debtor "incurred [the negative equity obligation] in connection with acquiring rights in the collateral."

Again, one need only look to the language in Official Comment 3 to §9-103, quoted and relied upon by *Johnson*.  "Freight charges" and "costs of storage" are all liabilities that preceded the acquisition.  As stated in *In re Townsend*, 2008 WL 920610 (Bankr. Kan. 2008), "[I]t [Official Comment 3] is expansive in the types of expenses included.  There is no express limitation requiring that the items

---

[5]  It should be noted that *In re Wear*, 2008 WL 217172 (Bankr. W.D. Wash. 2008) follows *Johnson*.

in addition to the purchase price be incurred at the time of the acquisition of the collateral, and only some of the items listed would fit into this time frame."[6]

Comparing the language of Bankruptcy Code §547(c)(3) and the language of §1325(a)(*) further refutes the *Johnson* conclusion that the fact that negative equity is a liability that preceded the acquisition is somehow disqualifying. Note the limiting phrase, "to the extent that such security interest secures new value that was given at or after the signing of a security agreement." There is no similar time-limiting phrase in §1325(a)(*).[7] The relationship between the time of the debt and the time of the transfer matters in applying §547 preference principles. The relationship between the purpose of the obligation and the collateral is what matters in applying §1325(a)(*) strip-down protection principles.

In sum, *Johnson*'s conclusion that, "the financed negative equity is nothing more than the refinance of the pre-existing debt owed on the Trade-In,"[8] is inconsistent with the facts, inconsistent with existing business practices,

---

[6] *Townsend* held that forced-place insurance is included in the purchase money security interest protected by §1325(a)(*)

[7] And, the words "purchase money security interest" are not part of §547(c)(3). Nonetheless, §547(c)(3) is sometimes referred to as the "purchase money exception." See *In re Grand Chevrolet, Inc.*, 25 F.3d 728, 731 (9th Cir. 1994).

[8] *In re Johnson*, 380 B.R. at 247.

inconsistent with Official Comment 3 to §9-103, and inconsistent with Congressional intent.

## III.  THERE IS NO FACTUAL BASIS FOR DEBTOR'S USE OF THE TERM "ABUSE," AND THERE IS NO LEGAL BASIS FOR DEBTOR'S USE OF THE TERM "WINDFALL"

Debtor's last point uses the terms "abuse" and "windfall" in describing the effect of §1325(a)(*).  "**<u>CONGRESS DID NOT INTEND THE HANGING PARAGRAPH FOLLOWING 11 U.S.C. SECTION 1325(a)(9) TO ALLOW ABUSE BY AND A WINDFALL TO AUTOMOBILE CREDITORS.</u>**" Appellee's Brief, p. 20.  There is no basis in the record in this case for use of the term "abuse."   There is no evidence or allegation of duress and/or unconscionability.  Debtor wanted a new car.  Wells Fargo made that possible.

Debtor now seems to be arguing that Wells Fargo should not have made that possible – that this Court should read §1325(a)(*) to protect the Debtor from being able to buy a new car.  This Court's reading of §1325(a)*) so as to end negative equity car loans is not going to prevent people from buying new cars when it would be more prudent to save their money.  Such a ruling would simply increase the costs of car financing.

Consider the following example:  Suppose that the Debtor borrowed the money from Friendly Finance to pay off the negative equity on the trade-in at an interest rate of 18%.  To obtain this loan, she signed a note and security agreement

on the new Cavalier. This transaction would be treated as a "purchase- money" transaction under §9-103 since Friendly Finance would have given "value" (the loan) which "enabled" the Debtor to acquire rights in or use of the collateral. This is precisely what happened in the transaction before the Court except that Debtor did not have to incur the additional costs of a second loan at 18%.

The argument that Wells Fargo is looking for windfall is similarly without support. Wells Fargo is not looking for a "windfall." It is simply arguing that Congress decided that "fair treatment" for creditors that enable debtors to buy automobiles is to protect them for strip down – protect them from a customer agreeing to pay $17,099.89 and then less than a year later changing that amount to $9,757.

The only parties who would benefit from the Court's ruling in Appellee's favor in this case are credit card companies and other unsecured creditors. Chapter 13 requires a commitment of all of debtor's disposable income to the Chapter 13 plan. 11 U.S.C. §1325(b). If the Court interprets §1325(a)(*) in a manner that allows a debtor to reduce the amount the debtor contractually promised to pay the lender that enabled him or her to buy a new car by $10,000, that does not put $10,000 in the debtor's pocket – that simply puts $10,000 more in the pockets of unsecured creditors. In other words, the Court's adoption of the Debtor's approach to §1325(a)(*) would result in a "windfall" for credit card

issuers and other unsecured creditors and would result in an "abuse" of automobile financers.

That is not what Congress intended as fair treatment of secured creditors in a post-BAPCPA Chapter 13.  That is not how this Court should interpret what Congress said in §1325(a)(*).

## IV.    CONCLUSION

For the reasons set out above, Wells Fargo respectfully requests that the Court reverse the Bankruptcy Court Order and hold that car financing transactions that include negative equity are protected in their entirety from "strip-down" by §1325(a)(*) of the Bankruptcy Code.

Dated:  May 9, 2008                              HAYNES AND BOONE, LLP


                                                 By /s/David G. Epstein
                                                     David G. Epstein

                                                 SEVERSON & WERSON
                                                 A Professional Corporation


                                                 By /s/Donald H. Cram, III
                                                     Donald H. Cram, III

                                                 Attorneys for Appellant Wells Fargo
                                                 Financial California, Inc.

### PROOF OF SERVICE

I, the undersigned, declare that I am over the age of 18 and am not a party to this action. I am employed in the City and County of San Francisco, California; my business address is Severson & Werson, One Embarcadero Center, Suite 2500, San Francisco, CA 94111.

On the date below I served copies of the **Appellant's Reply Brief** on all interested parties and courts in said case addressed as follows:

Shian MacLean
Law Offices of Rodney M. Kleman
400 Camino El Estero
Monterey, CA   93940


I caused an envelope to be deposited in the mail at San Francisco, California, with postage thereon fully prepaid. I am readily familiar with the firm's practice of collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in San Francisco, California in sealed envelopes with postage fully prepaid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. This declaration is executed in San Francisco, California, on May 9, 2008.


/s/John Bertinetti
            John Bertinetti